UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JUSTINE SHEU and
GABRIELA GUI

                                        No. _____

              Plaintiffs,

vs

DETROIT 90/90, a Michigan non-profit corporation,
BOARD OF DIRECTORS of Detroit 90/90,
A.I. CENTRAL, LLC, a Michigan limited liability company
AXIOS INTERNATIONAL, INC., a Michigan corporation,
AXIOS, INCORPORATED, a Michigan corporation,
BOARD OF DIRECTORS of Axios Incorporated,
PUBLIC SCHOOL ACADEMIES OF DETROIT,
a public corporation and government agency, and,
BOARD OF EDUCATION of the Public School Academies of
Detroit, a public body.

              Jointly and Severally,

              Defendants.
_____/

**COMPLAINT AND JURY DEMAND**

      The Plaintiffs sue the defendants for damages, injunctive and other relief as follows:

**PARTIES**

    1.      The plaintiff  Justine Sheu is an individual who resides in Wayne County,

Michigan.

    2.      The plaintiff  Gabriela Gui is an individual who resides in Wayne County,

Michigan.

3.      The defendant Detroit 90/90 is a non-profit corporation organized under the laws of the State of Michigan.  The defendant's principal place of business is in Wayne County, Michigan.  The defendant is a management company responsible for managing the day to day operations of the UPrep Schools:  University Prep Academy (elementary, middle and high schools) and University Prep Science and Math Academy (elementary, middle and high schools), which are public school academies (aka/charter schools) in the school districts operated by the Public School Academies of Detroit.

4.      The defendant Board of Directors of Detroit 90/90 is comprised of the persons appointed or elected according to law who are authorized to manage and direct the affairs of Detroit 90/90.  The Directors are sued in their official capacities.

5.      The defendant A.I. Central, LLC is a corporation organized under the laws of the State of Michigan. The defendant's principal place of business was in Kent County, Michigan. But the defendant also conducted business in Wayne County, Michigan.  Per a PEO (professional employment organization) co-employment arrangement, A.I. Central, LLC was a co-employer, first with New Urban Learning, and then with Detroit 90/90, of the teachers and other staff at the University Prep Academy School District and University Prep Science and Math School District during all times relevant to this Complaint.  On December 31, 2011, A.I. Central, LLC merged with Axios International, Inc. and the surviving entity is Axios International, Inc.

6.      Defendant Axios International, Inc. is a corporation organized under the laws of the State of Michigan. The defendant's principal place of business is in Kent County, Michigan. By merger with A.I. Central, LCC, Axios International, Inc. assumed all of the liabilities of A.I. Central, LCC.

7.     Axios Incorporated is a corporation organized under the laws of the State of Michigan. The defendant's principal place of business is in Kent County, Michigan.   In a document presented to Gabriela Gui on June 27, 2014, the title of the management company for UPSM is designated as "Detroit 90/90 - Axios, Inc. a Michigan corporation (f/k/a A.I. Central, L.L.C.)"  To the extent that A.I. Central is now known as "Axios, Inc." or has merged with Axios Incorporated, the plaintiffs also designate Axios Incorporated as a defendant which has assumed all of the liabilities of A.I. Central, LCC.  [Defendants A.I. Central, LLC, Axios International, Inc., Axios Incorporated and "Axios, Inc." are collectively referred within as "Axios.")

8.     The defendant Board of Directors of Axios Incorporated is comprised of the persons appointed or elected according to law who are authorized to manage and direct the affairs of Axios Incorporated.  The Directors are sued in their official capacities.

9.     The defendant the Public School Academies of Detroit ("PSAD")  is a public school district consisting of several public charter schools in Wayne County, Michigan organized under the Revised School Code, MCL § 380.501 et seq.

10.     The defendant School Board of the Public School Academies of Detroit is a public body organized under MCL 380.502 whose purpose is to organize and direct the charter schools operated by the Public School Academies of Detroit.  The School Board members are sued in their official capacities.

## JURISDICTION AND VENUE

11.     The plaintiffs make claims under the Constitution, laws, or treaties of the United States alleging deprivation of the right of due process, right of freedom of speech, right of

freedom from illegal search and seizures, all under 42 USC § 1983, and, alleging private rights of action under 18 USCS § 2707, Federal Stored Wire and Electronic Communications Act, and under 18 USCS § 2520, Federal Wire and Electronic Communications Interception Act. Therefore, this Court has original subject matter jurisdiction under 28 USC 1331.

12.    Venue is proper in the United States District Court for the Eastern District of Michigan, under 28 USC 1391, because the defendants are subject to this Court's personal jurisdiction and/or reside in this District.  Also, a substantial part of the events or omissions giving rise to the claim occurred in this District.

13.    Plaintiffs' claims under state law are so related to their claims within original jurisdiction of this Court that their state law claims form part of the same case or controversy under Article III of the United States Constitution.  Therefore, under 28 USCS 1367, this Court has supplemental jurisdiction over plaintiffs' state law claims.

## COMMON ALLEGATIONS

14.    University Prep Science and Math High School ("UPSM") and University Prep High School ("UPA") are two of the charter schools operated by the Public School Academies of Detroit.   From July 2010 through the middle of school year 2011-2012, New Urban Learning was the management company responsible for day to day operations at UPA and at UPSM.  A.I. Central LLC, a professional employment organization, acted with New Urban Learning as co-employers of the staff at those schools.

15.    On October 15, 2009, New Urban Learning/A.I Central LLC (hereafter, "NUL") hired plaintiff Gabriela Gui as the first principal of UPSM.

16.    Before signing an employment agreement, Dr. Gui told both Doug Ross (CEO of New Urban Learning) and Margaret Trimer-Hartley (then superintendent of the UPSM school

4

district) that she would not take a position as principal of the new high school if she could not carry out the duties of principal for at least 4 years. Dr. Gui believed it would take at least 4 years to found a general admittance college prep school in an urban environment plagued by high drop-out rates and a history of underachievement. Doug Ross responded that New Urban Learning "will do better than the 4 years" and would give her a 5 year contract. All subsequent conversations between Dr. Gui and Doug Ross and Margaret Trimer-Hartley referred to a 5-year contract.

17.     The Employment Agreement promised a term of employment from July 1, 2010 to June 30, 2015. The Agreement also stated that Dr. Gui's employment was "at will." Employment Agreement 10/8/09, Ex. 1.   Dr. Gui remained principal of UPSM from July 1, 2010 through June 27, 2014 when she was discharged.

18.     Before signing the Employment Agreement, Dr. Gui asked Margaret Trimer-Hartley why the Agreement stated she was an "at will" employee, when the parties had agreed to a 5-year term for her employment. Margaret Trimer-Hartley answered that the "at will" language meant nothing and that they had to put that in every employment contract. Based upon Trimer-Hartley's assurance, Dr. Gui left her employment at Detroit Public Schools and became principal at UPSM. Ex. 1.

19.     NUL was committed to site-based management at UPSM. The Employment Agreement provided: "University Prep Science & Math District embraces the North Central Regional Educational Laboratory's definition of site-based management, and agrees to adhere to them [sic] for the term of your contract." The Agreement also provided that Dr. Gui had authority to hire the school's staff and make contractual commitments on behalf of UPSM for the 2010-2011 school year. Ex. 2, Contract Addendum. In the field of education, site-based

management means that people closest to the work, at the school level, have control over: a) instructional programs; 2) staffing (hiring and firing); and 3) budgets, including grants.

20.     Dr. Gui left her previously employment of 15 years with Detroit Public Schools to become principal at UPSM based upon the promise of site-based management and a minimum 5-year employment term.

21.     NUL's contract with Dr. Gui provided that she be accountable for the following:

- Meeting AYP [annual yearly progress] beginning with the second group of 11th graders to take the Michigan Merit Exam (MME) in 2013-14;

- Meeting Performance goals outlined by Grand Valley State University [the "authorizer" of the charter schools operated by The Public School Academies of Detroit]—outperform host district; outperform peer districts; outperform weighted average performance of all districts represented in the school;

- Graduating 90 percent of ninth graders after four years, and sending 90 percent on to college;

- Site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget; designing and implementing curriculum and instructional practices.

Contract Addendum, Ex. 2.

22.     In the Contract Addendum, NUL agreed to purchase 5 years of service credit in the Michigan Public School Employee Retirement System (MPSERS) to compensate Gui for the five years of service credit she would lose during the term of her Employment Agreement. (Unlike DPS, NUL did not participate in MPSERS.)   Ex. 2.

23.     On or about February 11, 2010, through a lump sum payment of $79.000.00 to Gui, NUL furnished the funds to purchase the pension service credit promised in the first Contract Addendum.  In a second Contract Addendum, NUL memorialized the payment and stated, "Dr. Gui has a five year contact with UPSM."   There was no "employee at will" language in this Contract Addendum.   Contract Addendum 2/11/10, Ex. 3.

24.     This Addendum of 2/11/10 stated that the additional remuneration "is also intended to serve as compensation for work leading up to the opening of UPSM High School in the fall of 2010."  Id.  (Gui had actually performed many hours of work before July 1, 2010, when she was to start work per the Employment Agreement.)

25.     From October 15, 2009, through March 27, 2012, Dr. Gui operated under the initial Employment Agreement and the two Contract Addendums with NUL.  Ex. 1, 2, 3.

26.     Among other remuneration and benefits, the Employment Agreement provided Dr. Gui with an annual salary of $115,000.00 with 3% raises annually for the life of the contract. She consistently earned the raises.

27.     In the middle of the 2011-2012 school year, Detroit 90/90 replaced New Urban Learning as the management company responsible for day to day operations at UPSM and UPA. A.I. Central LLC ("Axios"), a professional employment organization, acted with Detroit 90/90 as co-employers of the staff at those schools.

28.     On March 30, 2012, Detroit 90/90 /A.I Central LLC (hereafter, "Detroit 90/90 and Axios") entered into an Employment Agreement with Dr. Gui as principal of UPSM. Employment Agreement 3/28/12, Ex. 4.  This Employment Agreement was substantially identical to the previous contract, except that it contained a term of employment from July 1, 2012 through June 30, 2015, and provided an annual salary of $122,450.00 for the 2012-2013 school year with 3% raises annually for the life of the contract.  This employment agreement just substituted Detroit 90/90 for New Urban Learning as the management company.

29.     The Employment Agreement of 3/28/12 contained the same commitment by the employer to site-based management at UPSM as contained in the Employment Agreement of 10/8/09.

7

30.     While the other staff at the school had to renew their contracts annually, Dr. Gui only renewed her contract when the management company changed from NUL to Detroit 90/90 and Axios.  When Dr. Gui asked why she was receiving a second contract mid-term, Margaret Trimer-Hartley's just stated that the management company had changed, and the contract needed to reflect that change.

31.     By the end of school year 2012-2013, Dr. Gui and the staff she selected, including plaintiff Justine Sheu, had fulfilled all of the goals set by NUL in the initial Employment Agreement with Dr. Gui.  With a glowing evaluation for the school year 2010-2011, the school superintendent rated Dr. Gui "highly effective" as principal, which is the highest rating attainable under state standards.  There was no evaluation performed for school year 2011-2012.  But the performance of the staff, under Dr. Gui's direction, continued to improve as measured by the students' graduation rates, ACT scores, annual evaluations from Excellent Schools Detroit, and rates of college admissions.

32.     In 2013 and 2014, the data showed that UPSM's academic results (ACT scores) exceed those of all but the magnet schools in Detroit Public Schools, exceeded those of UPA (which had been in existence for 11+ years), and exceeded those of several suburban schools. The National ACT average for African American students for 2012 was 17.0, and had not been higher than that in the previous 5 years. With an average composite ACT score of 17.1 in 2013 and of 18.5 in 2014, UPSM exceeded the national average. The Excellent Schools of Detroit organization graded UPSM with an A+ for School Culture three years in a row.  Parents, community members, partners, and visitors frequently expressed very positive comments about the school's instructional program, culture, great relationships, and rich opportunities offered to students.

33.     The successes of UPSM were the result of a research-based instructional framework model implemented with fidelity and of the collective efficacy of a staff selected through the most rigorous hiring process Detroit 90/90 and Axios had ever experienced.

34.     In the winter of 2013, Dr. Gui needed a skilled individual to assist students (especially juniors) in preparing for the ACT test to be given in the spring of 2013.  Dr. Gui hired plaintiff Justine Sheu as an independent contractor to serve as the school's ACT prep instructor.  Sheu's main duties were to prepare the students for taking the ACT test.  The goals that Dr. Gui set for Sheu for 2012-13 were that her instruction, test preparation, and motivational techniques yield a substantial increase in the final ACT scores of the students when compared with their practice test scores.

35.     By the end of school year 2012-2013, Ms. Sheu had fulfilled the goals set by Dr. Gui.  Moreover, the parents, students, and staff were thrilled with Ms. Sheu's performance.  She facilitated a series of workshops for parents and worked with some school advisors to prepare the juniors for college-related events and activities.   The students related to her exuberance and youthfulness; the parents highly valued the information she provided and were overjoyed that their children spoke so positively and enthusiastically about Sheu's classes.  The staff of UPSM High School warmed up to the passion and breadth of college-knowledge Sheu possessed.

36.     In the spring of 2013, anticipating the first senior class at UPSM High School during the 2013-2014 school year, Dr. Gui required a College and Career Readiness Advisor.  The school's Social Worker and the Advisors were already addressing the students' traditional counseling needs.  Therefore, Gui needed someone to:  provide ACT Prep to students in grades 10 and 11; help the seniors with college fairs, scholarships, applications, portfolios, and; work with students, parents, and staff to increase their college-knowledge and college readiness.

37.     With the approval of the then Superintendent, Margaret Trimer-Hartley and the Human Resources Department of Detroit 90/90, the position of College and Career Readiness Advisor was posted.  From the 60 applications received, the UPSM HS Leadership Team decided that Ms. Justine Sheu was the best fit for the position.  Ms. Sheu accepted the position in early summer of 2013, and arrangements were made for her to visit the HR Department for completing the hiring process.

38.     In the summer of 2013, Mark Ornstein became the new CEO of Detroit 90/90. During his welcome reception he announced that he would not honor the commitment to site-based management at any of the UPA or UPSM schools.  He also alluded to unifying the 2 districts.

39.     In the summer of 2013, Ornstein interposed a mid-level bureaucracy of supervisors and directors, the "Central Office," between him and the principals and staff at the schools.  See chart, Ex. 5.  In the summer of 2013, Ornstein began making decisions about staffing at the UPSM (taking people away and assigning people to the school without consulting the school's leadership team) and began making financial decisions for the school without disclosing how the school's grant money was being spent.  In early 2014, Ornstein directed the Central Office staff to begin the process of adopting a prescribed curriculum that conflicted totally with the approach to teaching of Dr. Gui and her staff.

40.     In August 2013, Ornstein revealed his restructuring to the staff at UPSM, including the plaintiffs.  Ornstein's restructuring of the administration and negation of site-based management became a matter of public concern for the staff and parents at UPSM.  As Ornstein's plan unfolded, the staff and parents viewed Ornstein and the officials in the Central Office as a dictatorship.  The staff and parents complained that:

A. Dr. Gui and the school teams could no longer make hiring decisions; the CEO took staff persons away from the school against their will even though they were needed and funded by the school, and; the CEO assigned staff to the school without giving the school administration a chance to interview or meet this staff beforehand;

B. Individuals making important educational decisions (like Ornstein) had no background in education; the Central Office made impulsive decisions, sometimes disregarding school or district policies and practices but still held the school staff responsible for the consequences of those decisions;

C. By creating the Central Office, Ornstein had created an unnecessary level of bureaucrats who had to justify their existence by interfering in an educational process of already proven efficacy, and;

D. Other complaints.

41.     Ornstein's restructuring particularly impacted Gabriela Gui.  Ornstein's changes withdrew from Dr. Gui the ability to conduct site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget, and; implementing curriculum and instructional practices.  Thus, Ornstein's changes breached the promise of site-based management in Gui's Employment Agreements.  Furthermore, Ornstein's changes jeopardized the successful learning environment that Dr. Gui and her hand-selected staff had created based upon a research-based instructional model.

42.     Ornstein's restructuring particularly impacted Justine Sheu.  At a meeting with Ornstein on August 13, 2013, Sheu learned of the changes to her job.  Ornstein appointed Venus Crosby as "Director of College Counseling."  Thus, Crosby replaced Dr.  Gui as Justine Sheu's supervisor. Crosby and Ornstein limited Sheu's initiative and creativity in her job.  They

11

removed Sheu from her position at UPSM where she had developed the site-specific knowledge and deep relationships with students and parents necessary to perform her job, and reassigned her to the Central Office staff as a "College Success Advisor."  Moreover, she was assigned to serve both UPSM and UPA, thus doubling her case load.  As a result of the change, Sheu was unable to enact some of the programs that were in place before the restructuring.

43.     Rather than allowing Sheu to use her innovative abilities, Crosby merely delegated tasks (mostly lower, ministerial tasks) to Sheu.  Crosby stated her management style was to "check on people" and keep them in their place.  That style did not match the collaborative and inclusive approach Gui had used.   Both to Crosby and Ornstein, Gui and Sheu challenged Ornstein's restructuring in general and Crosby's changes in Sheu's job responsibilities.

44.     On August 13, 2013, Sheu first met with Venus Crosby.  Crosby explained to Sheu her truncated job responsibilities. Crosby showed Sheu Crosby's framework for college advising/ACT preparation that she would implement at UPSM HS.  Sheu believed that Crosby's framework would implement changes that would be detrimental to the students.  Sheu expressed to Crosby her doubts about the efficacy of Crosby's plans.  Crosby was displeased with Sheu's criticism.  Crosby's attitude and communications to Sheu made it clear that Crosby did not want Sheu's input, that Sheu should stay in her place.

45.     Gui and her Assistant Principal, Grady Jones, Jr., also met with Crosby several times in August, when Crosby came to UPSM. During Crosby's first visit to the high school, without a thorough discussion or understanding of the instructional framework and program in place at UPSM HS, Venus Crosby dismissed the work of 3 years of UPSM staff,  accused them

of "taking shortcuts", imposed her college readiness plan (that both Gui and Jones found superficial), and expressed sheer disrespect toward Sheu and her professional abilities.

46.     Also in August 2103, Ornstein also removed Vera Smith as Parent Liason at UPSM and brought her to the Central Office.  Smith's removal was against Smith's will, without the school leadership's knowledge or approval, and was strongly disapproved by the school's parent organization.

47.     On August 16, 2013, Gui met with her administrative cabinet, Sheu, and the school's senior advisors to discuss the district restructuring and the changes to Sheu's and Smith's positions.  All persons present, including Gui and Sheu, strenuously objected to the general structural changes and the changes to Sheu's and Smith's positions.

48.     On August 17, 2013, Gui emailed a letter to Ornstein criticizing the restructuring and the changes to Shue's position, and, seeking the return of site-based management and the return of Sheu to her original position.

49.     After Gui's letter of August 17, 2013, Crosby hired two new college counsellors, Penny Wells to work out of UPSM and Carl Yiu to work out of UPA.  While they were both certified college counsellors, unlike Sheu they had no experience in the job.

50.     Parents of UPSM students began to inquire why Justine Sheu and Vera Smith were not at the school every day.  Gui and Sheu met with parents and explained the changes wrought by the restructuring.  Gui and Sheu explained how the changes negatively impacted the ability of Sheu and Smith to perform their jobs, and explained how the changes negatively impacted the students.  After these meetings, some parents told Sheu that they would contact Venus Crosby to address the issues.

51.     In September of 2013, through a series of emails Gui continued to advocate for the return of Sheu's and Smith's services to the UPSM and expressed concerns about Venus Crosby's capacity, leadership style, and actions.  In response, Ornstein called a meeting at the Central Office. Ornstein, Crosby, Trimer-Hartley and Gui participated. Ornstein and Trimer-Hartley dismissed Gui's concerns, insinuated that Gui had a personality problem, and directed Gui to cease voicing her opinions about what she believed about Central Office's decisions.

52.     On October 3, 2013, Ornstein held a meeting with Dr. Gui and her supervisor, Danielle Jackson, to discuss Ornstein's concerns that Gui was not supporting his restructuring of the school district.  Ornstein insisted that Gui support the restructuring in discussions with her school staff and parents.  Ornstein memorialized the meeting in a memo dated October 9, 2013.

53.     On October 10, 2013, Sheu could not come to work due to the sudden onset of illness (due to food poisoning) when she woke up that very morning.  The onslaught of her symptoms, including nausea, vomiting, and fainting, was sudden and unanticipated.  Early that morning, Venus Crosby called her and insinuated that Sheu had a hangover.

54.     On October 10, 2013, Crosby issued a written reprimand to Sheu concerning her absence entitled "Unacceptable Communication for Absences."   Ms. Crosby criticized Sheu for "failure to perform the required functions of your position by not communicating your absence in a timely manner, and/or providing adequate resources to reassign tasks."  This criticism was in referenced to Ms. Sheu's absence from an ACT prep session on October 10, 2013.

55.     Crosby's reprimand was a form of retaliation for Sheu's speech criticizing the restructuring of the school district, including Crosby's redesign of the college advising/ACT preparation program.

56.     Crosby did not place the reprimand in Sheu's personnel file.

57.     On or about July 14, 2014, Justine Sheu filed an unfair labor practice charge against Detroit 90/90 with the National Labor Relations Board claiming that her suspension and discharge was in retaliation for her concerted activities in violation of Section 8 of the National Labor Relations Act.

58.     On or about September 18, 2014, Detroit 90/90 and Axios placed the reprimand in Shue's personnel file.  Detroit 90/90 and Axios placed the reprimand in Sheu's personnel file as retaliation for her filing the unfair labor practice charge and to create further pretext for terminating her employment.

59.     Ornstein's restructuring also became a matter of great public concern among the parents of students at UPSM.  The parent-teacher-student association (PTSA) at UPSM sent a letter to all parents alerting them to the structural changes.  The PTSA expressed great concern that the restructuring was intended to benefit UPA (whose students had consistently performed at lower levels than UPSM students) at the expense of UPSM.  The PTSA also expressed great concern about restructuring an already successful site-based management platform at UPSM.

60.     On October 17, 2013, the PTSA and parents of UPSM held a meeting with Ornstein, Margaret Trimer-Harley (then Chief External Relations Officer in the Central Office), and other Detroit 90/90 administrators.  Before the meeting, teachers other than Justine Sheu passed out flyers to students giving parents of their students notice of the meeting and the anticipated topics for discussion: the detrimental changes caused by Ornstein's restructuring and the changes to the positions of Sheu and Smith.

61.     At the meeting of the PTSA on October 17, 2014, the parents were highly critical of Ornstein and his restructuring.  The parents submitted a list of questions to Ornstein indicating their dissatisfaction with the restructuring.  The parents highlighted the change in Justine Sheu's

and Vera Smith's job responsibilities as the prime examples of their objections to the restructuring.  The parents wanted Ornstein to restore Sheu and Smith to their original positions and allow Dr. Gui to resume site-based management in its entirety.  After the meeting, Ornstein expressed his belief that Gui was fueling the parents' dissatisfaction with his restructuring of the district.

62.     Sometime after the PTSA meeting on October 17, 2013, Justine Sheu met with Ornstein, Margaret Trimer-Hartley and Venus Crosby.  At this meeting, Ornstein and Trimer-Hartley expressed that there had been some "growing pains" about the district restructuring.  They were referring to the complaints from parents and school staff.   Trimer-Hartley told  Sheu, "It would behoove you to stay out of politics."  Ornstein and Trimer-Hartley were under the impression that the school staff was working together with the parents to oppose the restructuring.

63.     At the above meeting with Ornstein, Margaret Trimer-Hartley and Venus Crosby, Sheu was told that she would no longer do college advising but only ACT preparation.  Ornstein wanted ACT scores raised by 2 points from the practice test scores.

64.     Sometime after the above meeting with Ornstein, Margaret Trimer-Hartley and Venus Crosby, Sheu asked Ornstein for a meeting with just him to discuss her concerns about her removal from college counselling.  (She believed that removing her from college advising would negatively impact the students at UPSM, because Penny Wells, the recently hired college counsellor, had no prior experience and needed help from someone experienced with preparing students for successful admission to college.)

65.     On October 29, 2013, the PTSA and parents met with the school board (defendant PSAD), Ornstein and other Detroit 90/90 administrators.  The parents expressed the same

concerns they had expressed to Ornstein and the administrators on October 17, 2013.  The

parents again highlighted the changes to Justine Sheu's and Vera Smith's positions as prime

examples of the detrimental effects of Ornstein's restructuring.

66.     In early November 2013, Justine Sheu met just with Mark Ornstein.  She stated

her concern that UPA did not have a good program for ACT preparation established.  It would

take some coordination between the UPA staff and Sheu before she could create and implement

a cohesive program specifically for the UPA students.  But she did not have the time to do that.

Yet, she would be appraised based upon the ACT scores of both UPA and UPSM.  She also

advised Ornstein that the parents of UPSM students had concerns about her removal from

college advising.  Ornstein replied, "Let's see how it works out and if it doesn't work out, we can

revisit it."

67.     On November 8, 2013, Sheu met with Trimer-Hartley, Venus Crosby, Dr. Gui,

and Aisha Scott, the interim UPA principal, to discuss the changes in Sheu's position.  Dr. Gui

again asked for the return of Justine Sheu to UPSM for full-time ACT preparation and college

advising.  Timer-Hartley stated that this was the last time she would talk about Sheu's position

and that she wanted the complaints about Sheu's position to stop.

68.     During numerous instances, after the meetings of the parents with Ornstein and

PSAD and until he discharged her, Ornstein told Gui that she should be "controlling the parents"

and that it was her "fault" that they kept attending board meetings and expressing concerns.

69.     In early April 2014, UPSM and UPA received the ACT scores for their students.

The ACT scores for UPSM improved from 16.6 (practice test) to 18.5 (regular test 2014).  The

scores for UPA improved from 14.0 (practice test) to 16.5 (regular test 2014).   Thus, even under

the burden of a double case load, including students at UPA with historically lower performance levels, Sheu met the goals set by Ornstein.

70.     In April or May 2014, Sheu met with the advisors for the junior class at UPSM to discuss the restructuring of the district and the changes to her position.  The advisors were highly critical of the restructuring of the district and the changes to Sheu's position.  The advisors were unhappy with Venus Crosby's directives and her lack of guidance.  (Crosby had told Sheu not to talk to the junior advisors regarding assignments to students and about creating student portfolios.)

71.     On May 16, 2014, Sheu delivered a presentation to UPA seniors entitled "Transitioning to College."  As part of her advice to the students:

A.  She warned against assuming that, just because they did well in high school, they would automatically do well in college.  She told an anecdote about when she received her first "D" grade in college. In a self-deprecating and joking manner, she expressed the overconfidence she had exhibited because of her Asian heritage (relying on the legendary intellectual prowess of Asian persons), and the shock of receiving the "D" grade.

B.  Through a PowerPoint slide titled "Pressure to Engage in Unsafe Behavior", Sheu enumerated all the risks associated with drinking alcohol and smoking marijuana at college, and the overriding message was not to engage in unsafe behavior. Acknowledging that some students would nonetheless drink and smoke, she warned against the serious dangers of (a) binge drinking, (b) sexual assault, and (c) smoking illegal substances.  Using an anecdote about an athlete who had smoked a laced blunt and suffered long-term brain damage, she warned students never to consume anything they had not prepared themselves or had not witnessed being prepared, due to the risk of substances being laced.

C.  She advised students not to join a fraternity or sorority their freshman year because, in addition to an enormous commitment of time and energy, they would likely "be getting their asses beat" every night.

72.     On May 19, 2014, Margaret Trimer-Hartley called Gui.  Trimer-Hartley warned that Sheu was being placed on leave pending an investigation. When Gui pressed for details and

asked if an alternate solution would be possible, Trimer-Hartley expressed that Sheu was "gone", that it was a "done deal."

73.    On May 19, 2014, Venus Crosby, Margaret Trimer-Hartley (of Detroit 90/90) and John Sanford (of Axios) met with Sheu and suspended Sheu from her job "pending investigation" claiming that on May 16, 2014, students and others had complained in writing that:

> A.  Her jokes about her Asian heritage were racially insensitive and offensive.
>
> B.  Her message to seniors "if you didn't roll it, don't smoke it" encouraged students to abuse substances.
>
> C.  Her use of "asses" was profane and inappropriate.

74.    The expressed reasons for Sheu's suspension were mere pretext. The real reason the defendants suspended her was, because Sheu had spoken, and the defendants reasonably believed that Sheu had spoken, to school staff and parents of students (1) against Ornstein's restructuring of the school district and (2) against the changes in her own position, both matters of public concern.

75.    There was no good cause for suspending Sheu.

76.    On May 20, 2014, Sheu requested from John Sanford and Emily Bitzarakis (Detroit 90/90's Director of Human Resources) copies of the alleged complaints about her presentation, a citation of policies violated, and clarification on the nature of the investigative process. She asked for a hearing to present her testimony. There was no response to this request. She never received a hearing before her discharge.

77.    In fact, there was no investigation into the allegations against Sheu. There was no notice of a hearing and no opportunity for Sheu to examine the alleged complaints about her presentation and to be heard in her own defense before she was suspended. Sheu received no

hearing on disputed issues of fact.  The defendants suspended Sheu without good cause and without due process.

78.     PSAD and its school board showed an interest in the suspension of Justine Sheu.  Detroit 90/90, through its officers and directors, and Axios, through its officers and directors, consulted PSAD and its school board before suspending Sheu and obtained the approval of the latter entities before suspending Sheu.

79.     PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to suspend Justine Sheu so that the choice to suspend her was essentially the decision of PSAD.

80.     Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in the decision to suspend Justine Sheu's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios (both private entities) and the PSAD, a governmental entity.

81.     On May 21, 2014, Sheu sent an email message to UPSM staff, parents, and students explaining the circumstances of her suspension.  Sheu appealed for letters of support to Detroit 90/90 and Axios testifying to her professional character.

82.     On May 21, 2014, and thereafter, numerous staff members, parents, and students sent many letters of support lauding Sheu's abilities and imploring Detroit 90/90 and Axios to retain Sheu in her employment.

83.     On May 21, 2014, John Sanford of Axios and Emily Bitzarakis of Detroit 90/90 sent a letter entitled "Notice of Investigation Resolution" to Justine Sheu.  The letter terminated her employment.  The letter claimed that the reason for her discharge was her presentation to students on May 16, 2014, her email to students of April 29, 2014, and her appeal to staff,

20

parents, and students for support for her to retain her job:  "[Y]our recent email outreach to students, parents, and others since Monday, including a file attachment named 'Circumstances of Suspension' ...shows a lack of judgment, professionalism and maturity."   Id., p. 2.

84.     The defendants did not really terminate Sheu for her presentation to students on May 16, 2014, or her email to students of April 29, 2014.  Those expressed reasons were mere pretext.  The real reasons the defendants terminated her were, because:

   (A) Sheu had spoken, and the defendants reasonably believed Sheu had spoken, to
   school staff and parents of students (1) against Ornstein's restructuring of the school
   district and (2) against the changes in her own position, both matters of public concern,
   and;

   (B) Sheu had sought support to keep her job, a matter upon which staff, parents, and
   student had all expressed public concern.

85.     There was no investigation into the allegations against Sheu. There was no notice of a hearing and no opportunity for Sheu to examine the alleged complaints about her presentation and no opportunity for Sheu to be heard in her own defense before she was terminated.   Sheu received no hearing on disputed issues of fact.  The defendants terminated Sheu without good cause and without due process.

86.     PSAD and its school board showed an interest in the termination from employment of Justine Sheu.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before terminating Sheu and obtained the approval of the latter entities before terminating Sheu.

87.     PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to terminate Justine Sheu so that the choice to suspend her was essentially the decision of PSAD.

88.     Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in deciding to terminate Justine Sheu's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios, both private entities, and the PSAD, a governmental entity.

89.     On May 21, 2014, Gui asked Ornstein what process was used to determine to discharge Sheu.  Gui pointed out that, when students are accused of violating the Code of Conduct, the administration conducts a thorough factual investigation and a due process hearing before issuing of a recommendation to expel. Ornstein responded that "all that was done in Sheu's case", but did not offer any details.

90.     In response to another inquiry from Gui, John Sanford stated that, before determining consequences, it was unnecessary to talk to UPSM HS students, staff, and parents about their experiences with Sheu.  Sanford also denied Gui the ability to review the alleged evidence against Sheu.

91.     On May 21, 2014, Gui asked Ornstein whether she would have a job as principal of UPSM in the fall.  Ornstein promised that she would retain her job, unless she chose to decline it.

92.     On May 21, 2014, Ornstein asked Dr. Gui to introduce John Sanford of Axios and Emily Bitzarakis of Detroit 90/90 to the staff at meeting the next day to address the staff protest against Sheu's discharge.  Ornstein wanted Gui to show the staff that she supported the process and the decision to discharge Justine Sheu.  Dr. Gui did not want to attend the meeting, because

Ornstein had not answered her questions about what process was used, and, therefore, she could not approve the alleged process.  She also did not want to be disingenuous with her staff, with whom she had built relationships of trust. Therefore, Gui told Ornstein and Emily Bitzarakis that she had a doctor's appointment the next morning and would not be able to attend the meeting. (Although an appointment was not previously scheduled, Gui did see her family doctor the next morning for real, pre-existing health concerns).

93.     On the morning of May 22, 2014, Detroit 90/90 and Axios held a meeting with the staff of UPSM in order to silence the dissenting voices of the staff and parents who were extremely upset with the defendants' suspension and termination of Justine Sheu.   The parents and staff members were inundating the defendants with emails, letters, and telephone calls expressing their dismay.  The meeting did not go well for the defendants.  The staff was adamant in supporting Sheu.  The staff questioned the process used to terminate Sheu.  But Sanford and Bitzarakis were not able to address the staff's concerns.

94.     After the meeting on May 22, 2014, Ornstein was upset with Gui for not supporting the Central Office at the staff meeting.  He planned to schedule another staff meeting for Gui to show her support for Sheu's discharge.  Gui again asked Ornstein to explain the process used to decide to terminate Sheu.  After talking with John Sanford, Ornstein said the second meeting would not be necessary.  But Ornstein stated to Gui, "You are the leader of the school.  You need to communicate to staff.  You should express that for Justine to be terminated there was a severe enough of an issue."

95.     Vera Smith had been in charge of the Parental Involvement Plan at UPSM but Ornstein removed her to the Central office in fall 2013.  The PTSA had protested the removal of Vera Smith to the Central Office.  Subsequently, the defendants allowed Smith to return to her

post at UPSM.  But following the discharge of Justine Sheu, the defendants also discharged Vera Smith from her employment as coordinator of parent relations at UPSM.  The discharge of Vera Smith was without good cause.  She was discharged in retaliation for her resistance to the restructuring of the school district by Ornstein.

96.     On May 19, 2014, Detroit 90/90 and Axios confiscated from Sheu the laptop computer assigned to her while she was an employee at UPSM.

97.     On May 23, 2014, Director of IT Nicole Cummings, held a team meeting of the IT staff.  Cummings had possession of the laptop retrieved from Sheu.  Cummings stated to the IT staff that she had found on Sheu's laptop computer a document listing Sheu's passwords to her online bank account and to her personal email account on the Gmail server, which is a separate server from the server for the Detroit 90/90 and Axios email system.

98.     At the meeting on May 23, 2014, Cummings stated that she had found on Sheu's laptop photographs of Sheu in lingerie and had showed the photographs to her husband.

99.     At the meeting on May 23, 2014, Cummings then showed the same photographs of Sheu in lingerie to the others at the IT meeting.

100.     Ornstein's personal assistant, Breanna Watson, then came into the meeting of the IT staff.  Cummings indicated her intent to inspect the email messages in Sheu's personal email account with Gmail.  Despite the warning of Paris Cooks, an IT staff member, that intrusion into Sheu's personal email account was illegal, Cummings opened up the account.  Then, Breanna Watson encouraged Cummings to search the messages in Sheu's personal email account for any messages from Dr. Gui or Grady Jones to Sheu.  When Cummings stated she had found such messages, Watson instructed her to read them.  Cummings then read aloud various messages in which Gui and Jones (1) had advised Sheu regarding her appeal to staff for support after her

suspension and (2) had suggested possible responses to accusations Sheu had received from

Venus Crosby and Margaret Trimer-Hartley throughout the year.  At the conclusion of

Cummings' reading, Breanna Watson (Ornstein's personal assistant) exclaimed, "That's what

they are looking for."  Cummings printed out the messages and gave them to Watson.

101.    Gui and Jones sent the email messages described above to Sheu using their

personal email accounts, not the accounts provided by Detroit 90/90 and Axios.

102.    Cummings and Watson intentionally and without authorization accessed and

intruded into Sheu's private email account upon directions from Ornstein.  As agents of the

defendants Detroit 90/90, Axios, and PSAD, Cummings and Watson executed such intrusions in

the course of their employment and within the scope of their employment with the defendants.

103.    Justine Sheu did not authorize the defendants or their agents to use her personal

email password to log into her personal Gmail account or to view her personal email messages or

to disclose the contents of messages.

104.    Justine Sheu did not waive her right to privacy or confidentiality with regard to

messages in her personal Gmail account.

105.    Gabriela Gui did not authorize the defendants or their agents to view the contents

of her personal email messages to Justine Sheu stored within Sheu's email account with Gmail.

106.    Gabriela Gui did not waive her right to privacy or confidentiality with regard to

personal email messages to Justine Sheu stored within Sheu's email account with Gmail.

107.    At the time that Cummings and Watson were directed to access Sheu's private

email messages and at the time they did access those messages, the defendants possessed no

specific information about activity on Sheu's personal internet account regarding

communications with Gui or Jones concerning Sheu's suspension or termination.

108.     At the time that Cummings and Watson were directed to access Sheu's private email messages and at the time they did access those messages, the defendants had no probable cause to believe that Sheu, Gui, and Jones had used their personal email accounts to communicate with each other concerning Sheu's suspension or termination.

109.     At the time that Cummings and Watson were directed to access Sheu's private email messages and at the time they did access those messages, both Sheu and Gui had a reasonable expectation of privacy in their private email communications with each other, using their personal email accounts.

110.     Two weeks after the IT team meeting, Cummings told Paris Cooks that the Central Office did not trust him, because he had warned her that to access Sheu's personal email was illegal.  Cummings urged Cooks to reassure the Central Office that he would not reveal the exposition of Sheu's personal email messages.  Cooks refused to do that.

111.     In early June 2014, the PTSA presented a set of written question to the defendants asking why they had terminated Justine Sheu and Vera Smith and asking who would perform their tasks.  The PTSA also wanted information on the budget for Title I expenditures, because it would reveal whether the defendants planned to increase class sizes the next year.  The defendants did not provide the information regarding Title I expenditures until July 2014.

112.     On June 4, 2014, the UPSM staff held a meeting.  It was a "Chalk Talk" regarding the staff's strenuous objections to Ornstein's restructuring, the dictatorship of the Central Office, Sheu's discharge, the lack of due process involved, the need to form a union, and other issues.  The Chalk Talk was followed by a staff survey on the issues discussed.

113.     Following Sheu's discharge, the PTSA and students at UPSM held petition drives and obtained hundreds of signatures in protest against her discharge.

26

114.    On June 24, 2014, the PSAD board held a board meeting.  After the meeting, Ed Parks, the chairman of the board, told three parents of children at UPSM, "I have an email from someone high upon in UPSM.  It amounts to fucking insubordination.  We are going to do something to handle this.  You may not like the results."  Parks was referring to the email messages between Gui and Sheu, illegally intercepted, disclosed, and used by the defendants.

115.    On June 27, 2014, the defendants discharged Gui, Jones, and Cooks from their employment at UPSM without good cause and without due process.  Ornstein, Sanford, and Danielle Jackson personally discharged Gui.  Ornstein stated the discharge "is not necessarily about performance; it's that we are going in a different direction...The board feels it's necessary to go in a different direction."  Gui asked Ornstein for the specific reasons he was discharging her and to describe the "different direction" in which he and the PSAD Board was taking the school.  Ornstein refused to answer her questions.

116.    The discharge of Dr. Gui was without good cause.  Gui had fulfilled and exceed all goals set by her Employment Agreement.  She was an outstanding principal valued and respected by the staff, parents, and students.  She graduated 95% of the student at UPSM on time (within 4 years.)  One hundred percent of the graduating students were accepted by colleges and universities.  Those graduates generated $1.5 million in scholarships.

117.    The defendants actually terminated Dr. Gui because:

(A) Dr. Gui had spoken, and the defendants believed Gui had spoken, to school staff and parents of students about the following matters of public concern-- (1) against Ornstein's restructuring of the school district and nullification of site-based management (2) against the changes in the position of Justine Sheu and Vera Smith, and, (3) against the discharge of Justine Sheu and Vera Smith;

(B) Dr. Gui had refused to "control the parents" and suppress their right to protest Ornstein's restructuring and his discharge of Sheu and Smith;

(C) Dr. Gui had supported the right of Justine Sheu to due process as a prerequisite before her suspension and termination;

(D) Dr. Gui had refused to aid and abet the defendants' illegal discharge of Sheu by showing support for that discharge at the staff meeting on May 22, 2014.

118.    There was no notice of a hearing and no opportunity for Dr. Gui to be heard in her own defense before she was terminated.   Dr. Gui received no statement of reasons why she was discharged and no hearing on disputed issues of fact.  The defendants terminated Dr. Gui without good cause and without due process.

119.    PSAD and its school board showed an interest in the termination from employment of Gabriela Gui.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before terminating Gui and obtained the approval of the latter entities before terminating Gui.

120.    PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to terminate Gabriela Gui so that the choice to discharge her was essentially the decision of PSAD.

121.    Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in deciding to terminate Gabriela Gui's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios, both private entities, and the PSAD, a governmental entity.

122.    After the discharge of Gabriela Gui, the defendants terminated the employment of all the remaining members of the administrative cabinet who served with Dr. Gui at UPSM.  The defendants instituted these discharges all without cause in an effort to purge the school of any administrators who might be loyal to Dr. Gui or Ms. Sheu, or, who might oppose Ornstein's restructuring.  The defendants acted with the intent to silence any remaining dissent in opposition

to Ornstein's restructuring.  While the defendants terminated the administrators, the intent of the

defendants was to also send a message to the teachers that termination of employment would

result from any further expressions of dissent.  The defendants also terminated the employment

of Paris Cooks, because he had objected to the intrusion into Ms. Sheu's private email account

and because he also opposed the restructuring.

**COUNT I - 42 USC SECTION 1983**
**DEPRIVATION OF JUSTINE SHEU'S RIGHT TO FREEDOM OF SPEECH**
**UNDER THE 1st  AMENDMENT-**
**SHEU AS TO ALL DEFENDANTS**

123.    The plaintiffs incorporate paragraphs 1 through 122 above.

124.    The plaintiffs have the right to freedom of speech under the 1st and 14th

Amendments to the United States Constitution.

125.    In the matters of the suspension and termination of Justine Sheu's employment,

the defendants acted under color of law and there was state action sufficient to afford Sheu the

protections of the 1st Amendment for the following reasons:

A.   PSAD and its school board, governmental entities, showed an interest in the
suspension and termination from employment of Justine Sheu.  Detroit 90/90 and
Axios, through its officers and directors, consulted PSAD and its school board
before terminating Sheu and obtained the approval of the latter entities before
suspending and terminating Sheu.

B.   PSAD exercised coercive power over Detroit 90/90 and Axios or provided
significant encouragement to Detroit 90/90 and Axios, either overt or covert, to
suspend and terminate Justine Sheu that the choice to suspend and terminate her
was essentially the decision of PSAD.

C.   Alternatively, PSAD and its school board jointly participated with Detroit 90/90
and Axios, through its officers and directors, in the decision to suspend and
terminate Justine Sheu's employment.  There was a pervasive entwinement to the
point of largely overlapping identity between Detroit 90/90 and Axios (both
private entities) and the PSAD, a governmental entity.

126.    Defendants suspended and terminated Justine Shue from employment, because

29

(A) Sheu had spoken, and the defendants reasonably believed Sheu had spoken, to members of the Central Office, to school staff and parents of students (1) against Ornstein's restructuring of the school district and (2) against the changes in her own position, both matters of public concern, and;

B) Sheu had sought support to keep her job, a matter upon which staff, parents, and students had all expressed public concern.

127.    The 1st Amendment protects a citizen's right to criticize public officials and to seek redress of grievances against the government.   The plaintiff's speech criticizing the structuring of the school district, the changes to her position, and her suspension from employment were matters of public concern and, thus, were protected by the 1st Amendment.

128.    The defendants violated the plaintiff's 1st Amendment rights by taking adverse employment action against her.

129.    These unconstitutional deprivations of plaintiff's liberty interests implement or execute a policy statement, ordinance, regulation, or decision officially adopted and promulgated by PSAD. Alternatively, the constitutional deprivations resulted from the custom or decision of PSAD Board officials even though such custom did not receive formal approval through the Board's official decisionmaking channels.   Thus, PSAD together with Detroit 90/90 and Axios are liable jointly and severally under 42 USC Sections 1983 and 1988.

130.    Under 42 USC Sections 1983 and 1988, the defendants' unconstitutional acts are the proximate cause of plaintiff's damages, including, but not limited to: loss of salary and fringe, emotional distress, exemplary damages, expenses associated with seeking other employment, loss of earning capacity and ability to work, and the plaintiff will suffer these losses in the future.   The plaintiff is also entitled to attorney's fees and costs.

131.    In depriving the plaintiff of her freedom of speech, all of the defendants acted with evil motive and intent.   Their motive was to remove the plaintiff from her employment so

that they could silence the dissent against the district restructuring.  Therefore, the defendants are not entitled to qualified immunity and the plaintiff is entitled to punitive damages.

PLAINTIFF REQUESTS that this court enter judgment against Defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

<u>**COUNT II - 42 USC SECTION 1983**</u>
<u>**DEPRIVATION OF GABRIELA GUI'S RIGHT TO FREEDOM OF SPEECH**</u>
<u>**UNDER THE 1st AMENDMENT-**</u>
<u>**GUI AS TO ALL DEFENDANTS**</u>

132.    The plaintiffs incorporate paragraphs 1 through 131 above.

133.    The plaintiff Gabriela Gui has the right to freedom of speech under the 1st and 14th Amendments to the United States Constitution.

134.    In the matters of the termination of Gabriela Gui's employment, the defendants acted under color of law and there was state action sufficient to afford Gui the protections of the 1st Amendment for the following reasons:

A.    PSAD and its school board, governmental entities, showed an interest in the termination from employment of Gabriela Gui.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before terminating Gui and obtained the approval of the latter entities before terminating Sheu.

B.    PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to terminate Gabriela Gui that the choice to terminate her was essentially the decision of PSAD.

C.    Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in the decision to terminate Gabriela Gui's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios (both private entities) and the PSAD, a governmental entity.

135.    Defendants s terminated Gabriela Gui from employment, because:

A.    Dr. Gui had spoken, and the defendants believed Gui had spoken, to school staff and parents of students about the following matters of public concern-- (1) against Ornstein's restructuring of the school district and nullification of site-based

management (2) against the changes in the position of Justine Shue and Vera Smith, (3) against the suspension and discharge of Justine Sheu and the discharge of Vera Smith;

B. Dr. Gui had refused to "control the parents" and suppress their right to protest Ornstein's restructuring and his discharge of Sheu and Smith;

C. Dr. Gui had supported the right of Justine Sheu to due process as a prerequisite before her suspension and termination;

D. Dr. Gui had refused to aid and abet the defendants' illegal discharge of Sheu by showing support for that discharge at the staff meeting on May 22, 2014.

136.   The 1st Amendment protects a citizen's right to criticize public officials and to seek redress of grievances against the government.   The plaintiff's speech criticizing the structuring of the school district, the changes to employees' positions, and terminations of employees from employment were matters of public concern and, thus, were protected by the 1st Amendment.

137.   The defendants violated the plaintiff's 1st Amendment rights by taking adverse employment action against her.

138.   These unconstitutional deprivations of plaintiff's liberty interests implement or execute a policy statement, ordinance, regulation, or decision officially adopted and promulgated by PSAD. Alternatively, the constitutional deprivations resulted from the custom or decision of the PSAD Board officials even though such custom did not receive formal approval through the Board's official decisionmaking channels.   Thus, PSAD together with Detroit 90/90 and Axios, are liable jointly and severally under 42 USC Sections 1983 and 1988.

139.   Under 42 USC Sections 1983 and 1988, the defendants' unconstitutional acts are the proximate cause of plaintiff's damages, including, but not limited to: loss of salary and fringe, emotional distress, exemplary damages, expenses associated with seeking other

employment, loss of earning capacity and ability to work, and the plaintiff will suffer these losses in the future.  The plaintiff is also entitled to attorney's fees and costs.

140.     In depriving the plaintiff of her freedom of speech, all of the defendants acted with evil motive and intent.  Their motive was to remove the plaintiff from her employment so that they could silence the dissent against the district restructuring and the termination of employees.  Therefore, the defendants are not entitled to qualified immunity and the plaintiff is entitled to punitive damages.

PLAINTIFF REQUESTS that this court enter judgment against Defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

### COUNT III - 42 USC SECTION 1983 DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS- GABRIEL GUI AS TO ALL DEFENDANTS

141.     The plaintiffs incorporate paragraphs 1 through 140 above.

142.     Through her Employment Agreement of 10/8/09 with Detroit 90/90 and Axios, Gabriela Gui has a property interest in her employment as principal of UPSM from July 1, 2010 through June 30, 2015, the term in that contract.  The fixed term of employment in the Agreement negated the "employee at will" language.  Ex. 1.

143.     Before Gui left her prior position at DPS, she explained that she required at least a 4-year contract with New Urban Learning.  New Urban Learning's CEO promised her a 5-year contract.

144.     Before Gui signed the Employment Agreement, Margaret Trimer-Hartley explained that the "employee at will" language meant nothing and that they had to put that in every employment contract.

145.    In a Contract Addendum dated October 15, 2009, NUL agreed to purchase 5 years of service credit in the Michigan Public School Employee Retirement System (MPSERS) to compensate Gui for the five years of service credit she would lose during the term of her Employment Agreement.  Ex. 2.  This Addendum confirmed the employer's commitment to a 5-year fixed term of employment.

146.    On or about February 11, 2010, through a lump sum payment of $79.000.00 to Gui, NUL furnished the benefit promised in the first Contract Addendum.  In that document, NUL memorialized the payment and stated, "Dr. Gui has a five year contact with UPSM." There was no "employee at will" language in this Contract Addendum.  Ex. 3.

147.    This Addendum of 2/11/10 stated that the additional remuneration "is also intended to serve as compensation for work leading up to the opening of UPSM High School in the fall of 2010."  Id.  (Gui had actually performed many hours of work before July 1, 2010, when she was to start work per the Employment Agreement.)  Thus, even if Gui's initial Employment Agreement had not been for a fixed term, the second Contract Addendum promising "Dr. Gui has a five year contact with UPSM", and supported by additional consideration, would have amended the initial contract to create a fixed-term contract with a guarantee of discharge only for cause.

148.    In the Employment Agreement of 3/28/12, Detroit 90/90 and Axios affirmed the commitment to a five-year term of employment.  The fixed term of employment in the Agreement negated the "employee at will" language.  Ex. 4.

149.    Alternatively, the Employment Agreement of 3/28/12 had no effect on the terms of Gui's employment which the initial Employment Agreement, and its modification by the subsequent two Addendums, still controlled for the following reasons:

A. The initial Employment Agreement and Addendums were with New Urban Learning/A.I. Central LLC as co-employers. The second Employment Agreement was with Detroit 90/90/A.I. Central LLC as co-employers. One-half of the co-employer unit remained constant.

B. The successor employer was the predecessor employer's successor in fact.

C. A majority of the successor's employees were employed by the predecessor employer.

D. The successor employer remained in the same business, with the same location in the same school district, producing the same service, with the same curriculum.

E. There was no additional consideration to support the Employment Agreement of 3/28/12. Therefore, for all of the latter reasons, the successor employer was bound to the terms of the existing contract between Gui and New Urban Learning/A.I. Central LLC last modified by the Contract Addendum of 2/11/10.

150. On May 21, 2014, Gui asked Ornstein whether she would have a job as principal of UPSM in the fall (the final year of her five-year term). Ornstein promised that she would retain her job, unless she chose to decline it.

151. All of the above circumstances created an implied contract of just-cause employment and instilled in Gui a legitimate expectation of just-cause employment. Thus, plaintiff has a property interest in continued employment through June 30, 2015. She has a legitimate claim of entitlement to unpaid past and future salary and fringe benefits from the defendants through June 30, 2015.

152. After her discharge, Gui made a demand for payment of her salary, her opt-out payment for health insurance benefits, and the employer's contribution to her 401K account for the 52 weeks of the 2014-15 school year. Detroit 90/90 and Axios refused Gui's demand.

153. All of the defendants acted under color of law and engaged in state action for the following reasons:

A.  PSAD and its school board, governmental entities, showed an interest in the termination from employment of Gabriela Gui. Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before terminating Gui and obtained the approval of the latter entities before terminating Sheu.

B.  PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to terminate Gabriela Gui that the choice to terminate her was essentially the decision of PSAD.

C.  Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in the decision to terminate Gabriela Gui's employment. There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios (both private entities) and the PSAD, a governmental entity.

154.    By failing to pay the plaintiff the compensation to which she is entitled, without good cause, all of the defendants, in conspiracy with each other, have deprived the plaintiff of property without due process of law under color of law in violation of the 5th and 14th Amendments to the United States Constitution.

155.    By discharging Dr. Gui without notice of a hearing, without an opportunity to be heard, and without a statement of reasons why she was discharged, all of the defendants, in conspiracy with each other, have deprived the plaintiff of property without due process of law under color of law in violation of the 5th and 14th Amendments to the United States Constitution.

156.    These unconstitutional deprivations of plaintiff's liberty interests implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the PSAD and its school Board. Alternatively, the constitutional deprivations resulted from the "custom" of Board officials even though such custom did not receive formal approval through the Board's official decisionmaking channels. Thus, PSAD, together with Detroit 90/90 and Axios, are liable under 42 USC Sections 1983 and 1988.

157.    Under 42 USC Sections 1983 and 1988, the defendants' unconstitutional acts are the proximate cause of plaintiff's damages, including, but not limited to: loss of salary and fringe, emotional distress, exemplary damages, expenses associated with seeking other employment, loss of earning capacity and ability to work, the plaintiff suffered and will suffer these losses in the future.  The plaintiff is also entitled to attorney's fees and costs.

158.    In depriving the plaintiff of procedural and substantive due process, all of the defendants acted with evil motive and intent.  Their motive was to remove the plaintiff from her employment to silence dissent against the restructuring of the school district.  Therefore, the defendants are not entitled to qualified immunity and the plaintiff is entitled to punitive damages.

PLAINTIFF REQUESTS that this court enter judgment against Defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

## COUNT IV- BREACH OF EXPRESS AND IMPLIED EMPLOYMENT CONTRACT- GABRIEL GUI AS TO DETROIT 90/90 AND AXIOS

159.    Plaintiffs incorporate by reference paragraphs 1 through 158.

160.    While Plaintiff Gabriela Gui was employed by Detroit 90/90 and Axios, management made contractual promises and written and oral statements to Plaintiff that she had a contract for a 5-year term of employment and that it was defendants' policy not to discharge plaintiff from employment as long as she performed her job.

161.    Further, while plaintiff was employed by defendants, she was led to believe that she would not be terminated except for good cause.

162.    Plaintiff relied upon these contracts, policies, statements, and representations of defendants through their agents, servants, or employees. As a result, there was, by express words, implications, or operation of law, a contractual agreement between plaintiff and defendants by which defendants were obligated to terminate plaintiff's employment only for good cause.

163.     As a result of defendants' termination of plaintiff's employment, defendants have breached the contract described above.

164.     As a direct and proximate result of the termination and breach of contract, plaintiff has been placed in financial distress, has suffered loss of wages and benefits, earning capacity, and ability to work, and will suffer these losses in the future.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

## COUNT V- DISCHARGE VIOLATING  REASONABLE EXPECTATION OF JUST-CAUSE EMPLOYMENT
## GABRIEL GUI AS TO DETROIT 90/90 AND AXIOS

165.     Plaintiffs incorporate by reference paragraphs 1 through 164.

166.     While plaintiff was employed by defendants Detroit 90/90 and Axios, defendants' policies and procedures, which were reasonably related to employee discharge, instilled legitimate expectations of just-cause employment in Plaintiff.

167.     Plaintiff reasonably relied on these policies and procedures and, as a result, legitimately expected that she could be involuntarily terminated only for just cause.

168.     As a result of defendants' termination of plaintiff's employment, defendants interfered with the legitimate expectation of just-cause employment that defendants had instilled in plaintiff.

169.     As a direct and proximate result of defendants' actions, plaintiff has suffered depression, emotional and physical distress, mental anguish, loss of reputation, humiliation and embarrassment, and the physical manifestations of these problems and will suffer these problems in the future.

170.    As a further direct and proximate result of defendants' breach of duty, plaintiff has been placed in financial distress; has suffered loss of wages and benefits, earning capacity, and ability to work; and will suffer these losses in the future.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees

## COUNT VI - VIOLATION OF THE WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION ACT 18 USC 2510 ET SEQ.
## SHEU AND GUI AS TO ALL DEFENDANTS

171.    Plaintiffs incorporate by reference paragraphs 1 through 170.

172.    On or about May 23, 2104, the defendants or agents of all of the defendants intercepted electronic communications between Sheu and Gui and between Sheu and Grady Jones, Jr. by acquiring the contents of electronic communications through the use of an electronic, mechanical or other device.

173.    Sheu and Gui were parties to the intercepted electronic communications and also were persons against whom the interception was directed, and, thus are aggrieved persons under 18 USC 2510(11).

174.    On or about May 23, 2104, the defendants or agents of all of the defendants intentionally intercepted, endeavored to intercept, or procured other persons to intercept or to endeavor to intercept the plaintiffs' electronic communications.

175.    On and after May 23, 2104, the defendants or agents of all of the defendants intentionally disclosed, or endeavored to disclose, to other persons the contents of electronic communications between the plaintiffs, knowing or having reason to know that the information was obtained through the interception of an electronic communications in violation of the Wire and Electronic Communications Interception Act 18 USC 2510 et seq.

176.    On and after May 23, 2104, the defendants and agents of all of the defendants intentionally used, or endeavored to use, the contents of electronic communications between the plaintiffs, knowing or having reason to know that the information was obtained through the interception of electronic communications in violation of the Wire and Electronic Communications Interception Act 18 USC 2510 et seq.

177.    The agents of the defendants committed the above acts upon instructions from the management, officers, trustees, or directors of the defendants.  The agents committed the above acts in the course of and within the scope of their employment with the defendants.

178.    Neither Sheu nor Gui consented to the defendants or their agents intercepting, disclosing, or using their electronic communications.

179.    The defendants and agents of the defendants intercepted the communication of Sheu and Gui for the purpose of committing tortious acts in violation of the United States Constitution and the laws of the State of Michigan as stated in Counts I through V and Counts VIII through IX stated herein.

180.    Under 18 USC 2520, the defendants are civilly liable to plaintiffs for appropriate relief, including:

(1) such preliminary and other equitable or declaratory relief as may be appropriate;

(2) damages whichever is the greater of--

    (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

    (B) statutory damages of whichever is the greater of $ 100 a day for each day of violation or $10,000;

(3) punitive damages in appropriate cases; and

(4) a reasonable attorney's fee and other litigation costs reasonably incurred.

181.     All of the defendants and their agents acted with evil motive and intent.  Their motive was to remove Gui from her employment to silence dissent against the restructuring of the school district.  Therefore, the plaintiff is entitled to punitive damages.

182.     A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the private email messages between Sheu and Gui and between Sheu and Jones.  Justice requires that the court grant the injunctive relief.

183.     There exists no adequate remedy at law to halt the further dissemination of the private email messages.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which they are deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

### COUNT VI - VIOLATION OF THE STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT – 18 USC 2701 ET SEQ. SHEU AND GUI AS TO ALL DEFENDANTS

184.     Plaintiffs incorporate by reference paragraphs 1 through 183.

185.     On or about May 23, 2104, the defendants or agents of all of the defendants intercepted electronic communications between Sheu and Gui and between Sheu and Grady Jones, Jr. by acquiring the contents of electronic communications through the use of an electronic, mechanical or other device.

186.     Sheu and Gui were parties to the intercepted electronic communications and also were persons against whom the interception was directed, and, thus are aggrieved persons under 18 USC 2510(11) and 18 USC 2707 (a).

187.     On or about May 23, 2104, the defendants and agents of all of the defendants intentionally and without authorization accessed Sheu's email account on the Gmail server, a facility through which an electronic communication service is provided.  This conduct violated The Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC 2701(a)(1).

188.     The agents of the defendants committed the above acts upon instructions from the management, officers, trustees, or directors of the defendants.  The agents committed the above acts in the course of and within the scope of their employment with the defendants.

189.     Neither Sheu nor Gui consented to the defendants or their agents accessing Sheu's email account on the Gmail server.

190.     The defendants and their agents engaged in the violation of USC 2701(a)(1) with a knowing or intentional state of mind.

191.     Under 18 USC 2707, the defendants are civilly liable to plaintiffs for appropriate relief, including:

(1) such preliminary and other equitable or declaratory relief as may be appropriate;

(2) the sum of the actual damages suffered by the plaintiffs and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $ 1,000;

(3) punitive damages because the violation of USC 2701(a)(1) is willful and intentional; and

(4) a reasonable attorney's fee and other litigation costs reasonably incurred.

192.     All of the defendants and their agents acted willfully and intentionally, with evil motive and intent.  Their motive was to remove Gui from her employment to silence dissent against the restructuring of the school district.  Therefore, the plaintiff is entitled to punitive damages.

193.    A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal email messages between Sheu and Gui and between Sheu and Jones.  Justice requires that the court grant the injunctive relief.

194.    There exists no adequate remedy at law to halt the further dissemination the private email messages between Sheu and Gui and between Sheu and Jones.  Justice requires that the court grant the injunctive relief.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which they are deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

<u>**COUNT VII-INVASION OF PRIVACY**</u>
<u>**INTRUSION IN PLAINTIFFS' PRIVATE AFFAIRS**</u>
<u>**GUI AND SHEU AS TO ALL DEFENDANTS**</u>

195.    Plaintiffs incorporate by reference paragraphs 1 through 194.

196.    The email messages between Gui and Sheu and between Sheu and Grady Jones, Jr., intruded upon by defendants on or about May 23, 2014, were of a secret and private subject matter.

197.    The plaintiffs had a right to keep that subject matter private.

198.    To obtain email messages, the employers used a method that was objectionable to a reasonable person.

199.    The intrusion by defendants was intentional or grossly negligent.

A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from

further disseminating the personal photographs of Justine Sheu and the personal email messages. Justice requires that the court grant the injunctive relief.

200.    There exists no adequate remedy at law to halt the further dissemination of the personal photographs of Justine Sheu or the personal email messages.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which they are deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

### COUNT VIII-INVASION OF PRIVACY-PUBLIC DISCLOSURE OF EMBARRASSING PRIVATE FACTS ABOUT PLAINTIFF-SHEU AS TO ALL DEFENDANTS

201.    Plaintiffs incorporate by reference paragraphs 1 through 200.

202.    By displaying photographs of Sheu in lingerie to employees and to a relative of an employee, the defendants engaged in public disclosure of embarrassing private facts about Sheu.

203.    The disclosed information is highly offensive to a reasonable person and of no legitimate concern to the public.

204.    The public disclosure by defendants was intentional or grossly negligent.

205.    A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal photographs of Justine Sheu.  Justice requires that the court grant the injunctive relief.

206.    There exists no adequate remedy at law to halt the further dissemination of the personal photographs of Justine Sheu .

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

## COUNT IX- UNREASONABLE SEARCH AND SEIZURE UNDER THE FOURTH AMENDMENT, 42 USC 1983
## SHEU AND GUI AS TO ALL DEFENDANTS

207.    Plaintiffs incorporate by reference paragraphs 1 through 206.

208.    When they searched and seized email messages between Sheu and Gui and between Sheu and Grady Jones, Jr., the defendants acted under the color of state law for the following reasons:

A.    PSAD and its school board, governmental entities, showed an interest in the search and seizure of the email messages.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before searching and seizing the messages and obtained the approval of the latter entities before searching and seizing the messages.

B.    PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to search and seize the messages that the choice to search and seize the messages was essentially the decision of PSAD.

C.    Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in the decision to search and seize the messages.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios (both private entities) and the PSAD, a governmental entity.

209.    The defendants deprived the plaintiffs of rights, privileges, or immunities secured by the Constitution, specifically the right to be free from unreasonable searches and seizure, protected by Fourth Amendment to the United States Constitution.

210.    The plaintiffs had reasonable expectations of freedom from governmental intrusion into their personal email messages.

211.    The defendants did not have probable cause to search the email messages.

212.    The deprivation of the plaintiffs' constitutional right to be free from unreasonable searches and seizures occurred without due process of law, because the defendants did not obtain a warrant or other judicial process before executing the search and seizure.

213.    The agents of the defendants, while acting under color of state law, violated the plaintiffs' constitutional rights, and a policy or policy of inaction of the Public School Academies of Detroit was the moving force behind the violation.

214.    Thus, the defendants are liable under 42 USC Sections 1983 and 1988.

215.    A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal messages between Gui and Sheu.  Justice requires that the court grant the injunctive relief.

216.    There exists no adequate remedy at law to halt the further dissemination of the personal messages between Gui and Sheu.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which she is deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

### COUNT X- VIOLATION OF MICHIGAN FREEDOM OF INFORMATION ACT SHEU AND GUI AS TO DEFENDANT PSAD AND ITS SCHOOL BOARD

217.    Plaintiffs incorporate paragraphs 1 through 216 above.

46

218.    On July 9, 2014, Gabriela Gui through counsel submitted to PSAD a request for Gui's employment file and other documents under the Michigan Freedom of Information Act. Ex. 6.

219.    On July 30, 2014, Justine Sheu through counsel submitted to PSAD a request for Sheu's employment file and other documents under the Michigan Freedom of Information Act. Ex. 7.

220.    PSAD and its School Board has never responded to either request.

221.    Under the Michigan Freedom of Information Act, a public body shall either furnish the documents requested or respond in writing denying, in full or in part, the request for a public record within 5 business days after the public body receives the request. Alternatively, the public may issue a notice extending the time to respond by not more than 10 business days.  A public body shall not issue more than 1 notice of extension for a particular request.  MCL 15.235(2).  Failure to respond to a request p constitutes a public body's final determination to deny the request. MCL 15.235(3).

222.    PSAD and its School Board failed to respond to the plaintiffs' request within the 5-day period pursuant to MCL 15.235(2). That failure constitutes PSAD's final determination to deny the request, under MCL 15.235(3).

223.    Under MCL 15.240(4), (6), this court has jurisdiction to compel the PSAD's disclosure of the documents requested by plaintiff and to award plaintiff's reasonable attorney fees, costs and disbursements.

224.    PSAD and its School Board has arbitrarily and capriciously violated this act by their refusal or delay in disclosing or providing copies of the documents requested by plaintiffs.

Accordingly, plaintiffs are entitled, in addition to any actual or compensatory damages, punitive damages in the amount of $500.00 and attorney fees and costs.  MCL 15.240(7).

PLAINTIFFS REQUEST that this court enter an order of mandamus directing the defendants to furnish the requested documents and enter judgment against defendants in whatever sum to which they are deemed entitled, together with costs, interest, and attorney fees.

**COUNT XI**
**VIOLATION OF BULLARD-PLAWECK EMPLOYEE RIGHT TO KNOW ACT-**
**GUI AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT**
**90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS**

225.    Plaintiffs incorporate paragraphs 1 through 224 above.

226.    The defendants Detroit 90/90 and Axios have removed from Gui's personnel file the "First trimester performance review", dated December 1, 2010.  Ex. 8.

227.    By removing the "First trimester performance review" from Gui's personnel file, the defendants Detroit 90/90 and Axios willfully and knowing withheld information from Gui's personnel file.

228.    The defendants have included in Gui's personnel file a Teacher/Advisor Evaluation Rubric apparently used at University Preparatory Academy during the 2010-2011 school year.  Ex. 9.  This Evaluation Rubric did not apply to Dr. Gui since it was apparently used at a school other than UPSM and was used just for evaluation of teachers, not for evaluation of principals.  None of the signatures on the documents are Dr. Gui's signature.

229.    By including the above Teacher/Advisor Evaluation Rubric in Gui's personnel file, the defendants Detroit 90/90 and Axios willfully and knowing placed false information in Gui's personnel file.

230.    The plaintiff has asked the defendants to correct her personnel file but they have refused.

231.    Under the Bullard-Plawecki Employee Right to Know Act, MCL 423.451, et seq.,

Gui is entitled to have the false information expunged, and to statutory damages of $200.00 plus

costs, reasonable attorney's fees, and actual damages.

PLAINTIFF REQUESTS that this court order defendants Detroit 90/90, Axios, and their boards

of directors, to expunge the false information and include the correct information in her

personnel file, and that this Court enter judgment against defendants Detroit 90/90 and Axios in

whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

<u>**COUNT XII**</u>
<u>**VIOLATION OF BULLARD-PLAWECK EMPLOYEE RIGHT TO KNOW ACT-**</u>
<u>**SHEU AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT**</u>
<u>**90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS**</u>

232.    Plaintiffs incorporate paragraphs 1 through 231 above.

233.    On October 10, 2013, Venus Crosby, Director of College Counselling for Detroit

90/90 and Axios, gave a written reprimand to Sheu concerning "Unacceptable Communication

for Absences."   Ms. Crosby criticized Sheu for "failure to perform the required functions of your

position by not communicating your absence in a timely manner, and/or providing adequate

resources to reassign tasks."  This criticism was in referenced to Ms. Sheu's absence from an

ACT prep session on October 10, 2013, due to the sudden onset of illness (due to food

poisoning) when she woke up that very morning.  The onslaught of her symptoms, including

nausea, vomiting, and fainting, was sudden and unanticipated.

234.    But it was absurd for Ms. Crosby to reprimand Ms. Sheu for not reporting an

absence before she knew she was sick.  As soon as she was able to do so on the morning of

October 10, 2013, Ms. Sheu reported to Substitute Services and to Crosby that she would be

absent.

235.    Crosby also criticized Sheu for failing "to provide adequate resources to reassign tasks."  That criticism was also absurd.  Sheu is neither a certified teacher nor a substitute teacher, and, therefore, had no authority, standing, or responsibility to create a detailed lesson plan for someone to implement in her absence.  The teachers were responsible for creating unit and lesson plans prior to the beginning of their school year, and they created these unit plans *prior to the understanding* that Sheu's ACT prep sessions would be occurring in their classrooms.  The teachers should have implemented their lesson plans for October 10, 2013.

236.    Crosby referred to two prior absences as exacerbating factors generating her reprimand.  But Sheu gave Crosby and others ample advance notice of those absences which were due to a respiratory infection.

237.    Sheu refused to sign Crosby's written reprimand, because she believed it was patently unjust.

238.    Crosby's reprimand was a form of retaliation for Sheu's speech criticizing the restructuring of the school district, including Crosby's redesign of the college advising/ACT preparation program.

239.    On October 23, 2013, Sheu drafted a written response to the October 10th reprimand.  Sheu intended to submit this response to Crosby at the end of the school year.  Sheu wanted to wait to submit the response, because she sought to avoid the retaliation she anticipated from Crosby if Crosby received the response during the school year.

240.    On August 4, 2014, John Sanford provided a copy of Sheu's entire personnel file to plaintiffs' counsel.  Crosby's reprimand was not in the file.

241.    On September 18, 2014, John Sanford sent a copy of Crosby's reprimand to plaintiffs' counsel.  Sanford stated:

Ms. Sheu's supervisor, Venus Crosby, recently provided me with a copy of the attached which was a follow-up to a conversation she had with Ms. Sheu in early October, 2013. After this document was provided, Ms. Sheu did have a follow-up meeting with Mrs. Crosby and Ms. Emily Bitzarakis (HR – Det. 90/90) regarding it at Ms. Sheu's request.

While Ms. Sheu did not provide any written response to this documentation at that time and refused to sign it, after her separation we did find a two-and-a-half page draft response dated October 11, 2013 on her school laptop. As her response was never submitted, it is not part of her file.

242.    The Bullard-Plawecki Employee Right to Know Act prohibits the defendant from placing the reprimand in Sheu's personnel file.

243.    The defendants have refused to place Sheu's response of October 23, 2013, in her personnel file.

244.    By placing Crosby's unjustified reprimand in Sheu's personnel file, the defendants willfully and knowing placed false information in Sheu's personnel file.

245.    The defendants willfully and knowing withheld information from Sheu's personnel file: her response to the reprimand.

246.    Under the Bullard-Plawecki Employee Right to Know Act, MCL 423.505, 423.511, Sheu is entitled to have the reprimand of October 10, 2013 expunged, and to statutory damages of $200.00 plus costs, reasonable attorney's fees, and actual damages.

247.    In the alternative, under the Bullard-Plawecki Employee Right to Know Act, MCL 423.505, 423.511, Sheu is entitled to (1) have her response to the reprimand of October 10, 2013 included when the information is divulged to a third party and as long as the reprimand of October 10, 2013 is a part of the file, and, (2) to $200.00 plus costs, reasonable attorney's fees, and actual damages.

PLAINTIFF REQUESTS that this court order defendants Detroit 90/90, Axios, and their boards of directors, to expunge the false information and include the correct information in her

personnel file, and that this Court enter judgment against defendants Detroit 90/90 and Axios in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

### COUNT XII-DECLARATORY JUDGMENT REGARDING CONTENTS OF EMPLOYMENT FILE-
### GUI AND SHEU AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT 90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS

248.     Plaintiffs incorporate paragraphs 1 through 247 above.

249.     Under the Bullard-Plawecki Employee Right to Know Act, and the First and Fourteen Amendments to the United States Constitution, there is an actual controversy as to the proper contents of the plaintiffs' personnel files in the possession of Detroit 90/90 and Axios.

250.     Under 28 USC § 2201 and Michigan Court Rule 2.605, the plaintiffs are entitled to a declaratory judgment of their rights to accurate, fair, and complete personnel files. PLAINTIFFS REQUEST that this court enter a declaratory judgment as to the accurate, fair, and complete contents of the plaintiffs' personnel files, together with costs, interest, and attorney fees.

### COUNT XIII-CLAIM AND DELIVERY-
### SHEU AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT 90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS

251.     Plaintiffs incorporate paragraphs 1 through 250 above.

252.     The Employee Handbook of Detroit 90/90 and Axios states,

You may make occasional incidental use of electronic devices for personal use (less than 5%) during non-work time provided that you abide by all provisions in this policy....It must be understood that any personal information will be treated no differently from other information, which will be accessed, monitored, utilized and disclosed by the Employer to the extent permitted by applicable law. Accordingly, users cannot use electronic devices, including the computer systems, E-mail, Internet or voice mail systems to send, receive, create, edit or store any information that they wish to keep private.

253.    But the Handbook does not state that an employee's personal documents on the employer's computer are the property of the employer.

254.    During her tenure as an employee, the defendants issued to Sheu a laptop computer to use.  Sheu did use less than 5% of the laptop's memory for personal use.

255.    During her employment, Sheu placed on the hard drive of her laptop certain personal financial documents, including income tax documents.  Those documents remained Sheu's personal property despite the employer's policy regarding privacy of personal information.

256.    When Sheu was discharged, she asked John Sanford of Axios if she could retrieve her personal documents from the laptop.

257.    Initially, on May 22, 2014, John Sanford told Sheu that he would have the IT department look for the documents on her laptop.  He explained that the employer had a regular process for this.

258.    But then, later on May 22, 2014, Emily Bitzarakis, the Human Resources Director for Detroit 90/90, told Sheu:

> I spoke with the IT department, and I'm sorry to report that that information is not retrievable. Because it is a company-issued device, it is assumed that any personal information accessed or saved on the device will be kept to a minimum and also backed up in another location, so we do not have a process by which we maintain a copy of any personal information or files for your access after the fact. I'm very sorry for the inconvenience.

259.    Ms. Bitzarakis' representation concerning an alleged company policy for not returning personal information to employees was false.  Bitzaraki's representation that the defendants had not maintained a copy of Sheu's personal information was false.  The defendants had maintained a copy of Sheu's personal information from the laptop but withheld the information from her.

53

260.   The defendants have failed and refused to return the plaintiff's personal documents to the plaintiff.  The defendants have unlawfully detained the plaintiff's personal documents.

261.   The plaintiff seeks possession of the personal documents which the defendants have unlawfully detained.

PLAINTIFF REQUESTS that this court enter a judgment and writ of possession for the plaintiffs' personal documents on the defendants' laptop computer, together with costs, interest, and attorney fees.

## COUNT XIV- COMMON LAW CONVERSION- SHEU AS TO DETROIT 90/90 AND AXIOS

262.   The plaintiffs incorporate paragraphs 1 through 261 above.

263.   The defendants came into possession of Sheu's personal documents by retrieving the laptop computer they had permitted her to use.

264.   The defendants intentionally and wrongfully exerted dominion over the Sheu's personal documents.

265.   The defendants' dominion over the plaintiff's personal documents was in denial of or inconsistent with the plaintiff's rights therein.  As a direct result of the defendants' conversion, the plaintiff has suffered damages, including serious mental anguish, stress, embarrassment, and humiliation.

266.   The plaintiff seeks economic and exemplary damages sustained by the unlawful conversion by the defendant.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

## COUNT XV- STATUTORY LAW CONVERSION-
## SHEU AS TO DETROIT 90/90 AND AXIOS

267.    The plaintiffs incorporate paragraphs 1 through 266 above.

268.    The defendants came into possession of Sheu's personal documents by retrieving the laptop computer they had permitted her to use.

269.    The defendants intentionally and wrongfully exerted dominion over the Sheu's personal documents.

270.    The defendants' dominion over the plaintiff's personal documents was in denial of or inconsistent with the plaintiff's rights therein.  As a direct result of the defendants' conversion, the plaintiff has suffered damages, including serious mental anguish, stress, embarrassment, and humiliation.

271.    The plaintiff seeks economic and exemplary damages sustained by the unlawful conversion by the defendant.

272.    The defendant is liable for statutory conversion under MCL 600.2919a(1)(a).

273.    The plaintiff is entitled to and seeks a judgment against the defendants 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

**RELIEF REQUESTED**

For these reasons, the plaintiffs ask:

A. That defendants be required to appear and answer the allegations of the Complaint;

B. That this Court award to plaintiffs, for violation of their constitutional and common law actions for wrongful discharge: actual damages, including, but not limited to damages for loss of past and future salary and fringe benefits, emotional distress, exemplary damages, expenses associated with seeking other employment, plus punitive damages, interest and attorney's fees and costs;

C. That this Court award to plaintiffs for violation their rights to privacy under state common law, federal statutes, and the Fourth Amendment: statutory and/or actual damages plus punitive damages, and a reasonable attorney's fee and other litigation costs reasonably incurred;

D. That this Court award to plaintiff Justine Sheu 3 times the amount of actual damages sustained for the conversion of her personal documents, plus costs and reasonable attorney fees under MCL 600.2919a(1)(a);

E. That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting the defendant from disclosing or disseminating the personal photographs of Justine Sheu and the personal email messages between Justine Sheu and Gabriela Gui and between Justine Shue and Grady Jones, Jr.;

F. That this Court award to each plaintiff actual or compensatory damages, punitive damages in the amount of $500.00, and reasonable attorney fees and costs under the Michigan Freedom of Information Act;

G. That this Court order the deletions, additions and corrections to the plaintiffs' personnel files and award to the plaintiffs statutory and actual damages, plus reasonable attorney fees and costs, under the Bullard-Plawecki Employee Right to Know Act;

H. That this Court enter a declaratory judgment as to the accurate, fair, and complete contents of the plaintiffs' personnel files;

I. That this Court enter a judgment and writ of possession for the return of Justine Sheu's personal documents, and;

J. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
6675 Edwood Ave.
West Bloomfield, MI 48324
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: October 30, 2014

## JURY DEMAND

The plaintiff demands a jury to try this cause.


Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
6675 Edwood Ave.
West Bloomfield, MI 48324
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: October 30, 2014

# EXHIBIT 1

## *New Urban Learning*

### EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement") is entered into as of the 8th day of October 2009, by and between New Urban Learning/ A.I. Central LLC, a Michigan Corporation, ("Employer"), and Gabriela Gui ("Employee").

Employer and Employee hereby agree as follows:

1. Employment. Employer hereby employs Employee as a Principal at University Prep Science & Math High School, a Michigan public school academy managed by Employer (the "Academy"), and Employee hereby accepts such employment, on the terms and subject to the conditions set forth below.

2. Term of Employment. The term of Employee's employment with Employer under this Agreement shall commence on July 1, 2010 and end on June 30, 2015.

3. Duties. Employee shall perform all of the duties assigned to him or her by Employer and adhere to all of Employer's policies and procedures as may be in effect at any time or from time to time during Employee's employment. Employee further agrees to comply with all of the requirements of Michigan, federal and other applicable law with respect to Employer's operations and/or Employee's performance of his or her duties. Employee's duties under this Agreement shall include, but not be limited to, the following:

    (a) Developing and implementing instructional programs in Employee's areas of expertise in accordance with any program established or approved by Employer for the Academy;

    (b) Participating in cooperative efforts among teachers, staff and students with regard to curriculum, programmatic development and improvement, extra-curricular and other activities including:

    - Engaging parents in each student's education
    - Providing instruction to students and serving as a student advocate
    - Maintaining appropriate student discipline and conduct
    - Applying approved techniques for the ongoing assessment of student learning
    - Attending staff and committee meetings, including two after-school meetings, and fully participating in faculty decision making
    - Conducting and carrying out all other duties and obligations determined by Employer as necessary to facilitate the Academy's mission, goals and standards.

4. Qualifications. Employee represents to Employer that he or she has the appropriate and valid certifications and state requirements for the school year of Agreement. If employee does not provide notarized certificate to Human Resources Department this Agreement shall be considered void and no payments shall be made to employee. Employee understands other required documentation for their file and understands they shall not be paid until file is one hundred percent complete.

5. Compensation. Employer shall compensate Employee at an annual rate of $115,000.00 for the school year 2010-11 with payments to be made biweekly. Three-percent raises will be given annually (July 1) through the life of the contract.

No compensation shall be paid to Employee for any period after the date on which Employee's employment with Employer under this Agreement has terminated.

       a.        **401K Plan**: Employee will be eligible to participate in 401K Plan and receive employer match up to $6,000 beginning July 1, 2010.

The following compensation will also be paid to Employee based on the representations below:

**Health Insurance Waiver:**
Employees who waive their health insurance benefits will receive an additional $2,000, which will also be made in biweekly payments as reflected on their paychecks, but will not be included as a part of their annual salary for the purpose of calculating annual percentage increases. If Employee chooses to receive health insurance benefits during the year, he or she forfeits the remaining portion of the $2,000 payments. *(Please check the appropriate line and initial.)*

Employee chooses to _____ receive or ___✓___ waive health insurance benefits.

**Compensation Summary:**

Base pay:                                              **$ 115,000.00**

Waiver of Health Insurance:              $ 2,000.00

6.       <u>Benefits</u>. Employee will be provided with all of the benefits provided to other similarly situated employees of Employer including, without limitation, health insurance, vision and dental, (unless waived in Section 5, above), disability insurance, life insurance, vacation, sick and personal leave as specified in the Employee Handbook and the Axios/New Urban Learning Benefit Plan, and participation in Employer's retirement program, as permitted under applicable law and regulation, and as set forth in a separate document covering all specific benefits. Many of these benefits will be provided pursuant to formal written plans. The actual terms of any plan document for such benefit supersedes any contrary description and will govern in all instances. Employer necessarily reserves its right to modify or amend any of these benefits, at any time, in its sole discretion and in accordance with applicable law. Advance notice of such changes shall be given when possible.

7.       <u>Compliance with Law</u>. Employee understands and acknowledges that Michigan law requires employers to make accommodations to handicapped individuals where the accommodation does not impose an undue hardship on employers. Handicapped employees or applicants may request an accommodation by notifying Employer in writing of the need for accommodation within 182 days of the date the handicapper knows or should know that an accommodation is needed. Employee understands, agrees and acknowledges that failure to promptly notify Employer regarding the need for any such accommodation will preclude any claim that Employer failed to accommodate the handicapped.

8.       <u>Employment Relationship</u>. Employee's employment with Employer under this Agreement shall be "at will". Employer may terminate this Agreement and Employee's employment at any time, with or without cause. Either party seeking to terminate this Agreement and Employee's employment must provide the other party with 30 days notice of such intent to terminate. Employee understands and agrees that no person has authority to enter into any

-2-

oral agreement for employment for any specified period of time or to make any oral agreement contrary to this Section of this Agreement.

9.  Representations of Parties.  Employer and Employee each represents to the other that he, she or it (a) has carefully read and reviewed the terms of this Agreement, and (b) agrees to the terms of this Agreement freely and voluntarily and without coercion for the purposes of making a legal agreement.  The parties further agree that no representations or promises inconsistent with or additional to this Agreement have been made.

10. Memberships.  Employee's membership in outside organizations is permissible, provided that such memberships are in compliance with applicable Michigan law and do not constitute a conflict of interest

11. Applicable Law and Form.  This Agreement shall be governed by and is subject to all applicable laws of the State of Michigan, and all rules and regulations of Employer and the Academy, all of which are made part of the terms and conditions of this Agreement.

12. Addendum.  See attached Contract Addendum for agreements outside the scope of this document.

Employer and Employee have executed this Agreement as of the date first above written.

**EMPLOYER:**
New Urban Learning

By: _____

Date: _____

**EMPLOYEE:**

_____

Date: _____10/15/09_____

-3-

# EXHIBIT 2

To: Dr. Gabriela Gui
From: Margaret Trimer-Hartley
Re: Contract Addendum
Date: Oct. 15, 2009

May this Contract Addendum serve to:

1. Confirm and outline New Urban Learning's commitment to purchase five years of service credit for you in the Michigan Public School Employee Retirement System (MPSERS) as a signing bonus;
2. Outline the things for which you, as principal of UPSM High School, will be accountable;
3. Commit to provide you with a laptop computer and a cell phone to use for UPSM High School business beginning July 1, 2010;
4. Confirm New Urban Learning's/UPSM's commitment to site-based management.
5. Confirm your authority to make contractual commitments on behalf of UPSM HS to potential staff members for the 2010-2011 school year prior to your official hire date of July 1, 2010.

## Retirement

As a signing bonus, New Urban Learning will purchase five years of service credit through MPSERS on your behalf at a cost of $78,590.31. We will pay the state of Michigan directly in one lump sum just prior to the date you give your current employer 60-day notice of resignation.

## Accountability

As principal of UPSM High School, you will be accountable for the following:

- Meeting AYP beginning with year the second group of 11th graders to take the Michigan Merit Exam (MME) in 2013-14;
- Meeting performance goals outlined by Grand Valley State University—outperform host district; outperform peer districts; outperform weighted average performance of all districts represented in school;
- Graduating 90 percent of ninth graders after four years, and sending 90 percent on to college;
- Site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget; designing and implementing curriculum and instructional practices

## Laptop and Cell Phone

You will be provided with a UPSM laptop computer and a UPSM cell phone to use for UPSM High School business beginning July 1, 2010 through the duration of your contract.

## Site-Based Management

University Prep Science & Math District embraces the North Central Regional Educational Laboratory's definition of site-based management, and agrees to adhere to them for the term of your contract.

**Authority to Hire**

You will have authority to extend contract offers to staff members to work at UPSM HS for the 2010/2011 school year; all staff contracts will begin July 1, 2010.

Margaret Trimer-Hartley
Superintendent, UPSM

Dr. Gabriela Gui

# EXHIBIT 3

CONTRACT ADDENDUM

Dr. Gabriela Gui received a lump sum payment of $79,000 on Thursday, February 11.

The payment was given as a signing bonus for joining University Prep Science & Math as the founding high school principal in the 2010-2011 school year.  It is also intended to serve as compensation for work leading up to the opening of UPSM High School in the fall of 2010.

Further, UPSM agrees to set aside in an escrow account enough funds to cover the actual taxes incurred on her April 2011 tax return as a result of the $79,000 in income.

Dr. Gui has a five year contract with UPSM. She agrees to pay back in full the signing bonus and the taxes if she willfully breaches the employment contract in its current form at any time within the first 12 months.  The contract year begins July 1.


Dr. Gabriela Gui
Principal

Margaret Trimer-Hartley
Superintendent, UPSM

# EXHIBIT 4

**DETROIT 90/90**

**EMPLOYMENT AGREEMENT**

**THIS EMPLOYMENT AGREEMENT** (the "Agreement") is entered into as of the _____ day of _____ 2012, by and between Detroit 90/90/A.I. Central LLC, a Michigan Corporation, ("Employer"), and Gabriela Gui ("Employee").

Employer and Employee hereby agree as follows:

1.   <u>Employment</u>.  Employer hereby employs Employee as a Principal at University Prep Science & Math High School, a Michigan public school academy managed by Employer (the "Academy"), and Employee hereby accepts such employment, on the terms and subject to the conditions set forth below.

2.   <u>Term of Employment</u>.   The term of Employee's employment with Employer under this Agreement shall commence on July 1, 2012 and end on June 30, 2015.

3.   <u>Duties</u>.  Employee shall perform all of the duties assigned to him or her by Employer and adhere to all of Employer's policies and procedures as may be in effect at any time or from time to time during Employee's employment. Employee further agrees to comply with all of the requirements of Michigan, federal and other applicable law with respect to Employer's operations and/or Employee's performance of his or her duties. Employee's duties under this Agreement shall include, but not be limited to, the following:

(a)   As principal of UPSM High School, you will be accountable for the following:

   - Meeting AYP beginning with year the second group of 11th graders to take the Michigan Merit Exam (MME) in 2013-14;
   - Meeting performance goals outlined by Grand Valley State University - outperform host district; outperform peer districts; outperform weighted average performance of all districts represented in school;
   - Graduating 90 percent of ninth graders after four years, and sending 90 percent on to college;
   - Site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget; designing and implementing curriculum and instructional practices.

(b)   Developing and implementing instructional programs in Employee's areas of expertise in accordance with any program established or approved by Employer for the Academy;

(c)   Participating in cooperative efforts among teachers, staff and students with regard to curriculum, programmatic development and improvement, extra-curricular and other activities including:

- Engaging parents in each student's education
- Providing instruction to students and serving as a student advocate
- Maintaining appropriate student discipline and conduct
- Applying approved techniques for the ongoing assessment of student learning
- Attending staff and committee meetings, including two after-school meetings, and fully participating in faculty decision making
- Conducting and carrying out all other duties and obligations determined by Employer as necessary to facilitate the Academy's mission, goals and standards.

4. <u>Qualifications</u>. Employee represents to Employer that he or she has the appropriate and valid certifications and state requirements for the school year of Agreement. If employee does not provide notarized certificate to Human Resources Department this Agreement shall be considered void and no payments shall be made to employee. Employee understands other required documentation for their file and understands they shall not be paid until file is one hundred percent complete.

5. <u>Compensation</u>. Employer shall compensate Employee at an annual rate of $122,450.00 for the school year 2012-13 with payments to be made twice a month. Three-percent raises will be given annually (July 1) through the life of the contract.

No compensation shall be paid to Employee for any period after the date on which Employee's employment with Employer under this Agreement has terminated.

    a. **401K Plan:** Employee will be eligible to participate in 401K Plan and receive employer match up to $6,000 beginning July 1, 2012.

The following compensation will also be paid to Employee based on the representations below:

**Health Insurance Waiver:**

Employees who waive their health insurance benefits will receive an additional $2,000, which will also be made in twice monthly payments as reflected on their paychecks, but will not be included as a part of their annual salary for the purpose of calculating annual percentage increases. If Employee chooses to receive health insurance benefits during the year, he or she forfeits the remaining portion of the $2,000 payments. (Please check the appropriate line and initial.)

Employee chooses to _____ receive or _____X_____ waive health insurance benefits.

2

**Compensation Summary:**

Base pay:                                    **$ 122,450.00**

Waiver of Health Insurance:          $    2,000___

**Laptop and Cell Phone:**

You will be provided with a UPSM laptop computer and a UPSM cell phone to use for UPSM High School business for the duration of your contract.

6.   Benefits.  Employee will be provided with all of the benefits provided to other similarly situated employees of Employer including, without limitation, health insurance, vision and dental, (unless waived in Section 5, above), disability insurance, life insurance, vacation, sick and personal leave as specified in the Employee Handbook and the Axios/Detroit 90/90 Benefit Plan, and participation in Employer's retirement program, as permitted under applicable law and regulation, and as set forth in a separate document covering all specific benefits. Many of these benefits will be provided pursuant to formal written plans.  The actual terms of any plan document for such benefit supersedes any contrary description and will govern in all instances.  Employer necessarily reserves its right to modify or amend any of these benefits, at any time, in its sole discretion and in accordance with applicable law.  Advance notice of such changes shall be given when possible.

7.   Site-Based Management.  University Prep Science & Math District embraces the North Central Regional Educational Laboratory's definition of site-based management, and agrees to adhere to them for the term of your contract.

8.   Authority to Hire.  Employee will have authority to extend contract offers to staff members to work at UPSM HS for the 2012-2013 school year; all staff contracts will begin July 1, 2012.

9.   Compliance with Law.  Employee understands and acknowledges that Michigan law requires employers to make accommodations to handicapped individuals where the accommodation does not impose an undue hardship on employers. Handicapped employees or applicants may request an accommodation by notifying Employer in writing of the need for accommodation within 182 days of the date the handicapper knows or should know that an accommodation is needed. Employee understands, agrees and acknowledges that failure to promptly notify Employer regarding the need for any such accommodation will preclude any claim that Employer failed to accommodate the handicapped.

10.   Employment Relationship.  Employee's employment with Employer under this Agreement shall be "at will."  Employer may terminate this Agreement and Employee's employment at any time, with or without cause.  Either party seeking to terminate this Agreement and Employee's employment must provide the other

3

party with 30 days notice of such intent to terminate. Employee understands and agrees that no person has authority to enter into any oral agreement for employment for any specified period of time or to make any oral agreement contrary to this Section of this Agreement.

11. <u>Representations of Parties</u>. Employer and Employee each represents to the other that he, she or it (a) has carefully read and reviewed the terms of this Agreement, and (b) agrees to the terms of this Agreement freely and voluntarily and without coercion for the purposes of making a legal agreement. The parties further agree that no representations or promises inconsistent with or additional to this Agreement have been made.

12. <u>Memberships</u>. Employee's membership in outside organizations is permissible, provided that such memberships are in compliance with applicable Michigan law and do not constitute a conflict of interest.

13. <u>Applicable Law and Form</u>. This Agreement shall be governed by and is subject to all applicable laws of the State of Michigan, and all rules and regulations of Employer and the Academy, all of which are made part of the terms and conditions of this Agreement.

Employer and Employee have executed this Agreement as of the date first above written.

EMPLOYER:
Detroit 90/90/ A.I. Central LLC

By: _John B. Cleary_
John Cleary

Its: _Contract Administrator_

Date: _3/30/2012_

EMPLOYEE:

GABRIELA GUI
Name Printed

_Gabriela Gui_

Signature

Date: 03/28/2012

EMPLOYER:
Detroit 90/90/ A.I. Central LLC

By: _Geneva Williams_
Geneva Williams

Its: _Interim CEO_

Date: _3/30/2012_

BLOOMFIELD 38030-24 1182801v2

4

**EXHIBIT 5**



Detroit 90/90
Organizational Leadership Chart
Effective 9/30/2013

**Chief Executive Officer**
M. Ornstein

**Confidential Assistant to CEO**
B. Watson

## Academics

**Chief Academic Officer**
D. Jackson

**Principals**
G. Gui
T. Johnson
N. Livingston
K. Llorens
K. Phillips
A. Scott (int)
J. Spencer

**Director of Data, Instruction, and Assessments**
B. Allen

**Director of Student Development**
T. Henderson Jackson

**Director of Curriculum**
S. Sparks

## External Relations

**Chief External Relations Officer**
M. Trimer-Hartley

**Director of Development and Marketing**
J. Cook

**Director of LTI**
R. Millard

**Director of College Counseling**
V. Crosby

**Athletic Director**
E. Davie

## Operations

**Chief Operating Officer**
L. Koenig

**Director of Human Resources**
E. Bitzarakis

**Director of Finance**
S. Laird

**Director of Facilities**
M. Willis

**Director of Information Technology**
N. Cummings

### Legend
Senior Leadership
Junior Leadership

**EXHIBIT 6**

## ROBERT L. LEVI, P.C.

6675 Edwood Avenue
West Bloomfield, Michigan 48324

Telephone (248) 366-4412
Fax (877) 544-4082
www.robertlevilaw.com

**Robert Lawrence Levi**
**Attorney at Law**

July 7, 2014

The Public School Academies of Detroit          Via Certified Mail
c/o Ed Parks, Chairman of the Board          7013 0600 0000 5285 5075
610 Antoinette St.
Detroit, MI 48202

Re:   ***Dr. Gabriela Gui***
      Request under Bullard-Plawecki Employee Right to Know Act and
      under Michigan Freedom of Information Act

Dear Mr. Parks:

I represent Dr. Gabriela Gui concerning matters related to her employment with Detroit 90/90 and The Public School Academies of Detroit. Please consider this letter a request under the Bullard-Plawecki Employee Right to Know Act (MCL 423.501 et, seq.) and under the Michigan Freedom of Information Act (MCL 15.231 et seq.).

Please provide me with access to Dr. Gui's entire "personnel record" under the Bullard-Plawecki Employee Right to Know Act. "Personnel record" means a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. A personnel record includes a record in the possession of a person, corporation, partnership, or other association who has a contractual agreement with the employer to keep or supply a personnel record. Please mail me a copy of her personnel file. I will pay the reasonable costs for copying and postage. Alternatively, I can first review the personnel file at your office and then I will pay for copies of the file.

Also, under the Michigan Freedom of Information Act, please provide me with all public records pertaining to Dr. Gui's employment at University Prep Science Math. "Public record" means a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created. Please provide me with all public

2

records, including minutes of Board meetings, pertinent to: Dr. Gui's qualifications for employment, transfer, additional compensation, or disciplinary action, the hiring of Dr. Gui, her job performance, her promotion or demotion, change in her job responsibilities or position, the discharge of Dr. Gui from employment, or, reports to Grand Valley State University or other entity concerning Dr. Gui's performance or the evaluation of University Prep Science Math. I will pay the reasonable costs for copying and postage.

Finally, please provide me with all other employment records within your possession, custody, or control pertaining to Dr. Gui including, but not limited to, information concerning hours of employment, wages, salaries, plan document and current statement regarding her retirement benefits plan, current statement regarding her fringe benefits, any information regarding worker's compensation benefits, promotions, write-ups, disciplinary actions, performance evaluations, communications to Dr. Gui and others concerning her employment, and medical and other leaves of absence. I will pay the reasonable costs for copying and postage.

I have enclosed an authorization signed by Dr. Gui that allows you to provide me with the records I have requested.

Thank you very much.

Sincerely,

Robert L. Levi

RLL:rll
Encl.
Cc: Gabriela Gui w/encl.

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)  TOM TAPERTENNE

C. Date of Delivery  7/9/14

1. Article Addressed to:

The Public School Academies
of Detroit
c/o Ed Parks
610 Antoinette St.
Detroit, MI 48202

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail®   ☐ Priority Mail Express™
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7013 0600 0000 5285 5075

PS Form 3811, July 2013     Domestic Return Receipt

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Robert L. Levi, P.C.
Attorney and Counsellor
6675 Edwood Avenue
West Bloomfield, MI 48324

24263175

# U.S. Postal Service™
## CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To  PSAD

Street, Apt. No.;
or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006         See Reverse for Instructions

## Certified Mail Provides:

- A mailing receipt
- A unique identifier for your mailpiece
- A record of delivery kept by the Postal Service for two years

### Important Reminders:

- Certified Mail may ONLY be combined with First-Class Mail® or Priority Mail®.
- Certified Mail is *not* available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**

PS Form 3800, August 2006 *(Reverse)* PSN 7530-02-000-9047

# EXHIBIT 7

## ROBERT L. LEVI, P.C.

6675 Edwood Avenue
West Bloomfield, Michigan 48324

*Telephone (248) 366-4412*
*Fax (877) 544-4082*
*www.robertlevilaw.com*

*Robert Lawrence Levi*
*Attorney at Law*

July 24, 2014

The Public School Academies of Detroit                    Via Certified Mail
c/o Ed Parks, Chairman of the Board                       7013 0600 0000 5285 5112
610 Antoinette St.
Detroit, MI 48202

Re:  *Justine Sheu*
     Request under Bullard-Plawecki Employee Right to Know Act and
     under Michigan Freedom of Information Act

Dear Mr. Parks:

     I represent Dr. Justine Sheu concerning matters related to her employment with Detroit
90/90 and The Public School Academies of Detroit.  Please consider this letter a request under
the Bullard-Plawecki Employee Right to Know Act (MCL 423.501 et, seq.) and under the
Michigan Freedom of Information Act (MCL 15.231 et seq.).

     Please provide me with access to Ms. Sheu's entire "personnel record" under the Bullard-
Plawecki Employee Right to Know Act.  "Personnel record" means a record kept by the
employer that identifies the employee, to the extent that the record is used or has been used, or
may affect or be used relative to that employee's qualifications for employment, promotion,
transfer, additional compensation, or disciplinary action. A personnel record includes a record in
the possession of a person, corporation, partnership, or other association who has a contractual
agreement with the employer to keep or supply a personnel record.  Please mail me a copy of her
personnel file. I will pay the reasonable costs for copying and postage.  Alternatively, I can first
review the personnel file at your office and then I will pay for copies of the file.

     Also, under the Michigan Freedom of Information Act, please provide me with all public
records pertaining to Ms. Sheu's employment at University Prep Science Math. "Public record"
means a writing prepared, owned, used, in the possession of, or retained by a public body in the
performance of an official function, from the time it is created.  I will pay the reasonable costs for

2

copying and postage.

Finally, please provide me with all other employment records within your possession, custody, or control pertaining to Ms. Sheu including, but not limited to, hiring and discharge, information concerning hours of employment, wages, salaries, plan document and current statement regarding her retirement benefits plan, current statement regarding her fringe benefits, any information regarding worker's compensation benefits, promotions, write-ups, disciplinary actions, performance evaluations, communications to Ms. Sheu and others concerning her employment, and medical and other leaves of absence.  I will pay the reasonable costs for copying and postage.

I have enclosed an authorization signed by Ms. Sheu that allows you to provide me with the records I have requested.

Thank you very much.

Sincerely,

Robert L. Levi

RLL:rll
Encl.
Cc:  Justine Sheu w/encl.

2

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
Tom Stapertenne    7/30/14

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Public School Academies of
Detroit
c/o Ed Parks
610 Antoinette St.
Detroit, MI 48202

3. Service Type
☒ Certified Mail®    ☐ Priority Mail Express™
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7013 0600 0000 5285 5112

PS Form 3811, July 2013    Domestic Return Receipt

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Robert L. Levi, P.C.
Attorney and Counsellor
6675 Edwood Avenue
West Bloomfield, MI 48324

# U.S. Postal Service™
# CERTIFIED MAIL™ RECEIPT
## (Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

7112 5105 5285 0000 0600 1012

Sent To  PSAD

Street, Apt. No.;
or PO Box No.

City, State, ZIP+4

**PS Form 3800, August 2006**                    See Reverse for Instructions

# Certified Mail Provides:

- A mailing re...
- A unique ide.....er for your mailpiece
- A record of delivery kept by the Postal Service for two years

### Important Reminders:

- Certified Mail may ONLY be combined with First-Class Mail® or Priority Mail®.
- Certified Mail is *not* available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**

PS Form 3800, August 2006 *(Reverse)* PSN 7530-02-000-9047

# EXHIBIT 8



# University Prep Science & Math Middle School

**5100 John R., Detroit, Michigan 48202, T. 313.832.8400  F. 313.833.4816  www.uprepsm.com**

To:  Dr. Gabriela Gui
From:  Margaret Trimer-Hartley
Re:  First trimester performance review
Date:  December 1, 2010

May this memo serve as your official first trimester performance review.  It is a chance for both of us to reflect, rethink--if necessary--and recharge.

It has been a pleasure to put together my thoughts, impressions and analysis of your performance since you officially started as Principal of UPSM High School July 1, 2010.  My review touches several areas of performance, but I focus most on content (teaching AND learning), culture, communication and customer service—my top four priorities.

You deserve a hearty CONGRATULATIONS, Gabriela.  You have started a fabulous new general admissions science and math high school in the city of Detroit.  You have managed the myriad start-up challenges with determination, grace and a can-do, will-do, must-do attitude. Nothing you faced—from furniture and technology issues to enrollment and scheduling issues—proved insurmountable.  You and your mighty team tackled it all, and I am beaming with pride.

Perhaps your greatest accomplishment so far is the culture you have established in your professional learning community.  Your team asks the right questions, has the right debates and solves problems the way one would expect of master educators who are thoroughly committed to the kids AND to learning.   You chose well.  Your fidelity to our hiring protocol made a difference in the selection process. Now, the extremely high level of care, the support and the prodding you do gives them the courage and the desire to step outside their comfort zones and do the kinds of things necessary for student success.  You team appears willing and ready to do just about ANYTHING you ask of them. I believe you have the best team possible serving with you and Grady as the founders, the pioneers of UPSM HS.

The culture and camaraderie among the staff are beginning to trickle down to the students.  Developing meaningful, honest and productive relationships between teachers and students can be tricky—particularly at the high school level.  Boundaries are critical, but so, too, are genuine, deep connections.  Our kids know the difference between superficial and super special!  The recent whole-school wrap session was one of a couple of turning points in the development of student-to-teacher and student-to-student relationships.  The warmth the students feel for you and the staff is palpable. I see it everyday in their interactions—the hugging, the

endearing and affectionate "hello, mom" comments, even the way they step it up when you and/or Grady tie their ties and make them pull up their pants.  And yet they are still terrified of you. ☺  They know that you expect, demand and reinforce excellence—nothing less.

I look forward to watching this dynamic continue to evolve in the next trimester.

Your attention to data and your fixation on results are precisely the traits you must have to move this group of kids forward fast.  Using data, you have made important course corrections and adjustments this first trimester.  Your move to mandatory study hall at a time when students were simply not completing and turning in work is just one example of how you used your site-based authority to make a smart policy decision in real time.  You're not over the homework hump with this group yet, but you clearly understand that getting students to do their work is absolutely critical, and your team must do "whatever it takes" to make it happen.  Further, the analysis of which students are truly at risk that you and your team just completed this week as final grades were logged in, again, emphasizes that you are using data in a powerful way to drive real-time interventions and intense individualization.  THAT is what we are all about.

I look forward to an even more intense focus on individual student progress as we dissect the new data from Renaissance Learning.

Your communication with me, with your staff and with parents has developed nicely.  Learning what information to relay to your various audiences when and how is no small task.  You have figured out how and what to share with me. I feel great about the development of our dialog—difficult conversations and all—and I hope that you are comfortable with it, too.  At the same time, I am working very hard to accept and appreciate that you solve problems at the local level so that they do not get to me.  That is a gift, but it is a new way of operating for me.  Thank you for your patience while I get used to not having my nose in every issue!

Your staff is always in the loop thanks to your emails, your morning meetings and your constant presence in the hallways and classrooms.  Information is power, and you understand that teachers need to feel looped in, engaged and in control.

Connecting with parents is the most difficult of our communication challenges. You have established multiple ways of reaching out and ensuring they are in the loop.  I'm particularly delighted with the robo-calls and emails.  Using the technology of the day to reach parents where they are (usually on their cell phones) is smart and efficient.  Your weekly news briefs are also extremely helpful.  The teacher Web sites are developing nicely and have been a lifesaver for so many students—my own included.

Establishing a parent resource center is a huge step in the development of a stronger parent connection, and I'm excited to see that happening.  High school just

feels different for us parents—colder, more formal and distant.  For our highly emotional constituents who are accustomed to lots of hand-holding and bonding, it can be a difficult transition.  A parent center can serve as more than just a place to check PowerSchool and monitor student progress.  It can be a refuge where parents find each other, find their voice and find their way toward productive rather than reactive advocacy.  I encourage you to invite the Detroit Parent Network (DPN) in to offer training and support, and I urge you to continue working with Mrs. Robinson (Dana's mom) to develop our high school PTSA.  Our polling data and the mountain of anecdotal evidence we have from other charters and DPN show that the more we nurture the whole family, the more likely we will be able to recruit and retain them.

The team approach to working with some of your more challenging parents also appears to be a successful strategy for you.  You and Grady balance each other. Do not hesitate to bring me in when you need or want yet another style at the table.  I believe that worked well with Pace Cooper's family as well as Jamal Crews' parents.

Finally, we are looking forward to an extremely busy new year.  We will be recruiting students AND staff for next year, filing for our Title I funding, creating our district-wide salary schedule and many, many other things.  BUT all that, while important, is secondary to the job of moving every student forward as far and as fast as possible.

Stay as focused and relentless as you have been this first trimester.  And make sure you rest and restore yourself this winter break—or I will have to put you on an improvement plan in that area to ensure that you do not burn out!!

Thank you for choosing to lead UPSM High School.  You are a gift to our system, and I am a very fortunate superintendent.

# EXHIBIT 9

University Preparatory Academy
Teacher/Advisor Evaluation Rubric
Formal Evaluation 2010-11

Domain I: Planning and Preparation

| ELEMENT | LEVEL OF PERFORMANCE | | | |
| --- | --- | --- | --- | --- |
| | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
| **Component Ia: Demonstrating Knowledge of Content and Pedagogy** | | | | |
| Knowledge of Content | Teacher makes content errors or does not correct content errors students make. | Teacher displays basic content knowledge but cannot articulate connections with other parts of the discipline or with other disciplines. | **Teacher displays solid content knowledge and makes connections between the content and other parts of the discipline and other disciplines.** | Teacher displays extensive content knowledge, with evidence of continuing pursuit of such knowledge. |
| Knowledge of Prerequisite Relationships | Teacher displays little understanding of prerequisite knowledge important for student learning of the content. | **Teacher indicates some awareness of prerequisite learning although such knowledge may be incomplete or inaccurate.** | Teacher's plans and practices reflect understanding of prerequisite relationships among topics and concepts. | Teacher actively builds on knowledge of prerequisite relationships when describing instruction or seeking causes for student misunderstanding. |
| Knowledge of Content-Related Pedagogy | Teacher displays little understanding of the pedagogical issues involved in student learning of the content. | Teacher displays basic pedagogical knowledge but does not anticipate student misconceptions. | **Pedagogical practices reflect current research on best pedagogical practices within the discipline but without anticipating student misconceptions.** | Teacher displays continuing search for best practice and anticipates student misconception. |
| **Component Ib: Selecting Instructional Goals** | | | | |
| Value | Goals are not valuable and represent low expectations or no conceptual understanding for students. Goals do not reflect important learning. | Goals are moderately valuable in either their expectations or conceptual understanding for students and in importance of learning. | **Goals are valuable in their level of expectations, conceptual understanding and importance of learning.** | Not only are the goals valuable, but teacher can also clearly articulate how goals establish high expectations and relate to curriculum frameworks and standards. |
| Clarity | Goals are either no clear or are stated as student activities. Some goals do not permit viable methods of assessment. | Goals are only moderately clear or include a combination of goals and activities. Most permit viable methods of assessment. | **Most of the goals are clear but may include a few activities. Most permit viable methods of assessment.** | All the goals are clear, written in the form of student learning, and permit viable methods of assessment. |
| Differentiation | Goals are not suitable for the class. | Most of the goals are suitable for most students in the class. | **All the goals are suitable for most students in the class.** | Goals take into account the varying learning needs of individual students or groups. |
| Balance | Goals reflect only one type of learning and one discipline or strand. | Goals reflect several types of learning but no effort at coordination or integration. | **Goals reflect several different types of learning and opportunities for integration.** | Goals reflect student initiative in establishing important learning. |

**Component Ic: Designing Coherent Instruction**

| | | | | |
|---|---|---|---|---|
| **Learning Activities** | Learning activities are not suitable to students or instructional goals. They do not follow an organized progression and do not reflect recent professional research. | Only some of the learning activities are suitable to students or instructional goals. Progression of activities in the unit is uneven, and only some of the activities reflect recent professional research. | **Most of the learning activities are suitable to students and instructional goals. Progression of activities in the unit is fairly even, and most activities reflect recent professional research.** | Learning activities are highly relevant to students and instructional goals. They progress coherently, producing a unified whole and reflecting recent professional research. |
| **Instructional Materials and Resources** | Materials and resources do not support the instructional goals or engage students in meaningful learning. | Some of the materials and resources support the instructional goals, and some engage students in meaningful learning. | **All materials and resources support the instructional goals and most engage students in meaningful learning.** | All materials and resources support the instructional goals, and most engage students in meaningful learning. There is evidence of student participation in selecting or adapting materials. |
| **Instructional Groups** | Instructional groups do not support the instructional goals and offer no variety. | **Instructional groups are inconsistent in suitability to the instructional goals and offer minimal variety.** | Instructional groups are varied, as appropriate to the different instructional goals. | Instructional groups are varied, as appropriate to the different instructional goals, and most engage students in meaningful learning. There is evidence of student choice in selecting different patterns of instructional groups. |
| **Lesson and Unit Structure** | The lesson or unit has no clearly defined structure, or the structure is chaotic. Time allocations are unrealistic. | The lesson or unit has a recognizable structure, although the structure is not uniformly maintained throughout. Most time allocations are reasonable. | **The lesson or unit has a clearly defined structure that activities are organized around. Time allocations are reasonable.** | The lesson's or unit's structure is clear and allows for different pathways according to student needs. |

**Component Id: Assessing Student Learning**

| | | | | |
|---|---|---|---|---|
| **Criteria and Standards** | The proposed approach contains no clear criteria or standards. | Assessment criteria and standards have been developed, but they are either not clear or have not been clearly communicated to students. | **Assessment criteria and standards are clear and have been clearly communicated to students** | Assessment criteria and standards are clear and have been clearly communicated to students. There is evidence that students contributed to the development of the criteria and standards. |
| **Congruence with Instructional Goals** | Content and methods of assessment lack congruence with instructional goals. | Some of the instructional goals are assessed through the proposed approach, but many are not. | .All the instructional goals are nominally assessed through the proposed plan, but the approach is more suitable to some goals than to others. | The proposed approach to assessment is completely congruent with the instructional goals, both in content and process. |
| **Use of Data in Planning** | The assessment results affect planning for students only minimally. | **Teachers uses assessment results to plan for the class as a whole.** | Teacher uses assessment results to plan for individuals and groups of students. | Students are aware of how they are meeting the established standards and participate in planning the next steps. |

2

Domain II: The Classroom Environment

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| | | | **LEVEL OF PERFORMANCE** | |

**Component 2a: Establishing a Culture for Learning**

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Importance of the Content | Teacher or students convey a negative attitude toward the content, suggesting that the content is not important or is mandated by others. | Teacher communicates importance of the work but with little conviction and only minimal apparent buy-in by the students. | **Teacher conveys genuine enthusiasm for the subject, and students demonstrate consistent commitment to its value.** | Students demonstrate through their active participation, curiosity, and attention to detail that they value the content's importance. |
| Student Pride in Work | Students demonstrate little or no pride in their work. They seem to be motivated by the desire to complete a task rather than do high-quality work. | Students minimally accept the responsibility to "do good work" but invest little of their energy in the quality of the work. | **Students accept teacher insistence on work of high quality and demonstrate pride in that work.** | Students take obvious pride in their work and initiate improvements in it, for example, by revising drafts on their own initiative, helping peers, and ensuring that high-quality work is displayed. |
| Expectations for Learning and Achievement | Instructional goals and activities, interactions, and the classroom environment convey only modest expectations for student achievement. | Instructional goals and activities, interactions, and the classroom environment convey inconsistent expectations for student achievement. | **Instructional goals and activities, interactions, and the classroom environment convey high expectations for student achievement.** | Both students and teacher establish and maintain through of planning of learning activities, interactions, and the classroom environment high expectations for the learning of all students. |

**Component 2b: Managing Classroom Procedures**

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Management of Instructional Groups | Students not productively engaged in learning. | Tasks for group work are partially organized, resulting in some off-task behavior when teacher is involved with one group. | **Tasks for group work are organized, and groups are managed so most students are engaged at all times.** | Groups working independently are productively engaged at all times, with students assuming responsibility for productivity. |
| Management of Transitions | Much time is lost during transitions. | Transitions are sporadically efficient, resulting in some loss of instructional time. | **Transitions occur smoothly, with little loss of instructional time.** | Transitions are seamless, with students assuming some responsibility for productivity. |
| Management of Materials and Supplies | Materials are handled inefficiently, resulting in loss of instructional time. | Routines for handling materials and supplies function moderately well. | **Routines for handling materials and supplies occur smoothly, with little loss of instructional time.** | Routines for handling materials and supplies are seamless, with students assuming some responsibility for efficient operation. |
| Performance of Non-Instructional Duties | Considerable instructional time is lost in performing non-instructional duties. | Systems for performing noninstructional duties are fairly efficient, resulting in little loss of instructional time. | **Efficient systems for performing noninstructional duties are in place, resulting in minimal loss of instructional time.** | Systems for performing noninstructional duties are well established, with students assuming considerable responsibility for efficient operation. |

**Component 2c: The Classroom Environment**

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Managing Student Behavior Expectations | No standards of conduct appear to have been established, or students are confused as to what the standards are. | Standards of conduct appear to have been established for most situations, and most students seem to understand them. | **Standards of conduct are clear to all students.** | Standards of conduct are clear to all students and appear to have been developed with student participation. |

3

Domain III: Instruction

Component 3a:
Engaging Students in Learning

| ELEMENT | LEVEL OF PERFORMANCE | | | |
|---|---|---|---|---|
| | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
| Monitoring of Student Behavior | Student behavior is not monitored, and teacher is unaware of what students are doing. | Teacher is generally aware of student behavior but may miss the activities of some students. | **Teacher is alert to student behavior at all times.** | Monitoring by teacher is subtle and preventative. Students monitor their own and peers' behavior, correcting one another respectfully. |
| Response to Student Misbehavior | Teacher does not respond to misbehavior, or the response is inconsistent, overly repressive, or does not respect the student's dignity. | Teacher attempts to respond to student misbehavior but with uneven results, or no serious disruptive behavior occurs. | **Teacher response to misbehavior is appropriate and successful and respects the student's dignity, or student behavior is generally appropriate.** | Teacher response to misbehavior is highly effective and sensitive to students' individual needs, or student behavior is entirely appropriate. |
| Representation of Content | Representation of content is inappropriate and unclear or uses poor examples and analogies. | Representation of content is inconsistent in quality. Some is done skillfully, with good examples. Other portions are difficult to follow. | **Representation of content is appropriate and links well with students' knowledge and experience.** | Representation of content is appropriate and links well with students' knowledge and experience. Students contribute to representation of content. |
| Activities and Assignments | Activities and assignments are inappropriate for students in terms of their age or development. Students are not engaged mentally. | **Some activities and assignments are appropriate to students and engage them mentally, but others do not.** | Most activities and assignments are appropriate to students. Almost all students are cognitively engaged in them. | All students are cognitively engaged in the activities and assignments in their exploration of content. Students initiate or adapt activities and projects to enhance understanding. |
| Grouping of Students | Instructional groups are inappropriate to the students or to the instructional goals. | **Instructional groups are only partially appropriate to the students or only moderately successful in advancing the instructional goals of the lesson.** | Instructional groups are productive and fully appropriate to the students or to the instructional goals of the lesson. | Instructional groups are productive and fully appropriate to the instructional goals of a lesson. Students take the initiative to influence instructional groups to advance their understanding. |
| Instructional Materials and Resources | Instructional materials and resources are unsuitable to the instructional goals or do not engage students mentally. | Instructional materials and resources are partially suitable to the instructional goals, or students' level of mental engagement is moderate. | **Instructional materials and resources are suitable to the instructional goals and engage students mentally.** | Instructional materials and resources are suitable to the instructional goals and engage students mentally. Students initiate the choice, adaptation, or creation of materials to enhance their own purposes. |
| Structure and Pacing | The lesson has no clearly defined structure, or the pacing of the lesson is too slow or rushed, or both. | The lesson has a recognizable structure, although it is not uniformly maintained throughout the lesson. Pacing of the lesson is inconsistent. | **The lesson has a clearly defined structure around which the activities are organized. Pacing of the lesson is consistent.** | The lesson's structure is highly coherent, allowing for reflection and closure as appropriate. Pacing of the lesson is appropriate for the students. |

## Domain IV: Professional Responsibilities

### Component 3b: Providing Feedback to Students

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Quality: Accurate, Substantive, Constructive, Specific | Feedback is either not provided or is of uniformly poor quality. | Feedback is inconsistent in quality. Some elements of high quality are present. Others are not. | Feedback is consistently high quality. | Feedback is consistently high quality. Provision is made for students to use feedback in their learning. |
| Timeliness | Feedback is not provided in a timely manner. | Timeliness of feedback is inconsistent. | Feedback is consistently provided in a timely manner. | Feedback is consistently provided in a timely manner. Students make prompt use of the feedback in their learning. |

### Component 4a: Reflecting on Teaching

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Accuracy | Teacher does not know if a lesson was effective or achieved its goals, or profoundly misjudges the success of a lesson. | Teacher has a generally accurate impression of a lesson's effectiveness and the extent to which instructional goals were met. | Teacher makes an accurate assessment of a lesson's effectiveness and the extent to which it achieved its goals and can cite general references to support the judgment. | Teacher makes a thorough and accurate assessment of a lesson's effectiveness and the extent to which it achieved its goals, citing many specific examples from the lesson and weighing the relative strength of each. |
| Use in Future Teaching | Teacher has no suggestions for how a lesson may be improved another time. | Teacher makes general suggestions about how a lesson may be improved. | Teacher makes a few specific suggestions of what he may try another time. | Drawing on an extensive repertoire of skills, the teacher offers specific alternative actions, complete with probable successes of different approaches. |

### Component 4b: Maintaining Accurate Records/Reports

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Student Completion of Assignments | Teacher's system for maintaining information on student completion of assignments is in disarray or does not meet time requirements | Teacher's system for maintaining information on student completion of assignments is rudimentary and only partially effective. | Teacher's system for maintaining information on student completion of assignments is fully effective. | Teacher's system for maintaining information on student completion of assignments is fully effective. Students participate in the maintenance of the records. |
| Student Progress in Learning | Teacher has no system for maintaining information on student progress in learning, or the system is in disarray. | Teacher's system for maintaining information on student progress in learning is rudimentary and partially effective. | Teacher's system for maintaining information on student progress in learning is effective. | Teacher's system for maintaining information on student progress in learning is fully effective. Students contribute information and interpretation of the records. |
| Non-instructional Records | Teacher's records for non-instructional activities are in disarray, resulting in errors and confusion. | Teacher's records for non-instructional activities are adequate, but they require frequent monitoring to avoid error. | Teacher's system for maintaining information on non-instructional activities is fully effective. | Teacher's system for maintaining information on non-instructional activities is highly effective, and students contribute to its maintenance. |

### Component 4c:

## Communicating with Families

| Component | | | | |
|---|---|---|---|---|
| **Information About the Instructional Program** | Teacher provides little information about the instructional program to families. | Teacher participates in the school's activities for parent communication but offers little additional information. | **Teacher provides frequent information to parents, as appropriate, about the instructional program. Students participate in preparing materials for their families.** | Teacher provides frequent information to parents, as appropriate, about the instructional program. Students participate in preparing materials for their families. |
| **Information about Individual Students** | Teacher provides minimal information to parents and does not respond or responds insensitively to parent concerns about students. | Teacher adheres to the school's required procedures for communicating with parents. Responses to parent concerns are minimal. | **Teacher communicates with parents about students' progress on a regular basis and is available as needed to respond to parent concerns.** | Teacher provides information to parents frequently on both positive and negative aspects of student progress. Response to parent concerns is handled with great sensitivity. |
| **Engagement of Families in the Instructional Program** | Teacher makes no attempt to engage families in the instructional program, or such attempts are inappropriate. | Teacher makes modest and inconsistently successful attempts to engage families in the instructional program. | **Teacher's efforts to engage families in the instructional program are frequent and successful** | Teacher's efforts to engage families in the instructional program are frequent and successful. Students contribute ideas for projects that will be enhanced by family participation. |

## Component 4d: Contributing to the School and District

| Component | | | | |
|---|---|---|---|---|
| **Relationships with Colleagues** | Teacher's relationships with colleagues are negative or self-serving. | Teachers maintains cordial relationships with colleagues to fulfill the duties that the school or district requires. | **Support and cooperation characterize relationships with colleagues.** | Support and cooperation characterize relationships with colleagues. Teacher takes initiative in assuming leadership among the faculty. |
| **Service to the School** | Teacher avoids becoming involved in school events. | Teacher participates in school events when specifically asked. | **Teacher volunteers to participate in school events, making a substantial contribution.** | Teacher volunteers to participate in school events, making a substantial contribution, and assumes a leadership role in at least some aspects of school life. |
| **Participation in School and District Projects** | Teacher avoids becoming involved in school and district projects. | **Teacher participates in school and district projects when specifically asked.** | **Teacher volunteers to participate in school and district projects, making a substantial contribution.** | Teacher volunteers to participate in school and district projects, making a substantial contribution, and assumes a leadership role in a major school or district project. |
| **Timeliness** | Teacher is consistently late to school, meetings, and/or classes. Causing problems for colleagues, parents, and/or students. | Teacher maintains an inconsistent pattern of timeliness with regard to arriving at school, meetings and/or classes on time, causing problems for colleagues, parents, and/or students. | **Teacher is consistently on time for school, meetings, and/or classes.** | Teacher arrives early to school, meetings, and/or classes and uses these opportunities to provide extra support for colleagues, parents, and/or students. |

## Component 4c: Showing Professionalism

|  |  |  |  |
|---|---|---|---|
| Service to Students | Teacher is not alert to student needs. | Teacher's attempts to serve students are inconsistent. | **Teacher is moderately active in serving students.** | Teacher is highly proactive in serving students, seeking out resources when necessary. |
| Advocacy | Teacher contributes to school practices that result in some students being ill served by the school. | Teacher does not knowingly contribute to some students being ill served by the school. | **Teacher works within the context of a particular team or department to ensure that all students receive a fair opportunity to succeed.** | Teacher makes a particular effort to challenge negative attitudes and helps ensure that all students, particularly those traditionally underserved, are honored in the school. |
| Decision Making | Teacher makes decisions based on self-serving interests. | Teacher's decisions are based on limited though genuinely professional considerations. | **Teacher maintains an open mind and participates in team or building decision-making.** | Teacher takes a leadership role in team or building decision-making and helps ensure that such decisions are based on the highest professional standards. |

Teacher:

Building Lead:

Principal:

7