UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTINE SHEU and
GABRIELA GUI,

               Plaintiffs,

                                      CASE NO. 14-CV-14177

v.                              HONORABLE GEORGE CARAM STEEH

DETROIT 90/90, BOARD OF DIRECTORS
of Detroit 90/90, A.I. CENTRAL, LLC,
AXIOS INTERNATIONAL, INC., AXIOS
INCORPORATED, BOARD OF
DIRECTORS of Axios Incorporated,
PUBLIC SCHOOL ACADEMIES OF
DETROIT, and BOARD OF EDUCATION
of the Public School Academies of
Detroit,

               Defendants.

_____/

OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS PUBLIC SCHOOL
ACADEMIES OF DETROIT'S AND BOARD OF EDUCATION
OF PUBLIC SCHOOL ACADEMIES OF DETROIT'S MOTION
TO DISMISS (DOC. #14) AND DENYING IN PART AND
<u>GRANTING IN PART PLAINTIFFS' MOTION TO AMEND (DOC. #29)</u>

      Plaintiffs Justine Sheu and Gabriela Gui bring an array of allegations against

defendants related to their discharge from a Detroit charter school operated by defendants.

Prominently, plaintiffs allege their discharge resulted from their criticism of the school's

restructuring, was undertaken without due process or good cause, and involved violations

of their privacy when defendants accessed their Gmail accounts without permission.

Plaintiffs sued the Public School Academies of Detroit and the PSAD's Board of Education

(collectively, the "PSAD"), as well as the management companies hired to operate and

manage the schools.  This opinion and order deals only with the claims against the PSAD.

1

Now before the court is the PSAD motion for partial dismissal (Doc. #14) and plaintiffs' motion to file an amended complaint (Doc. #29). For the reasons that follow, PSAD's motion to dismiss will be granted in part and denied in part, and plaintiff's motion to amend will be granted in part and denied in part.

## I. BACKGROUND

The facts as alleged in the complaint follow.

The PSAD is a public school board, with ten board members, organized under Part 6C of the Revised School Code. *See* Mich. Comp. Laws §§ 380.521 *et seq.* Pursuant to statute and a charter agreement with Grand Valley State University, the PSAD operates a charter school comprised of three urban high school academy school districts in Detroit, Michigan. One of those school districts is at issue in this case—the University Preparatory Science and Math ("UPSM") school district.

Under the law and pursuant to its charter agreement, the PSAD has the authority to hire a management company to operate the school districts. To this end, the PSAD entered into an agreement with defendant New Urban Learning ("NUL"), which provided that NUL would be responsible for the management services, including the day-to-day operations, at the UPSM school district. Compl. ¶ 14. NUL in turn contracted with defendant A.I. Central LLC/Axios, Inc. ("A.I. Central/Axios"),[1] a professional employment organization, for assistance in providing management services at the schools. *Id.*

Plaintiff Gabriela Gui ("Gui") was hired by NUL as the first principal for the UPSM school district. *Id.* ¶ 15. Gui signed a five-year employment agreement with NUL for a term

---

[1] Plaintiffs allege that A.I. Central is now known as Axios, Inc., or has merged with Axios Incorporated. (Compl. ¶ 7). Plaintiffs sued A.I. Central, LLC as well as the Axios entities.

commencing on July 1, 2010 and ending on June 30, 2015. Doc. #1 at 60–62. The employment agreement stated that Gui was an at-will employee, but Gui contends that she was told that she had a five-year term that was not terminable at-will. Gui's duties as principal included developing and implementing instructional programs, as well as participating in cooperative efforts to develop and improve the curriculum. *Id.* at 60.

When Gui was hired, NUL was committed to site-based management at the UPSM district, and NUL reiterated its commitment to site-based management in Gui's employment agreement. Doc. 1 at 65. Site-based management means that "people closest to the work, at the school level, have control over: [1]) instructional programs; 2) staffing (hiring and firing); and 3) budgets, including grants." Compl. ¶ 19. Thus, Gui had the authority to hire staff members. She could "make contractual commitments on behalf of UPSM . . . to potential staff members. . . ." *Id.* at 64.

During the 2011-2012 school year, the PSAD replaced NUL with another management company, defendant Detroit 90/90, LLC ("Detroit 90/90"). Compl. ¶ 27. Detroit 90/90 and the PSAD entered into an independent contract agreement providing that Detroit 90/90 manage the UPSM district and the PSAD's other two districts. Doc. 14-2 at 1–21. Detroit 90/90 subsequently entered into an agreement with A.I. Central/Axios under which A.I. Central/Axios assumed certain human resources duties and became a joint-employer of employees assigned to the UPSM district. Compl. ¶ 27.

After the change, Detroit 90/90 and A.I. Central/Axios entered into an employment agreement with Gui. Doc. 1 at 69–72. The contract was substantially similar to Gui's prior contract with NUL. It provided that GUI would be principal for the UPSM district for a term commencing July 1, 2012 and ending June 30, 2015. Compl. ¶ 28.

As explained, because the UPSM district used site-based management, Gui had

3

input in determining the necessary staff.  One of the staff members Gui hired was plaintiff Justine Sheu ("Sheu").  Sheu was hired through Detroit 90/90, but she did not have a written employment agreement.

Sheu was hired in the winter of 2013 "to assist students (especially juniors) in preparing for the ACT test to be given in the spring of 2013." *Id.* ¶ 34.  Sheu excelled at her position; "[t]he students related to her exuberance and youthfulness; the parents highly valued the information she provided and were overjoyed that their children spoke so positively and enthusiastically about Sheu's classes." *Id.* ¶ 35.  When Gui decided that there needed to be a position for a College and Career Readiness Advisor, it was Sheu who filled this position. *Id.* ¶ 37.

The UPSM district achieved much success using the site-based management technique.  Nevertheless, in the summer of 2013, the new CEO of Detroit 90/90, Mark Ornstein, announced that he would "not honor the commitment to site-based management at any of the [school districts]." *Id.* ¶ 38.  Ornstein also alluded to unifying the UPSM school district and one of the PSAD's other school districts, the University Preparatory Academy ("UPA"). *Id.*  As part of this restructuring plan, Ornstein created the "Central Office," which centralized the staff base in charge of both the UPSM and UPA districts. *Id.* ¶ 39. Essentially, instead of Gui having as much input under the site-based management structure, the Central Office was given more authority.

Ornstein revealed his restructuring plan to the UPSM staff in August 2013. *Id.* ¶ 40. The plan was met with resistence.  Staff and parents alike complained about the restructuring. *Id.*

The restructuring effectively stripped Gui of her ability to conduct site-based management, including "hiring, evaluating and dismissing staff; managing the school's

budget, and; implementing curriculum and instructional practices." *Id.* ¶ 41. This change immediately affected Sheu's position as College and Career Readiness Advisor. Ornstein appointed Venus Crosby ("Crosby") as Director of College Counseling, placing her in charge of Sheu. *Id.* ¶ 4. Sheu was reassigned to the Central Office as a "College Success Advisor" for both the UPSM and UPA districts. *Id.* This caused Sheu's caseload to double.

Gui and Sheu were unhappy with the restructuring and expressed their concerns to Ornstein and other staff. *Id.* ¶ 48. The parents of students in the UPSM district began noticing the changes, leading Gui and Sheu to meet with them to explain the changes brought about by the restructuring. *Id.* ¶ 50. In addition, the parent-teacher-student association ("PTSA") at UPSM sent a letter to parents informing them of the structural changes that were occurring in the district. *Id.* ¶ 59.

Gui continued to complain about the restructuring. Ornstein held a meeting with the Central Office staff to address the issue. At this meeting, Ornstein dismissed Gui's concerns and told her "to cease voicing her opinions about what she believed about Central Office's decisions." *Id.* ¶ 51. Subsequently, on October 3, 2013, Ornstein held another meeting with Gui and her supervisor, Danielle Jackson, which was memorialized in a memorandum. *Id.* ¶ 52. Ornstein "insisted that Gui support the restructuring in discussions with her school staff and parents." *Id.* On multiple occasions, Ornstein told Gui that she should be "controlling the parents," and that it was Gui's fault the parents were attending meetings expressing concerns about the restructuring. *Id.*

Another meeting was held on October 17, 2013 with the PTSA, parents, Ornstein, and Margaret Trimer-Harley, the then-Chief External Relations Officer in the Central Office. *Id.* ¶ 60. The parents at the meeting "were highly critical of Ornstein and his restructuring." *Id.* ¶ 61. In addition, "[t]he parents wanted Ornstein to restore Sheu . . . to [her] original

position[] and allow Dr. Gui to resume site-based management in its entirety." *Id.* Ornstein was upset with Gui after the meeting, "express[ing] his belief that Gui was fueling the parents' dissatisfaction with his restructuring of the district." *Id.* Following the meeting, Ornstein removed Sheu from being a college advisor, restricting her to ACT preparation only, and told her to "stay out of politics." *Id.* ¶ 62–63.

On October 29, 2013, the PTSA and parents met with the PSAD board, Ornstein and Detroit 90/90 staff to express their concern about the restructuring. *Id.* ¶ 65. Among the chief concerns, the parents cited the changes to Sheu's position as an example of the detrimental effect of the restructuring efforts. *Id.*

Sheu alleges that she suffered retaliation for voicing her concerns about the restructuring of the school districts. For example, on one occasion, Sheu was ill with food poisoning. Despite calling in sick, Crosby issued Sheu a written reprimand for failing "to perform the required functions of your position by not communicating your absence in a timely manner, and/or providing adequate resources to reassign tasks." *Id.* ¶ 53–54. This reprimand was not placed in Sheu's file until she later filed an unfair labor practice charge against Detroit 90/90. *Id.* ¶ 58.

In May 2014, Sheu delivered a presentation to seniors in the UPA district about the transition from high school to college. *Id.* ¶ 71. In her presentation, Sheu "told an anecdote about when she received her first 'D' grade in college." *Id.* In the anecdote, Sheu told the students that she was shocked she received a "D" because she had relied on her Asian heritage and the legendary intellectual "prowess" of Asian persons. *Id.* Speaking about alcohol and drug use, Sheu advised the students not to engage in such behavior. *Id.* But, acknowledging that some students would nonetheless drink and use drugs, Sheu warned students never to consume anything they had not personally prepared

6

or witnessed being prepared.  *Id.*  Finally, in speaking about joining a fraternity or sorority during freshman year of college, Sheu told students not to because they would likely "be getting their asses beat" every night.  *Id.*

A few days after the presentation, Detroit 90/90 and A.I. Central/Axios employees met with Sheu and suspended her pending an investigation.  *Id.* ¶ 73.  Sheu was informed that students complained that her jokes about her Asian heritage "were racially insensitive and offensive"; her message about drugs and alcohol encouraged students to abuse substances; and her use of the word "asses" was "profane and inappropriate."  *Id.*  These reasons were cited in a May 21, 2014 letter sent to Sheu terminating her employment with Detroit 90/90.  *Id.* ¶ 83.  Sheu alleges that the decision to terminate her was a joint decision by Detroit 90/90, A.I. Central/Axios, and the PSAD.  *Id.* ¶ 86–88.  Prior to being fired, Sheu did not have an opportunity to review any of the alleged complaints filed against her, and she did not receive a hearing or otherwise have an opportunity to dispute the allegations.  *Id.* ¶ 85.

After Sheu's discharge, Ornstein wanted Gui to "show the staff [at the school districts] that she supported the process and the decision to discharge . . . Sheu."  *Id.* ¶ 92.  Specifically, Ornstein wanted Gui to attend a staff meeting "in order to silence the dissenting voices of the staff and parents who were extremely upset with the defendants' suspension and termination of . . . Sheu."  *Id.* ¶ 93.  Because Gui "could not approve the alleged process" used in firing Sheu, she told Ornstein that "she had a doctor's appointment the next morning and would not be able to attend the meeting."  *Id.* ¶ 92.  The meeting occurred, without Gui in attendance, and the "staff was adamant in supporting Sheu.  The staff questioned the process used to terminate Sheu."  *Id.* ¶ 93.

Sometime after Sheu's termination, her work laptop was confiscated.  Detroit 90/90's

Director of Information Technology ("IT"), Nicole Cummings ("Cummings"), "found on Sheu's laptop computer a document listing Sheu's passwords to her online bank account and to her personal email account on the Gmail server[.]" *Id.* ¶ 97. Cummings used Sheu's Gmail password to access her personal email account. She searched for messages between Gui and Sheu and between Sheu and Grady Jones, another staff member at the UPSM district. *Id.* ¶ 100. Cummings accessed multiple messages that were sent between Sheu, Jones and Gui during the time that Sheu was suspended and eventually terminated. In the messages, "Gui and Jones (1) had advised Sheu regarding her appeal to staff for support after her suspension and (2) had suggested possible responses to accusations Sheu had received from [Central Office staff] throughout the year." *Id.* Cummings printed the messages and gave them to Breanna Watson ("Watson"), Ornstein's secretary. *Id.* After receiving the messages, Watson allegedly responded, "That's what they are looking for!" Compl. ¶¶ 97-100. Plaintiffs contend that the "they" Watson was referencing was the PSAD.

In addition to obtaining access to Sheu's Gmail account, Cummings found photographs of Sheu in lingerie on the work laptop. *Id.* ¶ 98. She showed the photographs to her husband. *Id.*

The buzz surrounding Sheu's termination was not all that happened. Concern about the restructuring efforts continued after Sheu's termination. In June 2014, UPSM staff held a meeting "regarding the staff's strenuous objections to Ornstein's restructuring, the dictatorship of the Central Office, Sheu's discharge, the lack of due process involved [in Sheu's discharge], the need to form a union, and other issues." *Id.* ¶ 112. The PTSA and UPSM students unsuccessfully petitioned to reinstate Sheu to her position. *Id.* ¶ 113.

The PSAD held a meeting on June 24, 2014. Ed Parks ("Parks"), the chairman of

the PSAD board, allegedly referencing the emails between Gui and Sheu described above, stated to multiple parents after the meeting: "I have an email from someone high up[] in UPSM.  It amounts to fucking insubordination.  We are going to do something to handle this.  You may not like the results."  *Id.* ¶ 114.  Three days after the meeting, Gui, among others, was discharged.  *Id.* ¶ 115.  Gui was told by Ornstein that the discharge was "not necessarily about performance; it's that we are going in a different direction. . . The board feels it's necessary to go in a different direction."  *Id.*

Gui contends she was fired without cause as a joint decision by the PSAD, Detroit 90/90 and A.I. Central/Axios in response to her speaking out against the restructuring plans.  Subsequent to terminating Gui, "the defendants terminated the employment of all the remaining members of the administrative cabinet who served with Dr. Gui at UPSM."  *Id.* ¶ 122.

As principal, Gui met all expectations and requirements in her employment agreement with Detroit 90/90.  Under her tenure, graduation rates improved, ACT scores increased, and the rate of college admissions went up.  *Id.* ¶ 31–32.  Three years in a row, UPSM received an A+ rating from the Excellent Schools of Detroit organization.  *Id.* ¶ 32.

Gui and Sheu filed this action against the PSAD, its board, Detroit 90/90, and A.I. Central/Axios.  The complaint is in 17 counts, phrased by plaintiffs as follows:

| Count I | 42 USC Section 1983, Deprivation Of Justine Sheu's Right To Freedom Of Speech Under The 1st Amendment - Sheu As To All Defendants |
|---|---|
| Count II | 42 USC Section 1983, Deprivation Of Gabriela Gui's Right To Freedom Of Speech Under The 1st Amendment - Gui As To All Defendants |
| Count III | 42 USC Section 1983, Deprivation Of Property Without Due Process - Gabriel[a] Gui As To All Defendants |

Count IV         Breach Of Express And Implied Employment Contract - Gabriel[a] Gui As To Detroit 90/90 And Axios

Count V         Discharge Violating Reasonable Expectation Of Just-Cause Employment - Gabrial[a] Gui As To Detroit 90/90 And Axios

Count VI        Violation Of The Wire And Electronic Communications Interception Act 18 USC 2510 Et Seq. - Sheu And Gui As To All Defendants

Count VI[2]      Violation Of The Stored Wire And Electronic Communications And Transactional Records Access Act - 18 USC 2701 Et Seq. - Sheu And Gui As To All Defendants

Count VII       Invasion Of Privacy Intrusion In Plaintiffs' Private Affairs - Gui And Sheu As To All Defendants

Count VIII      Invasion Of Privacy - Public Disclosure Of Embarrassing Private Facts About Plaintiff - Sheu As To All Defendants

Count IX       Unreasonable Search And Seizure Under The Fourth Amendment, 42 USC 1983 - Sheu And Gui As To All Defendants

Count X         Violation Of Michigan Freedom Of Information Act - Sheu And Gui As To Defendant PSAD And Its School Board

Count XI       Violation Of Bullard-Plaweck Employee Right To Know Act - Gui As To Defendants Detroit 90/90, Board Of Directors Of Detroit 90/90, Axios, And Board Of Directors Of Axios

Count XII      Violation Of Bullard-Plaweck Employee Right To Know Act - Sheu As To Defendants Detroit 90/90, Board Of Directors Of Detroit 90/90, Axios, And Board Of Directors Of Axios

Count XII[3]     Declaratory Judgment Regarding Contents Of Employment File - Gui And Sheu As To Defendants Detroit 90/90, Board Of Directors Of Detroit 90/90, Axios, And Board Of Directors Of Axios

Count XIII     Claim And Delivery - Sheu As To Defendants Detroit 90/90, Board Of Directors Of Detroit 90/90, Axios, And Board Of Directors Of Axios

Count XIV     Common Law Conversion - Sheu As To Detroit 90/90 And Axios

Count XV      Statutory Law Conversion - Sheu As To Detroit 90/90 And Axios

---

[2] The complaint mistakenly uses Count VI twice.

[3] The complaint mistakenly uses Count XII twice.

The PSAD seeks dismissal of Counts I, II, III, VI, VI [SIC], VII, VIII and IX.  They do not seek to dismiss the FOIA claim in Count X, the only remaining count against the PSAD. The parties have stipulated to the dismissal of Counts VII and VIII as against the PSAD only.  Doc. #27.  These counts, therefore, will be dismissed against the PSAD.

Plaintiffs oppose the motion to dismiss in its entirety, and they also wish to amend the complaint.  The court held oral argument to address the motions on March 30, 2015. The motions are ready for decision.  The court's analysis follows.

## II. STANDARDS OF REVIEW

### A. Motion To Dismiss – Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted.  Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–56 (2007), the court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims.  "[N]aked assertions devoid of further factual enhancement" are insufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief mut provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555) (citations and quotation marks omitted).  Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint

11

are true." *Id.* (citing *Bell Atlantic*, 550 U.S. at 555).

## B. Motion To Amend – Fed. R. Civ. P. 15

Fed. R. Civ. P. 15(a)(2) allows a party to amend its complaint after a responsive pleading has been filed, with written consent of the opposing party or the court's leave. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Rule 15 states that leave "shall be freely given" when the underlying facts would support a claim, grounds for denying a motion for leave to amend include undue delay, bad faith or dilatory motive on the part of the movant, failure to cure deficiencies by amendments previously allowed, lack of notice to the opposing party, prejudice to the opposing party, and futility of the amendment. *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst., LLC v. Med. Mut. of Ohio*, 601 F.3d 505 (6th Cir. 2010) (citation and internal quotations omitted).

## III. DISCUSSION/ANALYSIS

Given the multiple claims against the PSAD, the court begins by discussing the constitutional claims. Next, the court will discuss the statutory claims. Because the issues raised in the PSAD's motion to dismiss are intertwined with plaintiffs' motion to amend, the motions will be discussed together.

## A. Constitutional Claims

Plaintiffs assert four constitutional claims against the PSAD under 42 U.S.C. § 1983 (Counts I, II, III and IX). Plaintiffs contend that they were deprived of their rights to freedom of speech under the First Amendment; specifically, that they were fired in retaliation for exercising their First Amendment rights. Gui also claims that she was deprived of her right to continue as principal of the UPSM school district without due process of law. Finally,

plaintiffs claim that they were subject to an unreasonable search and seizure when their email messages were accessed without permission.

1. The PSAD's potential <em>Monell</em> liability

As a threshold matter, the PSAD argues that the constitutional claims must be dismissed because plaintiffs cannot show that the PSAD was the moving force behind the alleged violations such that *Monell* liability attaches. At this juncture, through the lens of a 12(b)(6) motion, the court cannot agree.

Considering the allegations in the complaint and proposed first amended complaint, the court is persuaded that plaintiffs have plausibly alleged that the PSAD was the moving force behind the alleged constitutional violations. When drawing all reasonable inferences in plaintiffs' favor, the allegations in the complaint and first amended complaint plausibly allege a theory that the PSAD was behind the alleged constitutional violations.

The Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), established that a municipality cannot be liable under a respondeat superior theory. Assuming that plaintiffs could establish a constitutional violation, the PSAD "cannot be found liable unless the plaintiff[s] can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996). Alternatively, the PSAD could be responsible for constitutional violations if the PSAD "exercise[d] such coercive power or provide[d] such significant encouragement, either overt or covert, that in law the choice of the private actor is to deemed to be that of the [PSAD]." *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 565 (6th Cir. 2007) (citation omitted). This is known as the "state compulsion test." *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995) ("The state compulsion test requires proof that the state

13

significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state.").

Here, reading the complaint and proposed first amended complaint together, plaintiffs have plausibly alleged that the PSAD exercised coercive action such that they were the moving force behind the alleged constitutional violations leading to the plaintiffs' terminations.  The specific factual allegations supporting plaintiffs' position are:

- The PSAD and Detroit 90/90 share the same office, and members of Detroit 90/90's Central Office appear at all PSAD board meetings.  Proposed Amended Compl. ¶ 30.  While an inference can be drawn that the PSAD is merely staying informed of Detroit 90/90's management of the districts, an equal inference can be drawn that the PSAD is effectively coercing Detroit 90/90 to manage the districts in a manner determined by the PSAD.

- Gui spoke directly to PSAD board president Edward Parks about her objections, as well as the parents' opposition, to the school's restructuring.  In addition, PSAD board members were present at meetings with Detroit 90/90 and UPSM staff where Gui expressed concern about the restructuring.  In one particular meeting, "Parks said he supported Ornstein 100% and that Gui should listen to him because he was her boss."  Proposed Amended Compl. ¶ 67a.   In reprimanding Gui for taking a stance against the restructuring efforts, an inference can be drawn that Parks was making the PSAD's position known to Gui, and cautioning her not to take a contrary position.

- Parks continued to voice his support for the restructuring of the districts at a meeting on May 19, 2014, after Sheu was suspended.  Proposed Amended Compl. ¶ 75a.

- Parks knew that Gui was complaining to the parents about the restructuring because the PTSA president met with Parks to tell him that the parents were in "solidarity with Gui in opposing the restructuring."  Proposed Amended Compl. ¶ 68a.

- Ornstein told Gui that the PSAD board knew about, and supported, Detroit 90/90's decision to terminate Sheu.  Ornstein also told Gui that the PSAD knew that Gui failed to support the decision to terminate Sheu.  Proposed Amended Compl. ¶ 94a.

- After Sheu's Gmail messages were accessed, and messages were found between Sheu and Gui, Breanna Watson stated, "That's what they are looking for!"  Compl. 97-100.  There are only two inferences that can be

14

drawn from this allegation. Either Detroit 90/90 or the PSAD was looking for the emails between Sheu and Gui. A reasonable inference in favor of plaintiffs is that the PSAD asked Detroit 90/90 to find emails between Sheu and Gui in order to use the emails to terminate Gui.

- Ornstein rescheduled Gui's annual evaluation twice, the second time for June 27, 2014. Proposed Amended Compl. ¶ 113a. It is plausible that the meetings were rescheduled until Ornstein could obtain the PSAD's okay to fire Gui.

- At the June 24, 2014 PSAD board meeting, Parks told the PTSA president "I have an email from someone high up in UPSM. It amounts to fucking insubordination. We are going to handle this. You may not like the results." Compl. ¶ 114. It is plausible that Parks was referencing the emails between Gui and Sheu. And Gui was fired three days after this meeting. An inference can be drawn that the PSAD knew about the impending termination of Gui *before* it occurred because the PSAD was the decisionmaker. Indeed, Parks's alleged statement to parents that "we" are going to handle this could reasonably mean that the PSAD was involved in the decision to fire Gui.

- When Ornstein discharged Gui on June 27, 2014, he allegedly told her that the board wanted to go in a different direction. Although it is plausible that Ornstein was referring to the Detroit 90/90 board, it is equally plausible that Ornstein was referring to the PSAD board.

Based on the above allegations, plaintiffs have plausibly alleged that the PSAD was the moving force behind the alleged constitutional violations. In reaching this conclusion, the court makes clear that its decision is limited to determining "plausibility" under Rule 12(b)(6). The analysis may change if the evidence is viewed in a later stage of the case.

The PSAD argues that the above allegations are not enough to show that they were the moving force behind the alleged constitutional violations because the PSAD cannot speak through one of its board members. The PSAD is a public body that keeps records in accordance with the law. Because there is no resolution or official record showing that the PSAD coerced any actions taken against plaintiffs, nor is there any allegation that the PSAD violated the Open Meetings Act, the PSAD argues, they are not the moving force behind the alleged constitutional violations. The court disagrees that plaintiffs would have

to show official record of the PSAD's actions or a violation of the Open Meetings Act.  True, individual board members may not have the authority to act on behalf of the PSAD. However, the reasonable inference that can be drawn from the above allegations is that the individual board members were communicating the views of the PSAD as a whole.  The above allegations, when drawing all reasonable inferences in favor of plaintiffs, plausibly allege that the PSAD coerced the alleged unconstitutional actions taken against plaintiffs.

This does not end the court's inquiry.  Even if the PSAD is the moving force behind the alleged constitutional violations, the PSAD argues that plaintiffs fail to state a claim upon which relief can be granted.

### 2. Failure to state a claim

The PSAD argues that plaintiffs fail to state a claim upon which relief can be granted as it relates to the alleged constitutional violations.  Each claim is addressed in turn below.

### i. The First Amendment claims

Plaintiffs contend that the PSAD violated their First Amendment rights to speak freely about (1) the efforts to restructure the districts and move away from site-based management; and (2) changes in staff positions related to the restructuring, including the suspension and termination of Sheu.  Plaintiffs contend that they were fired from their employment in retaliation for engaging in this protected speech.

The PSAD argues that plaintiffs' First Amendment claims should be dismissed because, assuming retaliation, the speech plaintiffs were engaging in is not protected speech.  Specifically, the PSAD argues that the speech did not address a matter of public concern, and, therefore, is not protected by the First Amendment.

The court disagrees with the PSAD that the factual allegations in both the complaint and proposed first amended complaint do not plausibly allege that the PSAD retaliated

16

against plaintiffs for engaging in protected speech (the restructuring of the districts). Therefore, the First Amendment claims will not be dismissed against the PSAD.

To establish a First Amendment retaliation claim, three elements must be shown: "(1) the plaintiff was engaged in a constitutionally protected activity"; "(2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity"; and "(3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Jenkins v. Rock Hill Local School Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008).

In the employment context, the Sixth Circuit has stated,

> [I]n determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. First, a court must ascertain whether the relevant speech addressed a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 143 (1983). If the answer is yes, then the court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickerling v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); [citation omitted].

*Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). Here, defendants challenge the first step: they argue that plaintiffs fail to state a claim upon which relief can be granted because their speech was a matter of private concern.

Determining whether an expression is a matter of public concern is a question of law, "although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated." *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). Whether an employee's speech addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as

17

revealed by the whole record." *Connick*, 461 U.S. at 147–48. "[T]he entire speech does not have to address matters of public concern, as long as some portion of the speech does so." *Farhat*, 370 F.3d at 589 (citing *Connick*, 461 U.S. at 149).

In *Connick*, an assistant prosecutor was upset over a pending transfer to another district and circulated a questionnaire to her fellow employees about their views on office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. *Connick*, 461 U.S. at 141. The Supreme Court explained that only the issue about being pressured to work in political campaigns was a matter of public concern. As it related to the balance of the topics in the questionnaire, the Supreme Court reasoned that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

Analyzing the precedent in this area, the Sixth Circuit has applied the following principles:

1. Speech is of "public concern" if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.

2. The fact that the public employee engages in the speech while in the course of his or her employment does not preclude a finding that the speech touches upon a matter of public concern.

3. The employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern.

4. Although First Amendment protection might not be available if the

18

employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment.

*Farhat*, 370 F.3d at 590–91 (footnotes omitted).

Applying the above factors to the allegations in the complaint and proposed amended complaint, plaintiffs have stated First Amendment claims upon which relief can be granted. Plaintiffs have plausibly alleged that they were fired for speaking about a matter of public concern: the restructuring of the districts.[4] The speech about the restructuring of the districts was of public concern because it involved information that was "needed or appropriate to enable the members of society to make informed decisions. . . ." *Farhat*, 370 F.3d at 590. The restructuring plans affected the students who attended the school, the parents, the staff and the PTSA. Indeed, there was active participation in meetings with Detroit 90/90 where concerns about the restructuring efforts were addressed.

Moreover, the complaint alleges that, after Ornstein removed Sheu from being a college advisor, he told her to "stay out of politics." Compl. ¶¶ 62–63. This shows that, from Ornstein's perspective, the decision to restructure the districts was akin to a political decision that required getting the students and parents on board. And speech that is political in nature is speech of public concern. *See Connick*, 461 U.S. at 141.

The PSAD argues that Gui's First Amendment claim cannot survive a motion to dismiss because Gui was speaking in the course of her employment. However, as

---

[4] The court disagrees with plaintiffs that Sheu's speaking out against the changes in her own position, and plaintiffs seeking support for Sheu to keep her job, constitute matters of public concern. Although these issues may have tangentially been of interest to parents because they were part of the restructuring as a whole, the specific speech touched on a matter of private concern: plaintiffs' attempts to keep Sheu employed. These would not be matters of public concern, as contrasted with plaintiffs' speech about the restructuring efforts generally.

explained, the fact that an employee "engages in the speech while in the course of his or her employment does not preclude a finding that the speech touches upon a matter of public concern." *Farhat*, 370 F.3d at 590. This may come into play later in a summary judgment analysis, but it is not the proper basis for granting the PSAD's motion to dismiss.

This case is different than *Golembiewski v. Logie*, 852 F. Supp. 2d 908 (N.D. Ohio 2012), a case that the PSAD relies on in support of dismissal. The *Golembiewski* case involved an employee speaking out about the fairness of the University of Toledo's attendance policy, a private matter. The court explained that the employee's speech about the attendance policy was similar to the questionnaire in *Connick*, concerning a grievance about internal office policy. *Id.* at 920. Here, the speech plaintiffs engaged in relating to attempts to keep Sheu employed is similar to the questionnaire in *Connick* and the speech in *Golembiewski*. However, the speech related to the restructuring of the districts is not. As explained, plaintiffs have plausibly alleged that the restructuring efforts touched upon a matter of public concern because it affected the rights of the students and parents in the districts. This is different than *Golembiewski*, where the employee's speech affected only the staff's employment and attendance requirements.

The only argument made by the PSAD in support of dismissal of the First Amendment claims is that the plaintiffs did not engage in speech touching on a matter of public concern. Therefore, the court does not address any other bases for dismissal. For these reasons, the First Amendment claims will remain.

### ii. Deprivation of Due Process (Count III)

Next, the PSAD seeks dismissal of Count III. In Count III, Gui claims that she was deprived of due process under the Fifth and Fourteenth Amendments when she was fired

20

prior to the completion of her five-year term as principal.

In response to plaintiffs' motion to amend, the PSAD argues that Gui did not have a protected property interest in continued employment because any right to continued employment with Detroit 90/90, a private employer, arises out of Gui's employment contract. The court agrees. Therefore, Count III will be dismissed.

The Sixth Circuit's recent case in *Branham v. Thomas M. Cooley Law School*, 689 F.3d 558 (2012), cited by the PSAD in response to plaintiffs' motion to amend, is instructive. In *Branham*, a tenured law school professor filed an action against Thomas M. Cooley Law School and its dean alleging unlawful termination. Addressing the plaintiff's claims that her federal due process rights were violated in connection with the manner in which she was terminated, the Sixth Circuit stated:

> Branham was employed by a *private* law school. The distinction is important. "Procedural due process guarantees apply only in the presence of a 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amendment. As we have discussed, Branham's employment contract provided for a finite term of employment with a private employer. "Any right to continued employment enjoyed by an employee of a private employer arises out of the employment contract. Such contractual rights do not rise to the level of a protected property interest." Thus, Branham, a private employee, is not due any of the additional federal due process rights. . . .

*Id.* at 564–65 (internal citations omitted).

The facts here are indistinguishable from the facts in *Branham*. Gui is a party to an employment contract with Detroit 90/90, a private employer. If Gui has any right to continued employment, such right arises out of her employment contract with Detroit 90/90, and will be addressed in Gui's breach of contract claim against Detroit 90/90 (Count IV). As a private employee, Gui is "not due any of the additional federal due process rights." *Branham*, 689 F.3d at 565. Plaintiffs do not argue in response that Detroit 90/90 is a state actor rather than a private employer nor do they distinguish *Branham*. Indeed, plaintiffs

concede throughout their argument that Detroit 90/90 is a private actor. Therefore, the deprivation of due process claim (Count III) will be dismissed.

### iii. Unreasonable search and seizure (Count IX)

Finally, plaintiffs allege unreasonable searches and seizures under the Fourth Amendment arising out of their email messages being accessed without permission. The PSAD does not make any argument for dismissal related to these claims on the basis that plaintiffs fail to state a claim. The court, therefore, does not address these claims, and they will survive the PSAD's motion to dismiss.

### B. Statutory Claims

Next, the court considers the statutory claims, arising out of the alleged unauthorized interception and access of plaintiffs' email messages.

### 1. The Wire and Electronic Communications Interception Act

First, plaintiffs claim a violation of the Wire and Electronic Communications Interception Act (the "Wiretap Act"), 18 U.S.C. § 2510, *et seq.* The Wiretap Act states that it is unlawful when any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication." 18 U.S.C. § 2511. The conduct giving rise to a violation of the Wiretap Act is the contemporaneous interception of the communication at the time it is transmitted. Indeed, "courts have found that simply accessing another's stored email does not constitute interception because it is not done contemporaneously with the transmission of the original email." *Garback v. Lossing*, No. 09-12407, 2010 WL 3733971, at *3 (E.D. Mich. Sept. 20, 2010) (Murphy, J.) (collecting cases). Contemporaneous interception of a communication occurs only in a "very narrow range of circumstances":

[T]here is only a narrow window during which an E-mail interception may

occur—the seconds or mili-seconds before which a newly composed message is saved to any temporary location following a send command. Therefore, unless some type of automatic routing software is used (for example, a duplicate of all of an employee's messages are automatically sent to the employee's boss), interception of E-mail within the prohibition of [the Wiretap Act] is virtually impossible.

*Id.* (citing *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003).

Here, like *Garback*, plaintiffs do not allege that their emails were contemporaneously intercepted at the time the messages were sent. Instead, plaintiffs allege unlawful access to the emails after they were transmitted, which does not fall within the purview of the Wiretap Act. *See Bailey v. Bailey*, No. 07-11672, 2008 WL 324156, at *4 (E.D. Mich. Feb. 6, 2008) (Cox, J.) (concluding that contemporaneous interception is required under the Wiretap Act). The claims against the PSAD under the Wiretap Act, therefore, will be dismissed.

2. The Stored Wire and Electronic Communications and Transactional Records Act

Second, plaintiffs claim a violation of the Stored Wire and Electronic Communications and Transactional Records Act (the "Stored Wiretap Act"), 18 U.S.C. § 2701, *et seq.* The Stored Wiretap Act makes it unlawful to access a person's email messages without authorization. *Warshak v. United States*, 532 F.3d 521, 523 (6th Cir. 2008). A claim under the Stored Wiretap Act is permitted against persons who personally access "a facility through which an electronic communication service is provided." *Garback*, 2010 WL 3733971, at *6. In *Garback*, Judge Stephen Murhpy dismissed the plaintiff's claims under the Stored Wiretap Act because, as to a particular defendant, there was no showing that he was the person alleged to have accessed the email account. *Id.* Instead, that defendant, at most, used the information after it was accessed, which Judge Murphy found was not actionable under the Stored Wiretap Act. *Id.*

23

The same is true here.  The PSAD is not alleged to have accessed the emails in plaintiffs' accounts.  It was Breanna Watson who accessed the emails.  The most the PSAD is alleged to have done is use the information in the emails after Watson accessed them.  Plaintiffs have not disputed this fact or argued otherwise.  Like *Garback*, the allegations against the PSAD are insufficient to state a viable claim against the PSAD under the Stored Wiretap Act.  This claim, therefore, will be dismissed against the PSAD.

## IV. CONCLUSION

For the reasons stated above, the PSAD's motion to dismiss is GRANTED IN PART and DENIED IN PART.  Specifically, the motion is granted as it relates to Count III (deprivation of property without due process), both counts labeled Count VI (the statutory claims under the Wiretap Act and Stored Wiretap Act), Count VII (invasion of privacy) and Count VIII (invasion of privacy).  These counts are DISMISSED as against the PSAD.  The remainder of the PSAD's motion is denied.  In addition, plaintiffs' motion to file an amended complaint is GRANTED IN PART and DENIED IN PART.  Plaintiffs are directed to file a the first amended complaint stripped of the claims that have been dismissed in this opinion and order.

IT IS SO ORDERED.

Dated:  May 6, 2015

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on May 6, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk