UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTINE SHEU and
GABRIELA GUI,

     Plaintiffs,              Case No. 2:14-cv-14177

v                        Hon. George Caram Steeh

                        **<u>FIRST AMENDED COMPLAINT</u>**
                        **<u>AND JURY DEMAND</u>**

DETROIT 90/90, et al.

     Defendants.

| | |
|---|---|
| Robert L. Levi (P42598)<br>ROBERT L. LEVI, P.C.<br>6675 Edwood Avenue<br>West Bloomfield, MI  48324<br>(248) 366-4412<br>robert@robertlevilaw.com<br>*Attorneys for Plaintiffs* | Peter H. Webster (P48783)<br>Aimee R. Gibbs (P70522)<br>DICKINSON WRIGHT PLLC<br>2600 W. Big Beaver Road, Suite 300<br>Troy, MI  48084<br>(248) 433-7513<br>pwebster@dickinsonwright.com<br>agibbs@dickinsonwright.com<br>*Attorneys for Defendants Public School*<br>*Academies of Detroit and its Board* |
| | Maria F. Dwyer (P34335)<br>Brian D. Shekell (P75327)<br>CLARK HILL PLC<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>(313) 965-8300<br>mdwyer@clarkhill.com<br>bshekell@clarkhill.com<br>*Attorneys for Defendants Detroit 90/90, Board Of*<br>*Directors of Detroit 90/90, Axios International,*<br>*Inc., A.I. Central, LLC, Board Of Directors of* |

| | *Axios* Incorporated, and Axios, Incorporated. |
| --- | --- |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

The Plaintiffs sue the defendants for damages, injunctive and other relief as follows:

**PARTIES**

1.      The plaintiff  Justine Sheu is an individual who resides in Wayne County, Michigan.

2.      The plaintiff  Gabriela Gui is an individual who resides in Wayne County, Michigan.

3.      The defendant Detroit 90/90 is a non-profit corporation organized under the laws of the State of Michigan.  The defendant's principal place of business is in Wayne County, Michigan.  The defendant is a management company responsible for managing the day to day operations of the UPrep Schools:  University Prep Academy (elementary, middle and high schools) and University Prep Science and Math Schools (elementary, middle and high schools), which are public school academies (aka/charter schools) in the school districts operated by the Public School Academies of Detroit.

4.      The defendant Board of Directors of Detroit 90/90 is comprised of the persons appointed or elected according to law who are authorized to manage and direct the affairs of Detroit 90/90.  The Directors are sued in their official capacities.

5.      The defendant A.I. Central, LLC is a corporation organized under the laws of the State of Michigan. The defendant's principal place of business was in Kent County, Michigan. But the defendant also conducted business in Wayne County, Michigan.  Per a PEO (professional employment organization) co-employment arrangement, A.I. Central, LLC was a co-employer,

2

first with New Urban Learning, and then with Detroit 90/90, of the teachers and other staff at the University Prep Academy School District and University Prep Science and Math School District during all times relevant to this Complaint.  On December 31, 2011, A.I. Central, LLC merged with Axios International, Inc. and the surviving entity is Axios International, Inc.

6.     Defendant Axios International, Inc. is a corporation organized under the laws of the State of Michigan. The defendant's principal place of business is in Kent County, Michigan. By merger with A.I. Central, LCC, Axios International, Inc. assumed all of the liabilities of A.I. Central, LCC.

7.     Axios Incorporated is a corporation organized under the laws of the State of Michigan. The defendant's principal place of business is in Kent County, Michigan.   In a document presented to Gabriela Gui on June 27, 2014, the title of the management company for UPSM is designated as "Detroit 90/90 - Axios, Inc. a Michigan corporation (f/k/a A.I. Central, L.L.C.)"  To the extent that A.I. Central is now known as "Axios, Inc." or has merged with Axios Incorporated, the plaintiffs also designate Axios Incorporated as a defendant which has assumed all of the liabilities of A.I. Central, LCC.  [Defendants A.I. Central, LLC, Axios International, Inc., Axios Incorporated and "Axios, Inc." are collectively referred within as "Axios.")

8.     The defendant Board of Directors of Axios Incorporated is comprised of the persons appointed or elected according to law who are authorized to manage and direct the affairs of Axios Incorporated.  The Directors are sued in their official capacities.

9.     The defendant the Public School Academies of Detroit ("PSAD")  is a public school district consisting of several public charter schools in Wayne County, Michigan organized under the Revised School Code, MCL § 380.501 et seq.

10.     The defendant School Board of the Public School Academies of Detroit is a public body organized under MCL 380.502 whose purpose is to organize and direct the charter schools operated by the Public School Academies of Detroit.  The School Board members are sued in their official capacities.

## JURISDICTION AND VENUE

11.     The plaintiffs make claims under the Constitution, laws, or treaties of the United States alleging deprivation of the right of due process, right of freedom of speech, right of freedom from illegal search and seizures, all under 42 USC § 1983, and, alleging private rights of action under 18 USCS § 2707, Federal Stored Wire and Electronic Communications Act, and under 18 USCS § 2520, Federal Wire and Electronic Communications Interception Act.  Therefore, this Court has original subject matter jurisdiction under 28 USC 1331.

12.     Venue is proper in the United States District Court for the Eastern District of Michigan, under 28 USC 1391, because the defendants are subject to this Court's personal jurisdiction and/or reside in this District.  Also, a substantial part of the events or omissions giving rise to the claim occurred in this District.

13.     Plaintiffs' claims under state law are so related to their claims within original jurisdiction of this Court that their state law claims form part of the same case or controversy under Article III of the United States Constitution.  Therefore, under 28 USCS 1367, this Court has supplemental jurisdiction over plaintiffs' state law claims.

## COMMON ALLEGATIONS

14.     University Prep Science and Math High School ("UPSM") and University Prep High School ("UPA") are two of the charter schools operated by the Public School Academies of

Detroit.   From July 2010 through the middle of school year 2011-2012, New Urban Learning

was the management company responsible for day to day operations at UPA and at UPSM.  A.I.

Central LLC, a professional employment organization, acted with New Urban Learning as co-

employers of the staff at those schools.

  15. On October 15, 2009, New Urban Learning/A.I Central LLC (hereafter, "NUL")

hired plaintiff Gabriela Gui as the first principal of UPSM.

  16. Before signing an employment agreement, Dr. Gui told both Doug Ross (CEO of

New Urban Learning) and Margaret Trimer-Hartley (then superintendent of the UPSM school

district) that she would not take a position as principal of the new high school if she could not

carry out the duties of principal for at least 4 years. Dr. Gui believed it would take at least 4 years

to found a general admittance college prep school in an urban environment plagued by high

drop-out rates and a history of underachievement. Doug Ross responded that New Urban

Learning "will do better than the 4 years" and would give her a 5 year contract.  All subsequent

conversations between Dr. Gui and Doug Ross and Margaret Trimer-Hartley referred to a 5-year

contract.

  17. The Employment Agreement promised a term of employment from July 1, 2010

to June 30, 2015.  The Agreement also stated that Dr. Gui's employment was "at will."

Employment Agreement 10/8/09, Ex. 1.   Dr. Gui remained principal of UPSM from July 1,

2010 through June 27, 2014 when she was discharged.

  18. Before signing the Employment Agreement, Dr. Gui asked Margaret Trimer-

Hartley why the Agreement stated she was an "at will" employee, when the parties had agreed to

a 5-year term for her employment.  Margaret Trimer-Hartley answered that the "at will"

language meant nothing and that they had to put that in every employment contract.  Based upon

Trimer-Hartley's assurance, Dr. Gui left her employment at Detroit Public Schools and became principal at UPSM.   Ex. 1.

19.     NUL was committed to site-based management at UPSM.   The Employment Agreement provided:  "University Prep Science & Math District embraces the North Central Regional Educational Laboratory's definition of site-based management, and agrees to adhere to them [sic] for the term of your contract."   The Agreement also provided that Dr. Gui had authority to hire the school's staff and make contractual commitments on behalf of UPSM for the 2010-2011 school year.  Ex. 2, Contract Addendum.  In the field of education, site-based management means that people closest to the work, at the school level, have control over: a) instructional programs; 2) staffing (hiring and firing); and 3) budgets, including grants.

20.     Dr. Gui left her previously employment of 15 years with Detroit Public Schools to become principal at UPSM based upon the promise of site-based management and a minimum 5-year employment term.

21.     NUL's contract with Dr. Gui provided that she be accountable for the following:

- Meeting AYP [annual yearly progress] beginning with the second group of 11th graders to take the Michigan Merit Exam (MME) in 2013-14;

- Meeting Performance goals outlined by Grand Valley State University [the "authorizer" of the charter schools operated by The Public School Academies of Detroit]—outperform host district; outperform peer districts; outperform weighted average performance of all districts represented in the school;

- Graduating 90 percent of ninth graders after four years, and sending 90 percent on to college;

- Site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget; designing and implementing curriculum and instructional practices.

Contract Addendum, Ex. 2.

22.     In the Contract Addendum, NUL agreed to purchase 5 years of service credit in the Michigan Public School Employee Retirement System (MPSERS) to compensate Gui for the five years of service credit she would lose during the term of her Employment Agreement. (Unlike DPS, NUL did not participate in MPSERS.)   Ex. 2.

23.     On or about February 11, 2010, through a lump sum payment of $79.000.00 to Gui, NUL furnished the funds to purchase the pension service credit promised in the first Contract Addendum.  In a second Contract Addendum, NUL memorialized the payment and stated, "Dr. Gui has a five year contact with UPSM."   There was no "employee at will" language in this Contract Addendum.   Contract Addendum 2/11/10, Ex. 3.

24.     This Addendum of 2/11/10 stated that the additional remuneration "is also intended to serve as compensation for work leading up to the opening of UPSM High School in the fall of 2010."  Id.  (Gui had actually performed many hours of work before July 1, 2010, when she was to start work per the Employment Agreement.)

25.     From October 15, 2009, through March 27, 2012, Dr. Gui operated under the initial Employment Agreement and the two Contract Addendums with NUL.  Ex. 1, 2, 3.

26.     Among other remuneration and benefits, the Employment Agreement provided Dr. Gui with an annual salary of $115,000.00 with 3% raises annually for the life of the contract. She consistently earned the raises.

27.     In the middle of the 2011-2012 school year, Detroit 90/90 replaced New Urban Learning as the management company responsible for day to day operations at UPSM and UPA. A.I. Central LLC ("Axios"), a professional employment organization, acted with Detroit 90/90 as co-employers of the staff at those schools.

28.     On March 30, 2012, Detroit 90/90 /A.I Central LLC (hereafter, "Detroit 90/90 and Axios") entered into an Employment Agreement with Dr. Gui as principal of UPSM. Employment Agreement 3/28/12, Ex. 4.  This Employment Agreement was substantially identical to the previous contract, except that it contained a term of employment from July 1, 2012 through June 30, 2015, and provided an annual salary of $122,450.00 for the 2012-2013 school year with 3% raises annually for the life of the contract.  This employment agreement just substituted Detroit 90/90 for New Urban Learning as the management company.

29.     The Employment Agreement of 3/28/12 contained the same commitment by the employer to site-based management at UPSM as contained in the Employment Agreement of 10/8/09.

30.     While the other staff at the school had to renew their contracts annually, Dr. Gui only renewed her contract when the management company changed from NUL to Detroit 90/90 and Axios.  When Dr. Gui asked why she was receiving a second contract mid-term, Margaret Trimer-Hartley's just stated that the management company had changed, and the contract needed to reflect that change.

30a.  PSAD and Detroit 90/90 share the same office.  Members of Detroit 90/90's central office appear at all PSAD board meetings.  During her tenure as principal, Dr. Gui had dozens of direct contacts with PSAD board member John Cleary (and some with board member Keith Cooley) who was involved with school operations on a granular level, even with the acquisition of equipment and and with Gui's objections to the restructuring.

31.     By the end of school year 2012-2013, Dr. Gui and the staff she selected, including plaintiff Justine Sheu, had fulfilled all of the goals set by NUL in the initial Employment Agreement with Dr. Gui.  With a glowing evaluation for the school year 2010-2011, the school

superintendent rated Dr. Gui "highly effective" as principal, which is the highest rating attainable under state standards.  There was no evaluation performed for school year 2011-2012.  But the performance of the staff, under Dr. Gui's direction, continued to improve as measured by the students' graduation rates, ACT scores, annual evaluations from Excellent Schools Detroit, and rates of college admissions.

32.     In 2013 and 2014, the data showed that UPSM's academic results (ACT scores) exceed those of all but the magnet schools in Detroit Public Schools, exceeded those of UPA (which had been in existence for 11+ years), and exceeded those of several suburban schools. The National ACT average for African American students for 2012 was 17.0, and had not been higher than that in the previous 5 years. With an average composite ACT score of 17.1 in 2013 and of 18.5 in 2014, UPSM exceeded the national average. The Excellent Schools of Detroit organization graded UPSM with an A+ for School Culture three years in a row.  Parents, community members, partners, and visitors frequently expressed very positive comments about the school's instructional program, culture, great relationships, and rich opportunities offered to students.

33.     The successes of UPSM were the result of a research-based instructional framework model implemented with fidelity and of the collective efficacy of a staff selected through the most rigorous hiring process Detroit 90/90 and Axios had ever experienced.

34.     In the winter of 2013, Dr. Gui needed a skilled individual to assist students (especially juniors) in preparing for the ACT test to be given in the spring of 2013.  Dr. Gui hired plaintiff Justine Sheu as an independent contractor to serve as the school's ACT prep instructor. Sheu's main duties were to prepare the students for taking the ACT test.  The goals that Dr. Gui set for Sheu for 2012-13 were that her instruction, test preparation, and motivational techniques

yield a substantial increase in the final ACT scores of the students when compared with their practice test scores.

35.     By the end of school year 2012-2013, Ms. Sheu had fulfilled the goals set by Dr. Gui.  Moreover, the parents, students, and staff were thrilled with Ms. Sheu's performance.  She facilitated a series of workshops for parents and worked with some school advisors to prepare the juniors for college-related events and activities.   The students related to her exuberance and youthfulness; the parents highly valued the information she provided and were overjoyed that their children spoke so positively and enthusiastically about Sheu's classes.  The staff of UPSM High School warmed up to the passion and breadth of college-knowledge Sheu possessed.

36.     In the spring of 2013, anticipating the first senior class at UPSM High School during the 2013-2014 school year, Dr. Gui required a College and Career Readiness Advisor.  The school's Social Worker and the Advisors were already addressing the students' traditional counseling needs.  Therefore, Gui needed someone to:  provide ACT Prep to students in grades 10 and 11; help the seniors with college fairs, scholarships, applications, portfolios, and; work with students, parents, and staff to increase their college-knowledge and college readiness.

37.     With the approval of the then Superintendent, Margaret Trimer-Hartley and the Human Resources Department of Detroit 90/90, the position of College and Career Readiness Advisor was posted.  From the 60 applications received, the UPSM HS Leadership Team decided that Ms. Justine Sheu was the best fit for the position.  Ms. Sheu accepted the position in early summer of 2013, and arrangements were made for her to visit the HR Department for completing the hiring process.

38.     In the summer of 2013, Mark Ornstein became the new CEO of Detroit 90/90.  During his welcome reception he announced that he would not honor the commitment to site-

based management at any of the UPA or UPSM schools.  He also alluded to unifying the 2 districts.

39.     In the summer of 2013, Ornstein interposed a mid-level bureaucracy of supervisors and directors, the "Central Office," between him and the principals and staff at the schools.  See chart, Ex. 5.  In the summer of 2013, Ornstein began making decisions about staffing at the UPSM (taking people away and assigning people to the school without consulting the school's leadership team) and began making financial decisions for the school without disclosing how the school's grant money was being spent.  In early 2014, Ornstein directed the Central Office staff to begin the process of adopting a prescribed curriculum that conflicted totally with the approach to teaching of Dr. Gui and her staff.

40.     In August 2013, Ornstein revealed his restructuring to the staff at UPSM, including the plaintiffs.  Ornstein's restructuring of the administration and negation of site-based management became a matter of public concern for the staff and parents at UPSM.  As Ornstein's plan unfolded, the staff and parents viewed Ornstein and the officials in the Central Office as a dictatorship.  The staff and parents complained that:

A. Dr. Gui and the school teams could no longer make hiring decisions; the CEO took staff persons away from the school against their will even though they were needed and funded by the school, and; the CEO assigned staff to the school without giving the school administration a chance to interview or meet this staff beforehand;

B. Individuals making important educational decisions (like Ornstein) had no background in education; the Central Office made impulsive decisions, sometimes disregarding school or district policies and practices but still held the school staff responsible for the consequences of those decisions;

C. By creating the Central Office, Ornstein had created an unnecessary level of bureaucrats who had to justify their existence by interfering in an educational process of already proven efficacy, and;

D. Other complaints.

41.     Ornstein's restructuring particularly impacted Gabriela Gui.  Ornstein's changes withdrew from Dr. Gui the ability to conduct site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget, and; implementing curriculum and instructional practices.  Thus, Ornstein's changes breached the promise of site-based management in Gui's Employment Agreements.  Furthermore, Ornstein's changes jeopardized the successful learning environment that Dr. Gui and her hand-selected staff had created based upon a research-based instructional model.

42.     Ornstein's restructuring particularly impacted Justine Sheu.  At a meeting with Ornstein on August 13, 2013, Sheu learned of the changes to her job.  Ornstein appointed Venus Crosby as "Director of College Counseling."  Thus, Crosby replaced Dr. Gui as Justine Sheu's supervisor. Crosby and Ornstein limited Sheu's initiative and creativity in her job.  They removed Sheu from her position at UPSM where she had developed the site-specific knowledge and deep relationships with students and parents necessary to perform her job, and reassigned her to the Central Office staff as a "College Success Advisor."  Moreover, she was assigned to serve both UPSM and UPA, thus doubling her case load.  As a result of the change, Sheu was unable to enact some of the programs that were in place before the restructuring.

43.     Rather than allowing Sheu to use her innovative abilities, Crosby merely delegated tasks (mostly lower, ministerial tasks) to Sheu.  Crosby stated her management style was to "check on people" and keep them in their place.  That style did not match the

collaborative and inclusive approach Gui had used.   Both to Crosby and Ornstein, Gui and Sheu

challenged Ornstein's restructuring in general and Crosby's changes in Sheu's job

responsibilities.

44.     On August 13, 2013, Sheu first met with Venus Crosby.  Crosby explained to

Sheu her truncated job responsibilities. Crosby showed Sheu Crosby's framework for college

advising/ACT preparation that she would implement at UPSM HS.  Sheu believed that Crosby's

framework would implement changes that would be detrimental to the students.  Sheu expressed

to Crosby her doubts about the efficacy of Crosby's plans.  Crosby was displeased with Sheu's

criticism.  Crosby's attitude and communications to Sheu made it clear that Crosby did not want

Sheu's input, that Sheu should stay in her place.

45.     Gui and her Assistant Principal, Grady Jones, Jr., also met with Crosby several

times in August, when Crosby came to UPSM. During Crosby's first visit to the high school,

without a thorough discussion or understanding of the instructional framework and program in

place at UPSM HS, Venus Crosby dismissed the work of 3 years of UPSM staff,  accused them

of "taking shortcuts", imposed her college readiness plan (that both Gui and Jones found

superficial), and expressed sheer disrespect toward Sheu and her professional abilities.

46.     Also in August 2103, Ornstein also removed Vera Smith as Parent Liason at

UPSM and brought her to the Central Office.  Smith's removal was against Smith's will, without

the school leadership's knowledge or approval, and was strongly disapproved by the school's

parent organization.

47.     On August 16, 2013, Gui met with her administrative cabinet, Sheu, and the

school's senior advisors to discuss the district restructuring and the changes to Sheu's and

Smith's positions.  All persons present, including Gui and Sheu, strenuously objected to the general structural changes and the changes to Sheu's and Smith's positions.

48.     On August 17, 2013, Gui emailed a letter to Ornstein criticizing the restructuring and the changes to Shue's position, and, seeking the return of site-based management and the return of Sheu to her original position.

49.     After Gui's letter of August 17, 2013, Crosby hired two new college counsellors, Penny Wells to work out of UPSM and Carl Yiu to work out of UPA.  While they were both certified college counsellors, unlike Sheu they had no experience in the job.

50.     Parents of UPSM students began to inquire why Justine Sheu and Vera Smith were not at the school every day.  Gui and Sheu met with parents and explained the changes wrought by the restructuring.  Gui and Sheu explained how the changes negatively impacted the ability of Sheu and Smith to perform their jobs, and explained how the changes negatively impacted the students.  After these meetings, some parents told Sheu that they would contact Venus Crosby to address the issues.

50a.  The change in Sheu's job at the beginning of the school year meant that the staff at UPSM could not provide to the students the college readiness programs they had promised the students for the 2013-14 school year.  This directly impacted the students' ability to successfully obtain college admissions.   The parents, who knew how vital Sheu was to their children's future, protested the change to her job duties in meetings with Ornstein and the PSAD board.

51.     In September of 2013, through a series of emails Gui continued to advocate for the return of Sheu's and Smith's services to the UPSM and expressed concerns about Venus Crosby's capacity, leadership style, and actions.  In response, Ornstein called a meeting at the Central Office. Ornstein, Crosby, Trimer-Hartley and Gui participated. Ornstein and Trimer-

Hartley dismissed Gui's concerns, insinuated that Gui had a personality problem, and directed Gui to cease voicing her opinions about what she believed about Central Office's decisions.

52.     On October 3, 2013, Ornstein held a meeting with Dr. Gui and her supervisor, Danielle Jackson, to discuss Ornstein's concerns that Gui was not supporting his restructuring of the school district.  Ornstein insisted that Gui support the restructuring in discussions with her school staff and parents.  Ornstein told her, "Fix it.  Get the parents off of my back.  Convince them to go with my flow."  Ornstein memorialized the meeting in a memo dated October 9, 2013.

53.     On October 10, 2013, Sheu could not come to work due to the sudden onset of illness (due to food poisoning) when she woke up that very morning.  The onslaught of her symptoms, including nausea, vomiting, and fainting, was sudden and unanticipated.  Early that morning, Venus Crosby called her and insinuated that Sheu had a hangover.

54.     On October 10, 2013, Crosby issued a written reprimand to Sheu concerning her absence entitled "Unacceptable Communication for Absences."   Ms. Crosby criticized Sheu for "failure to perform the required functions of your position by not communicating your absence in a timely manner, and/or providing adequate resources to reassign tasks."  This criticism was in referenced to Ms. Sheu's absence from an ACT prep session on October 10, 2013.

55.     Crosby's reprimand was a form of retaliation for Sheu's speech criticizing the restructuring of the school district, including Crosby's redesign of the college advising/ACT preparation program.

56.     Crosby did not place the reprimand in Sheu's personnel file.

57.     On or about July 14, 2014, Justine Sheu filed an unfair labor practice charge against Detroit 90/90 with the National Labor Relations Board claiming that her suspension and

15

discharge was in retaliation for her concerted activities in violation of Section 8 of the National Labor Relations Act.

58.     On or about September 18, 2014, Detroit 90/90 and Axios placed the reprimand in Shue's personnel file.  Detroit 90/90 and Axios placed the reprimand in Sheu's personnel file as retaliation for her filing the unfair labor practice charge and to create further pretext for terminating her employment.

59.     Ornstein's restructuring also became a matter of great public concern among the parents of students at UPSM.  In October 2103, the parent-teacher-student association (PTSA) at UPSM sent a letter to all parents alerting them to the structural changes.  The PTSA expressed great concern that the restructuring was intended to benefit UPA (whose students had consistently performed at lower levels than UPSM students) at the expense of UPSM.  The PTSA also expressed great concern about restructuring an already successful site-based management platform at UPSM.

60.     On October 17, 2013, the PTSA and parents of UPSM held a meeting with Ornstein, Margaret Trimer-Harley (then Chief External Relations Officer in the Central Office), and other Detroit 90/90 administrators.  Before the meeting, teachers other than Justine Sheu passed out flyers to students giving parents of their students notice of the meeting and the anticipated topics for discussion: the detrimental changes caused by Ornstein's restructuring and the changes to the positions of Sheu and Smith.

61.     At the meeting of the PTSA on October 17, 2014, the parents were highly critical of Ornstein and his restructuring.  The parents submitted a list of questions to Ornstein indicating their dissatisfaction with the restructuring.  The parents highlighted the change in Justine Sheu's and Vera Smith's job responsibilities as the prime examples of their objections to the

16

restructuring.  The parents wanted Ornstein to restore Sheu and Smith to their original positions and allow Dr. Gui to resume site-based management in its entirety.  After the meeting, Ornstein expressed <u>to the PTSA president</u> his belief that Gui was fueling the parents' dissatisfaction with his restructuring of the district.

62.    Sometime after the PTSA meeting on October 17, 2013, Justine Sheu met with Ornstein, Margaret Trimer-Hartley and Venus Crosby.  At this meeting, Ornstein and Trimer-Hartley expressed that there had been some "growing pains" about the district restructuring.  They were referring to the complaints from parents and school staff.   Trimer-Hartley told  Sheu, "It would behoove you to stay out of politics."  Ornstein and Trimer-Hartley stated they believed school staff was working together with the parents to oppose the restructuring.

63.    At the above meeting with Ornstein, Margaret Trimer-Hartley and Venus Crosby, Sheu was told that she would no longer do college advising but only ACT preparation.  Ornstein wanted ACT scores raised by 2 points from the practice test scores.

64.    Sometime after the above meeting with Ornstein, Margaret Trimer-Hartley and Venus Crosby, Sheu asked Ornstein for a meeting with just him to discuss her concerns about her removal from college advising.  (She believed that removing her from college advising would negatively impact the students at UPSM, because Penny Wells, the recently hired college counsellor, had no prior experience and needed help from someone experienced with preparing students for successful admission to college.)

65.    On October 29, 2013, the PTSA and parents met with the school board (defendant PSAD), Ornstein and other Detroit 90/90 administrators.  The parents expressed the same concerns they had expressed to Ornstein and the administrators on October 17, 2013.  Parent Mike McLeod highlighted the negative effects of the changes to Sheu's position as a prime

example of the harm done by the restructuring.  He told the PSAD board that Sheu was very upset about and opposed to the changes to her job.  Thus, it was obvious to the Board that Sheu had been expressing her protests to the parents.

66.     In early November 2013, Justine Sheu met just with Mark Ornstein.  She stated her concern that UPA did not have a good program for ACT preparation established.  It would take some coordination between the UPA staff and Sheu before she could create and implement a cohesive program specifically for the UPA students.  But she did not have the time to do that. Yet, she would be appraised based upon the ACT scores of both UPA and UPSM.  She also advised Ornstein that the parents of UPSM students had concerns about her removal from college advising.  Ornstein replied, "Let's see how it works out and if it doesn't work out, we can revisit it."

67.     On November 8, 2013, Sheu met with Trimer-Hartley, Venus Crosby, Dr. Gui, and Aisha Scott, the interim UPA principal, to discuss the changes in Sheu's position.  Dr. Gui again asked for the return of Justine Sheu to UPSM for full-time ACT preparation and college advising.  Timer-Hartley stated that this was the last time she would talk about Sheu's position and that she wanted the complaints about Sheu's position to stop.

67a.    Throughout the 2013-14 school year, Gui spoke directly several times to PSAD board president Edward Parks about her objections and the parents' opposition to the restructuring.  On November 8, 2013, Ornstein summoned Gui to a meeting in his office. Unbeknownst to Gui, PSAD board president Edward Parks Detroit 90/90 board president Dr. Glenda Price were present.  Ornstein blamed Gui for not supporting the restructuring and for stirring up staff and parents.  He told her to "stop complaining."  Gui explained her doubts about the restructuring, the opposition of the parents and staff and her ethical dilemma because she

18

believed Ornstein's changes were educationally unsound and deleterious for the school. Parks said he supported Ornstein 100% and that Gui should listen to him because he was her boss.  But Parks also said he supported Gui and she was an excellent principal.

68.     During numerous instances, after the meetings of the parents with Ornstein and PSAD and until he discharged her, Ornstein told Gui that she should be "controlling the parents" and that it was her "fault" that they kept attending board meetings and expressing concerns.

68a.     In February 2014, the PTSA president had a private breakfast meeting with Edward Parks.  She discussed the UPSM parents' confidence in and support for Dr. Gui as principal and the parent's solidarity with Gui in opposing the restructuring.  Parks said that he knew that the parents supported Dr. Gui but just as many were against her.  AC.   Therefore, PSAD's board president knew that Gui was "complaining" to the parents about the restructuring and that the PTSA and parents supported Gui.

69.     In early April 2014, UPSM and UPA received the ACT scores for their students. The ACT scores for UPSM improved from 16.6 (practice test) to 18.5 (regular test 2014).  The scores for UPA improved from 14.0 (practice test) to 16.5 (regular test 2014).   Thus, even under the burden of a double case load, including students at UPA with historically lower performance levels, Sheu met the goals set by Ornstein.

70.     In April or May 2014, Sheu met with the advisors for the junior class at UPSM to discuss the restructuring of the district and the changes to her position.  The advisors were highly critical of the restructuring of the district and the changes to Sheu's position.  The advisors were unhappy with Venus Crosby's directives and her lack of guidance.  (Crosby had told Sheu not to talk to the junior advisors regarding assignments to students and about creating student portfolios.)

71.     On May 16, 2014, Sheu delivered a presentation to UPA seniors entitled

"Transitioning to College."  As part of her advice to the students:

A.  She warned against assuming that, just because they did well in high school, they would automatically do well in college.  She told an anecdote about when she received her first "D" grade in college. In a self-deprecating and joking manner, she expressed the overconfidence she had exhibited because of her Asian heritage (relying on the legendary intellectual prowess of Asian persons), and the shock of receiving the "D" grade.

B.  Through a PowerPoint slide titled "Pressure to Engage in Unsafe Behavior", Sheu enumerated all the risks associated with drinking alcohol and smoking marijuana at college, and the overriding message was not to engage in unsafe behavior. Acknowledging that some students would nonetheless drink and smoke, she warned against the serious dangers of (a) binge drinking, (b) sexual assault, and (c) smoking illegal substances.  Using an anecdote about an athlete who had smoked a laced blunt and suffered long-term brain damage, she warned students never to consume anything they had not prepared themselves or had not witnessed being prepared, due to the risk of substances being laced.

C.  She advised students not to join a fraternity or sorority their freshman year because, in addition to an enormous commitment of time and energy, they would likely "be getting their asses beat" every night.

72.     On May 19, 2014, Margaret Trimer-Hartley called Gui.  Trimer-Hartley warned

that Sheu was being placed on leave pending an investigation. When Gui pressed for details and

asked if an alternate solution would be possible, Trimer-Hartley expressed that Sheu was "gone",

that it was a "done deal."

73.     On May 19, 2014, Venus Crosby, Margaret Trimer-Hartley (of Detroit 90/90) and

John Sanford (of Axios) met with Sheu and suspended Sheu  from her job "pending

investigation" claiming that on May 16, 2014, students and others had complained in writing

that:

A.  Her jokes about her Asian heritage were racially insensitive and offensive.

B.  Her message to seniors "if you didn't roll it, don't smoke it" encouraged students to abuse substances.

      C.  Her use of "asses" was profane and inappropriate.

74.    The expressed reasons for Sheu's suspension were mere pretext.  The real reason the defendants suspended her was, because Sheu had spoken, and the defendants reasonably believed that Sheu had spoken, to school staff and parents of students (1) against Ornstein's restructuring of the school district and (2) against the changes in her own position, both matters of public concern.

75.    There was no good cause for suspending Sheu.

75a.    On May 19, 2014, after Sheu's suspension, Mark Ornstein held a district wide meeting for staff.  He mandated that the staff support his values.  He said, "Get on board or not.  You're either with me or you're not."  He made similar statements at many district wide meetings.  Parks was at the staff meeting, endorsed the restructuring, and noted the board would vote on it on June 24, 2014 ( the meeting when Parks spoke about the email he had).  AC, ¶67a.

76.    On May 20, 2014, Sheu requested from John Sanford and Emily Bitzarakis (Detroit 90/90's Director of Human Resources) copies of the alleged complaints about her presentation, a citation of policies violated, and clarification on the nature of the investigative process.  She asked for a hearing to present her testimony.  There was no response to this request.  She never received a hearing before her discharge.

77.    In fact, there was no investigation into the allegations against Sheu.  There was no notice of a hearing and no opportunity for Sheu to examine the alleged complaints about her presentation and to be heard in her own defense before she was suspended.  Sheu received no hearing on disputed issues of fact.  The defendants suspended Sheu without good cause and without due process.

78.     PSAD and its school board showed an interest in the suspension of Justine Sheu. Detroit 90/90, through its officers and directors, and Axios, through its officers and directors, consulted PSAD and its school board before suspending Sheu and obtained the approval of the latter entities before suspending Sheu.

79.     PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to suspend Justine Sheu so that the choice to suspend her was essentially the decision of PSAD.

80.     Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in the decision to suspend Justine Sheu's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios (both private entities) and the PSAD, a governmental entity.

81.     On May 21, 2014, Sheu sent an email message to UPSM staff, parents, and students explaining the circumstances of her suspension.  Sheu appealed for letters of support to Detroit 90/90 and Axios testifying to her professional character.

82.     On May 21, 2014, and thereafter, numerous staff members, parents, and students sent many letters of support lauding Sheu's abilities and imploring Detroit 90/90 and Axios to retain Sheu in her employment.  Students and parents delivered to the PSAD school board petitions with over 300 petitions in support of Sheu.

83.     On May 21, 2014, John Sanford of Axios and Emily Bitzarakis of Detroit 90/90 sent a letter entitled "Notice of Investigation Resolution" to Justine Sheu.  The letter terminated her employment.  The letter claimed that the reason for her discharge was her presentation to students on May 16, 2014, her email to students of April 29, 2014, and her appeal to staff, parents, and students for support for her to retain her job:  "[Y]our recent email outreach to

students, parents, and others since Monday, including a file attachment named 'Circumstances of Suspension' ...shows a lack of judgment, professionalism and maturity."   Id., p. 2.

84.     The defendants did not really terminate Sheu for her presentation to students on May 16, 2014, or her email to students of April 29, 2014.  Those expressed reasons were mere pretext.  The real reasons the defendants terminated her were, because:

(A) Sheu had spoken, and the defendants reasonably believed Sheu had spoken, to school staff and parents of students (1) against Ornstein's restructuring of the school district and (2) against the changes in her own position, both matters of public concern, and;

(B) Sheu had sought support to keep her job, a matter upon which staff, parents, and student had all expressed public concern.

85.     There was no investigation into the allegations against Sheu. There was no notice of a hearing and no opportunity for Sheu to examine the alleged complaints about her presentation and no opportunity for Sheu to be heard in her own defense before she was terminated.   Sheu received no hearing on disputed issues of fact.  The defendants terminated Sheu without good cause and without due process.

86.     PSAD and its school board showed an interest in the termination from employment of Justine Sheu.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before terminating Sheu and obtained the approval of the latter entities before terminating Sheu.

87.     PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to terminate Justine Sheu so that the choice to suspend her was essentially the decision of PSAD.

23

88.     Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in deciding to terminate Justine Sheu's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios, both private entities, and the PSAD, a governmental entity.

89.     On May 21, 2014, Gui asked Ornstein what process was used to determine to discharge Sheu.  Gui pointed out that, when students are accused of violating the Code of Conduct, the administration conducts a thorough factual investigation and a due process hearing before issuing of a recommendation to expel. Ornstein responded that "all that was done in Sheu's case", but did not offer any details.

90.     In response to another inquiry from Gui, John Sanford stated that, before determining consequences, it was unnecessary to talk to UPSM HS students, staff, and parents about their experiences with Sheu.  Sanford also denied Gui the ability to review the alleged evidence against Sheu.

91.     On May 21, 2014, Gui asked Ornstein whether she would have a job as principal of UPSM in the fall.  Ornstein promised that she would retain her job, unless she chose to decline it.

92.     On May 21, 2014, Ornstein asked Dr. Gui to introduce John Sanford of Axios and Emily Bitzarakis of Detroit 90/90 to the staff at meeting the next day to address the staff protest against Sheu's discharge.  Ornstein wanted Gui to show the staff that she supported the process and the decision to discharge Justine Sheu.  Dr. Gui did not want to attend the meeting, because Ornstein had not answered her questions about what process was used, and, therefore, she could not approve the alleged process.  She also did not want to be disingenuous with her staff, with whom she had built relationships of trust. Therefore, Gui told Ornstein and Emily Bitzarakis that

she had a doctor's appointment the next morning and would not be able to attend the meeting. (Although an appointment was not previously scheduled, Gui did see her family doctor the next morning for real, pre-existing health concerns).

93.    On the morning of May 22, 2014, Detroit 90/90 and Axios held a meeting with the staff of UPSM in order to silence the dissenting voices of the staff and parents who were extremely upset with the defendants' suspension and termination of Justine Sheu.   The parents and staff members were inundating the defendants with emails, letters, and telephone calls expressing their dismay.  The meeting did not go well for the defendants.  The staff and parents were adamant in supporting Sheu.  The staff questioned the process used to terminate Sheu.  But Sanford and Bitzarakis were not able to address the staff's concerns.

94.    After the meeting on May 22, 2014, Ornstein was upset with Gui for not supporting the Central Office at the staff meeting.  He planned to schedule another staff meeting for Gui to show her support for Sheu's discharge.  Gui again asked Ornstein to explain the process used to decide to terminate Sheu.  After talking with John Sanford, Ornstein said the second meeting would not be necessary.  But Ornstein stated to Gui, "You are the leader of the school.  You need to communicate to staff.  You should express that for Justine to be terminated there was a severe enough of an issue."

94a.  After the meeting on May 22, 2014, the school staff was still outraged over Sheu's discharge.  The PSAD board was scheduled to perform a site visit the next day.  Gui suggested that perhaps Ornstein should postpone the visit, since the staff was so upset.  But Ornstein told her, "The board is knowledgeable and supportive of the situation and the decision made."  Thus, the PSAD board knew about the controversy over Sheu's discharge and Gui's failure to communicate to the staff her support for the decision.

25

95.    Vera Smith had been in charge of the Parental Involvement Plan at UPSM but Ornstein removed her to the Central office in fall 2013.  The PTSA had protested the removal of Vera Smith to the Central Office.  Subsequently, the defendants allowed Smith to return to her post at UPSM.  But following the discharge of Justine Sheu, the defendants also discharged Vera Smith from her employment as coordinator of parent relations at UPSM.  The discharge of Vera Smith was without good cause.  She was discharged in retaliation for her resistance to the restructuring of the school district by Ornstein.

96.    On May 19, 2014, Detroit 90/90 and Axios confiscated from Sheu the laptop computer assigned to her while she was an employee at UPSM.

97.    On May 23, 2014, Director of IT Nicole Cummings, held a team meeting of the IT staff.  Cummings had possession of the laptop retrieved from Sheu.  Cummings stated to the IT staff that she had found on Sheu's laptop computer a document listing Sheu's passwords to her online bank account and to her personal email account on the Gmail server, which is a separate server from the server for the Detroit 90/90 and Axios email system.

98.    At the meeting on May 23, 2014, Cummings stated that she had found on Sheu's laptop photographs of Sheu in lingerie and had showed the photographs to her husband.

99.    At the meeting on May 23, 2014, Cummings then showed the same photographs of Sheu in lingerie to the others at the IT meeting.

100.    Ornstein's personal assistant, Breanna Watson, then came into the meeting of the IT staff.  Cummings indicated her intent to inspect the email messages in Sheu's personal email account with Gmail.  Despite the warning of Paris Cooks, an IT staff member, that intrusion into Sheu's personal email account was illegal, Cummings opened up the account.  Then, Breanna Watson encouraged Cummings to search the messages in Sheu's personal email account for any

messages from Dr. Gui or Grady Jones to Sheu.  When Cummings stated she had found such messages, Watson instructed her to read them.  Cummings then read aloud various messages in which Gui and Jones (1) had advised Sheu regarding her appeal to staff for support after her suspension and (2) had suggested possible responses to accusations Sheu had received from Venus Crosby and Margaret Trimer-Hartley throughout the year.  At the conclusion of Cummings' reading, Breanna Watson (Ornstein's personal assistant) exclaimed, "That's what they are looking for."  Cummings printed out the messages and gave them to Watson.  Some of the email messages read by Cummings are attached as Exhibit 10.

101.    Gui and Jones sent the email messages described above to Sheu using their personal email accounts, not the accounts provided by Detroit 90/90 and Axios.

102.    Cummings and Watson intentionally and without authorization accessed and intruded into Sheu's private email account upon directions from Ornstein.  As agents of the defendants Detroit 90/90, Axios, and PSAD, Cummings and Watson executed such intrusions in the course of their employment and within the scope of their employment with the defendants.

103.    Justine Sheu did not authorize the defendants or their agents to use her personal email password to log into her personal Gmail account or to view her personal email messages or to disclose the contents of messages.

104.    Justine Sheu did not waive her right to privacy or confidentiality with regard to messages in her personal Gmail account.

105.    Gabriela Gui did not authorize the defendants or their agents to view the contents of her personal email messages to Justine Sheu stored within Sheu's email account with Gmail.

106.    Gabriela Gui did not waive her right to privacy or confidentiality with regard to personal email messages to Justine Sheu stored within Sheu's email account with Gmail.

107. At the time that Cummings and Watson were directed to access Sheu's private email messages and at the time they did access those messages, the defendants possessed no specific information about activity on Sheu's personal internet account regarding communications with Gui or Jones concerning Sheu's suspension or termination.

108. At the time that Cummings and Watson were directed to access Sheu's private email messages and at the time they did access those messages, the defendants had no probable cause to believe that Sheu, Gui, and Jones had used their personal email accounts to communicate with each other concerning Sheu's suspension or termination.

109. At the time that Cummings and Watson were directed to access Sheu's private email messages and at the time they did access those messages, both Sheu and Gui had a reasonable expectation of privacy in their private email communications with each other, using their personal email accounts.

110. Two weeks after the IT team meeting, Cummings told Paris Cooks that the Central Office did not trust him, because he had warned her that to access Sheu's personal email was illegal. Cummings urged Cooks to reassure the Central Office that he would not reveal the exposition of Sheu's personal email messages. Cooks refused to do that.

111. In early June 2014, the PTSA presented a set of written question to the defendants asking why they had terminated Justine Sheu and Vera Smith and asking who would perform their tasks. The PTSA also wanted information on the budget for Title I expenditures, because it would reveal whether the defendants planned to increase class sizes the next year. The defendants did not provide the information regarding Title I expenditures until July 2014.

112. On June 4, 2014, the UPSM staff held a meeting. It was a "Chalk Talk" regarding the staff's strenuous objections to Ornstein's restructuring, the dictatorship of the Central Office,

Sheu's discharge, the lack of due process involved, the need to form a union, and other issues. The Chalk Talk was followed by a staff survey on the issues discussed.

113.    Following Sheu's discharge, the PTSA and students at UPSM held petition drives and obtained hundreds of signatures in protest against her discharge.

113a.   During June 2014, Ornstein rescheduled Gui's annual evaluation twice, the second time for June 27, 2014.

114.    On June 24, 2014, the PSAD board held a board meeting.  This was the first board meeting since Breanna Watson had obtained the emails between Sheu and Gui.  After the meeting, Ed Parks, the chairman of the board, told three parents of children at UPSM, "I have an email from someone high upon in UPSM.  It amounts to fucking insubordination.  We are going to do something to handle this.  You may not like the results."  Parks was referring to the email messages between Gui and Sheu, illegally intercepted, disclosed, and used by the defendants.

115.    On June 27, 2014, the defendants discharged Gui, Jones, and Cooks from their employment at UPSM without good cause and without due process.  Ornstein, Sanford, and Danielle Jackson personally discharged Gui.  Ornstein stated the discharge "is not necessarily about performance; it's that we are going in a different direction...The board feels it's necessary to go in a different direction."  Gui asked Ornstein for the specific reasons he was discharging her and to describe the "different direction" in which he and the PSAD Board was taking the school.  Ornstein refused to answer her questions.

116.    The discharge of Dr. Gui was without good cause.  Gui had fulfilled and exceed all goals set by her Employment Agreement.  She was an outstanding principal valued and respected by the staff, parents, and students.  She graduated 95% of the student at UPSM on time

(within 4 years.)  One hundred percent of the graduating students were accepted by colleges and universities.  Those graduates generated $1.5 million in scholarships.

117.    The defendants actually terminated Dr. Gui because:

(A) Dr. Gui had spoken, and the defendants believed Gui had spoken, to school staff and parents of students about the following matters of public concern-- (1) against Ornstein's restructuring of the school district and nullification of site-based management (2) against the changes in the position of Justine Sheu and Vera Smith, and, (3) against the discharge of Justine Sheu and Vera Smith;

(B) Dr. Gui had refused to "control the parents" and suppress their right to protest Ornstein's restructuring and his discharge of Sheu and Smith;

(C) Dr. Gui had supported the right of Justine Sheu to due process as a prerequisite before her suspension and termination;

(D) Dr. Gui had refused to aid and abet the defendants' illegal discharge of Sheu by showing support for that discharge at the staff meeting on May 22, 2014.

118.    There was no notice of a hearing and no opportunity for Dr. Gui to be heard in her own defense before she was terminated.   Dr. Gui received no statement of reasons why she was discharged and no hearing on disputed issues of fact.  The defendants terminated Dr. Gui without good cause and without due process.

119.    PSAD and its school board showed an interest in the termination from employment of Gabriela Gui.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before terminating Gui and obtained the approval of the latter entities before terminating Gui.

120.    PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to terminate Gabriela Gui so that the choice to discharge her was essentially the decision of PSAD.

121.   Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in deciding to terminate Gabriela Gui's employment.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios, both private entities, and the PSAD, a governmental entity.

122.   After the discharge of Gabriela Gui, the defendants terminated the employment of all the remaining members of the administrative cabinet who served with Dr. Gui at UPSM.  The defendants instituted these discharges all without cause in an effort to purge the school of any administrators who might be loyal to Dr. Gui or Ms. Sheu, or, who might oppose Ornstein's restructuring.  The defendants acted with the intent to silence any remaining dissent in opposition to Ornstein's restructuring.  While the defendants terminated the administrators, the intent of the defendants was to also send a message to the teachers that termination of employment would result from any further expressions of dissent.  The defendants also terminated the employment of Paris Cooks, because he had objected to the intrusion into Ms. Sheu's private email account and because he also opposed the restructuring.

122a.  In early June 2014, over 300 students, faculty, and parents signed petitions protesting the discharge of Sheu and delivered the petitions to PSAD.  Those persons signed other petitions on line.  The PTSA sent a petition to PSAD and Detroit 90/90 asking for a written explanation of the "termination process used for the abrupt removal of Justine Sheu..."  All of this communication occurred while the Detroit Free Press was publishing a series of articles criticizing the low standards for education and low fiscal accountability of charter schools in Michigan.  In its written correspondence with the PSAD board, the PTSA specifically correlated the message in those articles with their frustration with the board and Detroit 90/90.

31

**COUNT I - 42 USC SECTION 1983**
**DEPRIVATION OF JUSTINE SHEU'S RIGHT TO FREEDOM OF SPEECH**
**UNDER THE 1st AMENDMENT-**
**SHEU AS TO ALL DEFENDANTS**

123.    The plaintiffs incorporate paragraphs 1 through 122a above.

124.    The plaintiffs have the right to freedom of speech under the 1st and 14th

Amendments to the United States Constitution.

125.    In the matters of the suspension and termination of Justine Sheu's employment,

the defendants acted under color of law and there was state action sufficient to afford Sheu the

protections of the 1st Amendment for the following reasons:

    A.  PSAD and its school board, governmental entities, showed an interest in the
    suspension and termination from employment of Justine Sheu.  Detroit 90/90 and
    Axios, through its officers and directors, consulted PSAD and its school board
    before terminating Sheu and obtained the approval of the latter entities before
    suspending and terminating Sheu.

    B.  PSAD exercised coercive power over Detroit 90/90 and Axios or provided
    significant encouragement to Detroit 90/90 and Axios, either overt or covert, to
    suspend and terminate Justine Sheu that the choice to suspend and terminate her
    was essentially the decision of PSAD.

    C.  Alternatively, PSAD and its school board jointly participated with Detroit 90/90
    and Axios, through its officers and directors, in the decision to suspend and
    terminate Justine Sheu's employment.  There was a pervasive entwinement to the
    point of largely overlapping identity between Detroit 90/90 and Axios (both
    private entities) and the PSAD, a governmental entity.

    D.  <u>PSAD and its board held control over the decision to terminate the Plaintiff.
    PSAD made the final decision to terminate the Plaintiff so that PSAD was the
    moving force behind the discharge of the Plaintiffs.</u>

    E.  <u>PSAD and its board shared with the other Defendants the common goal of
    suppressing dissent concerning the restructuring and conspired, agreed, and/or
    engaged in concerted action with the other Defendants to discharge Sheu.</u>

126.    Defendants suspended and terminated Justine Shue from employment, because

    (A) Sheu had spoken, and the defendants reasonably believed Sheu had spoken, to
    members of the Central Office, to school staff and parents of students (1) against

32

Ornstein's restructuring of the school district and (2) against the changes in her own position, both matters of public concern, and;

B) Sheu had sought support to keep her job, a matter upon which staff, parents, and students had all expressed public concern.

127.   The 1st Amendment protects a citizen's right to criticize public officials and to seek redress of grievances against the government.   The plaintiff's speech criticizing the structuring of the school district, the changes to her position, and her suspension from employment were matters of public concern and, thus, were protected by the 1st Amendment.

128.   The defendants violated the plaintiff's 1st Amendment rights by taking adverse employment action against her.

129.   These unconstitutional deprivations of plaintiff's liberty interests implement or execute a policy statement, ordinance, regulation, or decision officially adopted and promulgated by PSAD. Alternatively, the constitutional deprivations resulted from the custom or decision of PSAD Board officials even though such custom did not receive formal approval through the Board's official decisionmaking channels.   Thus, PSAD together with Detroit 90/90 and Axios are liable jointly and severally under 42 USC Sections 1983 and 1988.

130.   Under 42 USC Sections 1983 and 1988, the defendants' unconstitutional acts are the proximate cause of plaintiff's damages, including, but not limited to: loss of salary and fringe, emotional distress, exemplary damages, expenses associated with seeking other employment, loss of earning capacity and ability to work, and the plaintiff will suffer these losses in the future.   The plaintiff is also entitled to attorney's fees and costs.

131.   In depriving the plaintiff of her freedom of speech, all of the defendants acted with evil motive and intent.   Their motive was to remove the plaintiff from her employment so

that they could silence the dissent against the district restructuring.  Therefore, the defendants are

not entitled to qualified immunity and the plaintiff is entitled to punitive damages.

PLAINTIFF REQUESTS that this court enter judgment against Defendants in whatever

sum to which she is deemed entitled, together with costs, interest, and attorney fees.

**COUNT II - 42 USC SECTION 1983**
**DEPRIVATION OF GABRIELA GUI'S RIGHT TO FREEDOM OF SPEECH**
**UNDER THE 1st AMENDMENT-**
**GUI AS TO ALL DEFENDANTS**

132.    The plaintiffs incorporate paragraphs 1 through 131 above.

133.    The plaintiff Gabriela Gui has the right to freedom of speech under the 1st and 14th

Amendments to the United States Constitution.

134.    In the matters of the termination of Gabriela Gui's employment, the defendants

acted under color of law and there was state action sufficient to afford Gui the protections of the

1st Amendment for the following reasons:

    A.    PSAD and its school board, governmental entities, showed an interest in the
termination from employment of Gabriela Gui.  Detroit 90/90 and Axios, through
their officers and directors, consulted PSAD and its school board before
terminating Gui and obtained the approval of the latter entities before terminating
Gui.

    B.    PSAD exercised coercive power over Detroit 90/90 and Axios or provided
significant encouragement to Detroit 90/90 and Axios, either overt or covert, to
terminate Gabriela Gui that the choice to terminate her was essentially the
decision of PSAD.

    C.    Alternatively, PSAD and its school board jointly participated with Detroit 90/90
and Axios, through their officers and directors, in the decision to terminate
Gabriela Gui's employment.  There was a pervasive entwinement to the point of
largely overlapping identity between Detroit 90/90 and Axios (both private
entities) and the PSAD, a governmental entity.

    D.    PSAD and its board held control over the decision to terminate the Plaintiff.
PSAD made the final decision to terminate the Plaintiff so that PSAD was the
moving force behind the discharge of the Plaintiffs.

E. <u>PSAD and its board shared with the other Defendants the common goal of suppressing dissent concerning the restructuring and conspired, agreed, and/or engaged in concerted action with the other Defendants to discharge Dr. Gui.</u>

135.   Defendants s terminated Gabriela Gui from employment, because:

A. Dr. Gui had spoken, and the defendants believed Gui had spoken, to school staff and parents of students about the following matters of public concern-- (1) against Ornstein's restructuring of the school district and nullification of site-based management (2) against the changes in the position of Justine Shue and Vera Smith, (3) against the suspension and discharge of Justine Sheu and the discharge of Vera Smith;

B. Dr. Gui had refused to "control the parents" and suppress their right to protest Ornstein's restructuring and his discharge of Sheu and Smith;

C. Dr. Gui had supported the right of Justine Sheu to due process as a prerequisite before her suspension and termination;

D. Dr. Gui had refused to aid and abet the defendants' illegal discharge of Sheu by showing support for that discharge at the staff meeting on May 22, 2014.

136.   The 1st Amendment protects a citizen's right to criticize public officials and to seek redress of grievances against the government.   The plaintiff's speech criticizing the structuring of the school district, the changes to employees' positions, and terminations of employees from employment were matters of public concern and, thus, were protected by the 1st Amendment.

137.   The defendants violated the plaintiff's 1st Amendment rights by taking adverse employment action against her.

138.   These unconstitutional deprivations of plaintiff's liberty interests implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by PSAD. <u>Specifically, in Exhibit A, paragraph D of the Independent Contractor Agreement between PSAD and Detroit 90/90, PSAD created a policy of denying due process to the faculty of PSAD schools.   Independent Contractor Agreement attached as Exhibit 10.</u>

Alternatively, the constitutional deprivations resulted from the custom or decision of the PSAD Board officials even though such custom did not receive formal approval through the Board's official decisionmaking channels.  Thus, PSAD together with Detroit 90/90 and Axios, are liable jointly and severally under 42 USC Sections 1983 and 1988.

139.     Under 42 USC Sections 1983 and 1988, the defendants' unconstitutional acts are the proximate cause of plaintiff's damages, including, but not limited to: loss of salary and fringe, emotional distress, exemplary damages, expenses associated with seeking other employment, loss of earning capacity and ability to work, and the plaintiff will suffer these losses in the future.  The plaintiff is also entitled to attorney's fees and costs.

140.     In depriving the plaintiff of her freedom of speech, all of the defendants acted with evil motive and intent.  Their motive was to remove the plaintiff from her employment so that they could silence the dissent against the district restructuring and the termination of employees.  Therefore, the defendants are not entitled to qualified immunity and the plaintiff is entitled to punitive damages.

PLAINTIFF REQUESTS that this court enter judgment against Defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

### COUNT III - 42 USC SECTION 1983
### DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS-
### GABRIEL GUI AS TO DETROIT 90/90 AND AXIOS

141.     The plaintiffs incorporate paragraphs 1 through 140 above.

142.     Through her Employment Agreement of 10/8/09 with Detroit 90/90 and Axios, Gabriela Gui has a property interest in her employment as principal of UPSM from July 1, 2010 through June 30, 2015, the term in that contract.  The fixed term of employment in the Agreement negated the "employee at will" language.  Ex. 1.

143.     Before Gui left her prior position at DPS, she explained that she required at least a 4-year contract with New Urban Learning.  New Urban Learning's CEO promised her a 5-year contract.

144.     Before Gui signed the Employment Agreement, Margaret Trimer-Hartley explained that the "employee at will" language meant nothing and that they had to put that in every employment contract.

145.     In a Contract Addendum dated October 15, 2009, NUL agreed to purchase 5 years of service credit in the Michigan Public School Employee Retirement System (MPSERS) to compensate Gui for the five years of service credit she would lose during the term of her Employment Agreement.  Ex. 2.  This Addendum confirmed the employer's commitment to a 5-year fixed term of employment.

146.     On or about February 11, 2010, through a lump sum payment of $79.000.00 to Gui, NUL furnished the benefit promised in the first Contract Addendum.  In that document, NUL memorialized the payment and stated, "Dr. Gui has a five year contact with UPSM."  There was no "employee at will" language in this Contract Addendum.   Ex. 3.

147.     This Addendum of 2/11/10 stated that the additional remuneration "is also intended to serve as compensation for work leading up to the opening of UPSM High School in the fall of 2010."  Id.  (Gui had actually performed many hours of work before July 1, 2010, when she was to start work per the Employment Agreement.)  Thus, even if Gui's initial Employment Agreement had not been for a fixed term, the second Contract Addendum promising "Dr. Gui has a five year contact with UPSM", and supported by additional consideration, would have amended the initial contract to create a fixed-term contract with a guarantee of discharge only for cause.

148.     In the Employment Agreement of 3/28/12, Detroit 90/90 and Axios affirmed the commitment to a five-year term of employment.  The fixed term of employment in the Agreement negated the "employee at will" language.  Ex. 4.

149.     Alternatively, the Employment Agreement of 3/28/12 had no effect on the terms of Gui's employment which the initial Employment Agreement, and its modification by the subsequent two Addendums, still controlled for the following reasons:

A.  The initial Employment Agreement and Addendums were with New Urban Learning/A.I. Central LLC as co-employers.  The second Employment Agreement was with Detroit 90/90/A.I. Central LLC as co-employers.  One-half of the co-employer unit remained constant.

B.  The successor employer was the predecessor employer's successor in fact.

C.  A majority of the successor's employees were employed by the predecessor employer.

D.  The successor employer remained in the same business, with the same location in the same school district, producing the same service, with the same curriculum.

E.  There was no additional consideration to support the Employment Agreement of 3/28/12. Therefore, for all of the latter reasons, the successor employer was bound to the terms of the existing contract between Gui and New Urban Learning/A.I. Central LLC last modified by the Contract Addendum of 2/11/10.

150.     On May 21, 2014, Gui asked Ornstein whether she would have a job as principal of UPSM in the fall (the final year of her five-year term).  Ornstein promised that she would retain her job, unless she chose to decline it.

151.     All of the above circumstances created an implied contract of just-cause employment and instilled in Gui a legitimate expectation of just-cause employment.  Thus, plaintiff has a property interest in continued employment through June 30, 2015.  She has a

legitimate claim of entitlement to unpaid past and future salary and fringe benefits from the

defendants through June 30, 2015.

152.    After her discharge, Gui made a demand for payment of her salary, her opt-out

payment for health insurance benefits, and the employer's contribution to her 401K account for

the 52 weeks of the 2014-15 school year.  Detroit 90/90 and Axios refused Gui's demand.

153.    Defendants Detroit 90/90 and Axios acted under color of law and engaged in state

action for the following reasons:

A.   PSAD and its school board, governmental entities, showed an interest in the
termination from employment of Gabriela Gui.  Detroit 90/90 and Axios, through
their officers and directors, consulted PSAD and its school board before
terminating Gui and obtained the approval of the latter entities before terminating
Gui.

B.   PSAD exercised coercive power over Detroit 90/90 and Axios or provided
significant encouragement to Detroit 90/90 and Axios, either overt or covert, to
terminate Gabriela Gui that the choice to terminate her was essentially the
decision of PSAD.

C.   Alternatively, PSAD and its school board jointly participated with Detroit 90/90
and Axios, through their officers and directors, in the decision to terminate
Gabriela Gui's employment.  There was a pervasive entwinement to the point of
largely overlapping identity between Detroit 90/90 and Axios (both private
entities) and the PSAD, a governmental entity.

154.    By failing to pay the plaintiff the compensation to which she is entitled, without

good cause, the defendants have deprived the plaintiff of property without due process of law

under color of law in violation of the 5th and 14th Amendments to the United States Constitution.

155.    By discharging Dr. Gui without notice of a hearing, without an opportunity to be

heard, and without a statement of reasons why she was discharged, the defendants have deprived

the plaintiff of property without due process of law under color of law in violation of the 5th and

14th Amendments to the United States Constitution.

156.    These unconstitutional deprivations of plaintiff's liberty interests implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the PSAD and its school Board.   In their Independent Contractor Agreement with Detroit 90/90, PSAD required that Detroit 90/90 not provide due process hearings to faculty:

> Detroit 90/90 shall provide student process hearings in compliance with all applicable laws, to an extent consistent with PSAD's own obligations as to students only (and not as to faculty.)

Exhibit A to Independent Contractor Agreement, ¶ D.  (Ex. 11.)  The constitutional deprivations resulted from the "custom" of Board officials even though such custom did not receive formal approval through the Board's official decisionmaking channels.  Thus, Detroit 90/90 and Axios, are liable under 42 USC Sections 1983 and 1988.

157.    Under 42 USC Sections 1983 and 1988, the defendants' unconstitutional acts are the proximate cause of plaintiff's damages, including, but not limited to: loss of salary and fringe, emotional distress, exemplary damages, expenses associated with seeking other employment, loss of earning capacity and ability to work, the plaintiff suffered and will suffer these losses in the future.  The plaintiff is also entitled to attorney's fees and costs.

158.    In depriving the plaintiff of procedural and substantive due process, all of the defendants acted with evil motive and intent.  Their motive was to remove the plaintiff from her employment to silence dissent against the restructuring of the school district.  Therefore, the defendants are not entitled to qualified immunity and the plaintiff is entitled to punitive damages.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

40

### COUNT IV- BREACH OF EXPRESS AND IMPLIED EMPLOYMENT CONTRACT-
### GABRIEL GUI AS TO DETROIT 90/90 AND AXIOS

159.    Plaintiffs incorporate by reference paragraphs 1 through 158.

160.    While Plaintiff Gabriela Gui was employed by Detroit 90/90 and Axios, management made contractual promises and written and oral statements to Plaintiff that she had a contract for a 5-year term of employment and that it was defendants' policy not to discharge plaintiff from employment as long as she performed her job.

161.    Further, while plaintiff was employed by defendants, she was led to believe that she would not be terminated except for good cause.

162.    Plaintiff relied upon these contracts, policies, statements, and representations of defendants through their agents, servants, or employees. As a result, there was, by express words, implications, or operation of law, a contractual agreement between plaintiff and defendants by which defendants were obligated to terminate plaintiff's employment only for good cause.

163.    As a result of defendants' termination of plaintiff's employment, defendants have breached the contract described above.

164.    As a direct and proximate result of the termination and breach of contract, plaintiff has been placed in financial distress, has suffered loss of wages and benefits, earning capacity, and ability to work, and will suffer these losses in the future.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

### COUNT V- DISCHARGE VIOLATING  REASONABLE EXPECTATION OF JUST-
### CAUSE EMPLOYMENT
### GABRIEL GUI AS TO DETROIT 90/90 AND AXIOS

165.    Plaintiffs incorporate by reference paragraphs 1 through 164.

166.     While plaintiff was employed by defendants Detroit 90/90 and Axios, defendants' policies and procedures, which were reasonably related to employee discharge, instilled legitimate expectations of just-cause employment in Plaintiff.

167.     Plaintiff reasonably relied on these policies and procedures and, as a result, legitimately expected that she could be involuntarily terminated only for just cause.

168.     As a result of defendants' termination of plaintiff's employment, defendants interfered with the legitimate expectation of just-cause employment that defendants had instilled in plaintiff.

169.     As a direct and proximate result of defendants' actions, plaintiff has suffered depression, emotional and physical distress, mental anguish, loss of reputation, humiliation and embarrassment, and the physical manifestations of these problems and will suffer these problems in the future.

170.     As a further direct and proximate result of defendants' breach of duty, plaintiff has been placed in financial distress; has suffered loss of wages and benefits, earning capacity, and ability to work; and will suffer these losses in the future.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees

## COUNT VI - VIOLATION OF THE WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION ACT 18 USC 2510 ET SEQ. SHEU AND GUI AS TO DETROIT 90/90 AND AXIOS

171.     Plaintiffs incorporate by reference paragraphs 1 through 170.

172.     On or about May 23, 2104, the defendants or their agents intercepted electronic communications between Sheu and Gui and between Sheu and Grady Jones, Jr. by acquiring the

contents of electronic communications through the use of an electronic, mechanical or other device.

173.    Sheu and Gui were parties to the intercepted electronic communications and also were persons against whom the interception was directed, and, thus are aggrieved persons under 18 USC 2510(11).

174.    On or about May 23, 2104, the defendants or their agents intentionally intercepted, endeavored to intercept, or procured other persons to intercept or to endeavor to intercept the plaintiffs' electronic communications.

175.    On and after May 23, 2104, the defendants or their agents intentionally disclosed, or endeavored to disclose, to other persons the contents of electronic communications between the plaintiffs, knowing or having reason to know that the information was obtained through the interception of an electronic communications in violation of the Wire and Electronic Communications Interception Act 18 USC 2510 et seq.

176.    On and after May 23, 2104, the defendants or their agents intentionally used, or endeavored to use, the contents of electronic communications between the plaintiffs, knowing or having reason to know that the information was obtained through the interception of electronic communications in violation of the Wire and Electronic Communications Interception Act 18 USC 2510 et seq.

177.    The agents of the defendants committed the above acts upon instructions from the management, officers, or directors of the defendants.  The agents committed the above acts in the course of and within the scope of their employment with the defendants.

178.    Neither Sheu nor Gui consented to the defendants or their agents intercepting, disclosing, or using their electronic communications.

179.     The defendants and agents of the defendants intercepted the communication of Sheu and Gui for the purpose of committing tortious acts in violation of the United States Constitution and the laws of the State of Michigan as stated in Counts I through V and Counts VIII through IX stated herein.

180.     Under 18 USC 2520, the defendants are civilly liable to plaintiffs for appropriate relief, including:

(1) such preliminary and other equitable or declaratory relief as may be appropriate;

(2) damages whichever is the greater of--

    (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

    (B) statutory damages of whichever is the greater of $ 100 a day for each day of violation or $10,000;

(3) punitive damages in appropriate cases; and

(4) a reasonable attorney's fee and other litigation costs reasonably incurred.

181.     The defendants and their agents acted with evil motive and intent.  Their motive was to remove Gui from her employment to silence dissent against the restructuring of the school district.  Therefore, the plaintiff is entitled to punitive damages.

182.     A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the private email messages between Sheu and Gui and between Sheu and Jones.  Justice requires that the court grant the injunctive relief.

183.     There exists no adequate remedy at law to halt the further dissemination of the private email messages.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which they are deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

### COUNT VII - VIOLATION OF THE STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT – 18 USC 2701 ET SEQ. SHEU AND GUI AS TO DETROIT 90/90 AND AXIOS

184.    Plaintiffs incorporate by reference paragraphs 1 through 183.

185.    On or about May 23, 2104, the defendants or their agents intercepted electronic communications between Sheu and Gui and between Sheu and Grady Jones, Jr. by acquiring the contents of electronic communications through the use of an electronic, mechanical or other device.

186.    Sheu and Gui were parties to the intercepted electronic communications and also were persons against whom the interception was directed, and, thus are aggrieved persons under 18 USC 2510(11) and 18 USC 2707 (a).

187.    On or about May 23, 2104, the defendants and their agents intentionally and without authorization accessed Sheu's email account on the Gmail server, a facility through which an electronic communication service is provided.  This conduct violated The Stored Wire and Electronic Communications and Transactional Records Access Act, 18 USC 2701(a)(1).

188.    The agents of the defendants committed the above acts upon instructions from the management, officers, or directors of the defendants.  The agents committed the above acts in the course of and within the scope of their employment with the defendants.

189.    Neither Sheu nor Gui consented to the defendants or their agents accessing Sheu's email account on the Gmail server.

190.    The defendants and their agents engaged in the violation of USC 2701(a)(1) with a knowing or intentional state of mind.

191.    Under 18 USC 2707, the defendants are civilly liable to plaintiffs for appropriate relief, including:

(1) such preliminary and other equitable or declaratory relief as may be appropriate;

(2) the sum of the actual damages suffered by the plaintiffs and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $ 1,000;

(3) punitive damages because the violation of USC 2701(a)(1) is willful and intentional; and

(4) a reasonable attorney's fee and other litigation costs reasonably incurred.

192.    The defendants and their agents acted willfully and intentionally, with evil motive and intent.  Their motive was to remove Gui from her employment to silence dissent against the restructuring of the school district.  Therefore, the plaintiff is entitled to punitive damages.

193.    A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal email messages between Sheu and Gui and between Sheu and Jones.  Justice requires that the court grant the injunctive relief.

194.    There exists no adequate remedy at law to halt the further dissemination the private email messages between Sheu and Gui and between Sheu and Jones.  Justice requires that the court grant the injunctive relief.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which they are deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

## COUNT VIII-INVASION OF PRIVACY
## INTRUSION IN PLAINTIFFS' PRIVATE AFFAIRS
## GUI AND SHEU AS TO DETROIT 90/90 AND AXIOS

195.    Plaintiffs incorporate by reference paragraphs 1 through 194.

196.    The email messages between Gui and Sheu and between Sheu and Grady Jones, Jr., intruded upon by defendants on or about May 23, 2014, were of a secret and private subject matter.

197.    The plaintiffs had a right to keep that subject matter private.

198.    To obtain email messages, the employers used a method that was objectionable to a reasonable person.

199.    The intrusion by defendants was intentional or grossly negligent.

A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal email messages.  Justice requires that the court grant the injunctive relief.

200.    There exists no adequate remedy at law to halt the further dissemination of the personal photographs of Justine Sheu or the personal email messages.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which they are deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

## COUNT IX-INVASION OF PRIVACY-PUBLIC DISCLOSURE OF EMBARRASSING
## PRIVATE FACTS ABOUT PLAINTIFF-
## SHEU AS TO DETROIT 90/90 AND AXIOS

201.    Plaintiffs incorporate by reference paragraphs 1 through 200.

202.     By displaying photographs of Sheu in lingerie to employees and to a relative of an employee, the defendants engaged in public disclosure of embarrassing private facts about Sheu.

203.     The disclosed information is highly offensive to a reasonable person and of no legitimate concern to the public.

204.     The public disclosure by defendants was intentional or grossly negligent.

205.     A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal photographs of Justine Sheu.  Justice requires that the court grant the injunctive relief.

206.     There exists no adequate remedy at law to halt the further dissemination of the personal photographs of Justine Sheu .

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

### COUNT X- UNREASONABLE SEARCH AND SEIZURE UNDER THE FOURTH AMENDMENT, 42 USC 1983
### SHEU AND GUI AS TO ALL DEFENDANTS

207.     Plaintiffs incorporate by reference paragraphs 1 through 206.

208.     When they searched and seized email messages between Sheu and Gui and between Sheu and Grady Jones, Jr., the defendants acted under the color of state law for the following reasons:

   A.   PSAD and its school board, governmental entities, showed an interest in the search and seizure of the email messages.  Detroit 90/90 and Axios, through their officers and directors, consulted PSAD and its school board before searching and seizing the messages and obtained the approval of the latter entities before searching and seizing the messages.

48

B. PSAD exercised coercive power over Detroit 90/90 and Axios or provided significant encouragement to Detroit 90/90 and Axios, either overt or covert, to search and seize the messages that the choice to search and seize the messages was essentially the decision of PSAD.

C. Alternatively, PSAD and its school board jointly participated with Detroit 90/90 and Axios, through their officers and directors, in the decision to search and seize the messages.  There was a pervasive entwinement to the point of largely overlapping identity between Detroit 90/90 and Axios (both private entities) and the PSAD, a governmental entity.

D. PSAD and it board were the moving force behind the search and seizure of the Plaintiffs' messages.

E. PSAD and its board shared with the other Defendants the common goal of suppressing dissent concerning the restructuring and conspired, agreed, and/or engaged in concerted action with the other Defendants to obtain the Plaintiffs' personal emails to justify to the PTSA the discharge of Dr. Gui.

209.    The defendants deprived the plaintiffs of rights, privileges, or immunities secured by the Constitution, specifically the right to be free from unreasonable searches and seizure, protected by Fourth Amendment to the United States Constitution.

210.    The plaintiffs had reasonable expectations of freedom from governmental intrusion into their personal email messages.

211.    The defendants did not have probable cause to search the email messages.

212.    The deprivation of the plaintiffs' constitutional right to be free from unreasonable searches and seizures occurred without due process of law, because the defendants did not obtain a warrant or other judicial process before executing the search and seizure.

213.    The agents of the defendants, while acting under color of state law, violated the plaintiffs' constitutional rights, and a policy or policy of inaction of the Public School Academies of Detroit was the moving force behind the violation.

214.    Thus, the defendants are liable under 42 USC Sections 1983 and 1988.

49

215.     A real and imminent danger of irreparable injury arises if a temporary restraining order, preliminary injunction, and permanent injunction are not issued to stop the defendants from further disseminating the personal messages between Gui and Sheu.  Justice requires that the court grant the injunctive relief.

216.     There exists no adequate remedy at law to halt the further dissemination of the personal messages between Gui and Sheu.

PLAINTIFFS REQUEST that this court enter judgment against defendants in whatever sum to which she is deemed entitled together with costs, interest, and attorney fees, and issue a temporary restraining order, preliminary and permanent injunction.

## COUNT XI- VIOLATION OF MICHIGAN FREEDOM OF INFORMATION ACT SHEU AND GUI AS TO DEFENDANT PSAD AND ITS SCHOOL BOARD

217.     Plaintiffs incorporate paragraphs 1 through 216 above.

218.     On July 9, 2014, Gabriela Gui through counsel submitted to PSAD a request for Gui's employment file and other documents under the Michigan Freedom of Information Act. Ex. 6.

219.     On July 30, 2014, Justine Sheu through counsel submitted to PSAD a request for Sheu's employment file and other documents under the Michigan Freedom of Information Act. Ex. 7.

220.     PSAD and its School Board have never responded to either request.

221.     Under the Michigan Freedom of Information Act, a public body shall either furnish the documents requested or respond in writing denying, in full or in part, the request for a public record within 5 business days after the public body receives the request. Alternatively, the public may issue a notice extending the time to respond by not more than 10 business days.  A public body shall not issue more than 1 notice of extension for a particular request.  MCL

15.235(2).  Failure to respond to a request p constitutes a public body's final determination to deny the request. MCL 15.235(3).

222.    PSAD and its School Board failed to respond to the plaintiffs' request within the 5-day period pursuant to MCL 15.235(2). That failure constitutes PSAD's final determination to deny the request, under MCL 15.235(3).

223.    Under MCL 15.240(4), (6), this court has jurisdiction to compel the PSAD's disclosure of the documents requested by plaintiff and to award plaintiff's reasonable attorney fees, costs and disbursements.

224.    PSAD and its School Board have arbitrarily and capriciously violated this act by their refusal or delay in disclosing or providing copies of the documents requested by plaintiffs. Accordingly, plaintiffs are entitled, in addition to any actual or compensatory damages, punitive damages in the amount of $500.00 and attorney fees and costs.  MCL 15.240(7).

PLAINTIFFS REQUEST that this court enter an order of mandamus directing the defendants to furnish the requested documents and enter judgment against defendants in whatever sum to which they are deemed entitled, together with costs, interest, and attorney fees.

### COUNT XII
### VIOLATION OF BULLARD-PLAWECK EMPLOYEE RIGHT TO KNOW ACT- GUI AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT 90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS

225.    Plaintiffs incorporate paragraphs 1 through 224 above.

226.    The defendants Detroit 90/90 and Axios placed in Gui's personnel file a purported "Second trimester performance review" dated May 3, 2011.  The purported "Second trimester performance review" is not the actual performance review presented to Gui by her supervisor Margaret Trimer-Hartley.  Ex. 8.

227.    The actual "Second trimester performance review" is dated May 4, 2011 and exceeds the purported evaluation of May 3, 2011 in its praise of Dr. Gui.  Ex. 9.

228.    Also, the defendants have removed from Gui's personnel file the "First trimester performance review", dated December 1, 2010.  Ex. 10.

229.    The defendants have alleged that there was a performance review done for Gui in 2012 and that Gui penned a lengthy response to it.  The defendants have claimed that, for some reason, this evaluation cannot be found.  In fact, no one conducted a performance evaluation for Gui in 2012.

230.    The defendants have placed in Gui's personnel file a 7-page document entitled "University Preparatory Academy, Teacher/Advisor Evaluation Rubric, Formal Evaluation 2010-11".  Ex. 11.   The defendant should remove this document from the personnel file, because it has no application to the performance evaluations of Gui, because (1) it was generated by University Preparatory Academy when it was a different school district from University Prep Science and Math High School, and, (2) it is a rubric for evaluation of teachers, not principals.

231.    The defendants Detroit 90/90 and Axios willfully and knowing placed, and have stated an intent to place, false information in Gui's personnel file.

232.    The defendants Detroit 90/90 and Axios willfully and knowing withheld information from Gui's personnel file.

233.    The plaintiff has asked the defendants to correct her personnel file but they have refused.

234.    Under the Bullard-Plawecki Employee Right to Know Act, MCL 423.451, et seq., Gui is entitled to have the false information expunged, and to statutory damages of $200.00 plus costs, reasonable attorney's fees, and actual damages.

PLAINTIFF REQUESTS that this court order defendants Detroit 90/90, Axios, and their boards

of directors, to expunge the false information and include the correct information in her

personnel file, and that this Court enter judgment against defendants Detroit 90/90 and Axios in

whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

**COUNT XIII**
**VIOLATION OF BULLARD-PLAWECK EMPLOYEE RIGHT TO KNOW ACT-**
**SHEU AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT**
**90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS**

235.    Plaintiffs incorporate paragraphs 1 through 234 above.

236.    On October 10, 2013, Venus Crosby, Director of College Counselling for Detroit

90/90 and Axios, gave a written reprimand to Sheu concerning "Unacceptable Communication

for Absences."   Ms. Crosby criticized Sheu for "failure to perform the required functions of your

position by not communicating your absence in a timely manner, and/or providing adequate

resources to reassign tasks."  This criticism was in referenced to Ms. Sheu's absence from an

ACT prep session on October 10, 2013, due to the sudden onset of illness (due to food

poisoning) when she woke up that very morning.  The onslaught of her symptoms, including

nausea, vomiting, and fainting, was sudden and unanticipated.

237.    But it was absurd for Ms. Crosby to reprimand Ms. Sheu for not reporting an

absence before she knew she was sick.  As soon as she was able to do so on the morning of

October 10, 2013, Ms. Sheu reported to Substitute Services and to Crosby that she would be

absent.

238.    Crosby also criticized Sheu for failing "to provide adequate resources to reassign

tasks."   That criticism was also absurd.  Sheu is neither a certified teacher nor a substitute

teacher, and, therefore, had no authority, standing, or responsibility to create a detailed lesson

plan for someone to implement in her absence.  The teachers were responsible for creating unit and lesson plans prior to the beginning of their school year, and they created these unit plans *prior to the understanding* that Sheu's ACT prep sessions would be occurring in their classrooms.  The teachers should have implemented their lesson plans for October 10, 2013.

239.   Crosby referred to two prior absences as exacerbating factors generating her reprimand.  But Sheu gave Crosby and others ample advance notice of those absences which were due to a respiratory infection.

240.   Sheu refused to sign Crosby's written reprimand, because she believed it was patently unjust.

241.   Crosby's reprimand was a form of retaliation for Sheu's speech criticizing the restructuring of the school district, including Crosby's redesign of the college advising/ACT preparation program.

242.   On October 23, 2013, Sheu drafted a written response to the October 10th reprimand.  Sheu intended to submit this response to Crosby at the end of the school year.  Sheu wanted to wait to submit the response, because she sought to avoid the retaliation she anticipated from Crosby if Crosby received the response during the school year.

243.   On August 4, 2014, John Sanford provided a copy of Sheu's entire personnel file to plaintiffs' counsel.  Crosby's reprimand was not in the file.

244.   On September 18, 2014, John Sanford sent a copy of Crosby's reprimand to plaintiffs' counsel.  Sanford stated:

> Ms. Sheu's supervisor, Venus Crosby, recently provided me with a copy of the attached which was a follow-up to a conversation she had with Ms. Sheu in early October, 2013.  After this document was provided, Ms. Sheu did have a follow-up meeting with Mrs. Crosby and Ms. Emily Bitzarakis (HR – Det. 90/90) regarding it at Ms. Sheu's request.

While Ms. Sheu did not provide any written response to this documentation at that time and refused to sign it, after her separation we did find a two-and-a-half page draft response dated October 11, 2013 on her school laptop.  As her response was never submitted, it is not part of her file.

245.     The Bullard-Plawecki Employee Right to Know Act prohibits the defendant from placing the reprimand in Sheu's personnel file.

246.     The defendants have refused to place Sheu's response of October 23, 2013, in her personnel file.

246a.   The defendants have also placed in Sheu's  personnel file a letter dated May 21, 2014, notifying her of the termination of her employment.  That letter contains false information accusing Sheu of using abusive or profane language, harassment, negligence or inferior work, dishonesty, making or publishing false, vicious or malicious statements, unauthorized solicitations, behavior causing damage to members of the learning community, and other false allegations.

247.     By placing Crosby's unjustified reprimand and the letter of May 21, 2014 in Sheu's personnel file, the defendants willfully and knowing placed false information in Sheu's personnel file.

248.     The defendants willfully and knowing withheld information from Sheu's personnel file: her response to the reprimand.

249.     Under the Bullard-Plawecki Employee Right to Know Act, MCL 423.505, 423.511, Sheu is entitled to have the reprimand of October 10, 2013 and the letter of May 21, 2014 expunged, and to statutory damages of $200.00 plus costs, reasonable attorney's fees, and actual damages.

250.     In the alternative, under the Bullard-Plawecki Employee Right to Know Act, MCL 423.505, 423.511, Sheu is entitled to (1) have her response to the reprimand of October 10, 2013 included when the information is divulged to a third party and as long as the reprimand of October 10, 2013 is a part of the file, and, (2) to $200.00 plus costs, reasonable attorney's fees, and actual damages.

PLAINTIFF REQUESTS that this court order defendants Detroit 90/90, Axios, and their boards of directors, to expunge the false information and include the correct information in her personnel file, and that this Court enter judgment against defendants Detroit 90/90 and Axios in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

### COUNT XIV-DECLARATORY JUDGMENT REGARDING CONTENTS OF EMPLOYMENT FILE- GUI AND SHEU AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT 90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS

251.     Plaintiffs incorporate paragraphs 1 through 250 above.

252.     Under the Bullard-Plawecki Employee Right to Know Act, and the First and Fourteen Amendments to the United States Constitution, there is an actual controversy as to the proper contents of the plaintiffs' personnel files in the possession of Detroit 90/90 and Axios.

253.     Under 28 USC § 2201 and Michigan Court Rule 2.605, the plaintiffs are entitled to a declaratory judgment of their rights to accurate, fair, and complete personnel files.

PLAINTIFFS REQUEST that this court enter a declaratory judgment as to the accurate, fair, and complete contents of the plaintiffs' personnel files, together with costs, interest, and attorney fees.

### COUNT XV-CLAIM AND DELIVERY- SHEU AS TO DEFENDANTS DETROIT 90/90, BOARD OF DIRECTORS OF DETROIT 90/90, AXIOS, AND BOARD OF DIRECTORS OF AXIOS

254.     Plaintiffs incorporate paragraphs 1 through 253 above.

255.     The Employee Handbook of Detroit 90/90 and Axios states,

You may make occasional incidental use of electronic devices for personal use
(less than 5%) during non-work time provided that you abide by all provisions in
this policy....It must be understood that any personal information will be treated
no differently from other information, which will be accessed, monitored, utilized
and disclosed by the Employer to the extent permitted by applicable law.
Accordingly, users cannot use electronic devices, including the computer systems,
E-mail, Internet or voice mail systems to send, receive, create, edit or store any
information that they wish to keep private.

256.     But the Handbook does not state that an employee's personal documents

on the employer's computer are the property of the employer.

257.     During her tenure as an employee, the defendants issued to Sheu a laptop

computer to use.  Sheu did use less than 5% of the laptop's memory for personal use.

258.     During her employment, Sheu placed on the hard drive of her laptop certain

personal financial documents, including income tax documents.  Those documents remained

Sheu's personal property despite the employer's policy regarding privacy of personal

information.

259.     When Sheu was discharged, she asked John Sanford of Axios if she could retrieve

her personal documents from the laptop.

260.     Initially, on May 22, 2014, John Sanford told Sheu that he would have the IT

department look for the documents on her laptop.  He explained that the employer had a regular

process for this.

261.     But then, later on May 22, 2014, Emily Bitzarakis, the Human Resources Director

for Detroit 90/90, told Sheu:

I spoke with the IT department, and I'm sorry to report that that information is not
retrievable. Because it is a company-issued device, it is assumed that any personal
information accessed or saved on the device will be kept to a minimum and also
backed up in another location, so we do not have a process by which we maintain

a copy of any personal information or files for your access after the fact. I'm very sorry for the inconvenience.

262.   Ms. Bitzarakis' representation concerning an alleged company policy for not returning personal information to employees was false.  Bitzaraki's representation that the defendants had not maintained a copy of Sheu's personal information was false.  The defendants had maintained a copy of Sheu's personal information from the laptop but withheld the information from her.

263.   The defendants have failed and refused to return the plaintiff's personal documents to the plaintiff.  The defendants have unlawfully detained the plaintiff's personal documents.

264.   The plaintiff seeks possession of the personal documents which the defendants have unlawfully detained.

PLAINTIFF REQUESTS that this court enter a judgment and writ of possession for the plaintiffs' personal documents on the defendants' laptop computer, together with costs, interest, and attorney fees.

## COUNT XVI- COMMON LAW CONVERSION-
## SHEU AS TO DETROIT 90/90 AND AXIOS

265.   The plaintiffs incorporate paragraphs 1 through 264 above.

266.   The defendants came into possession of Sheu's personal documents by retrieving the laptop computer they had permitted her to use.

267.   The defendants intentionally and wrongfully exerted dominion over the Sheu's personal documents.

268.   The defendants' dominion over the plaintiff's personal documents was in denial of or inconsistent with the plaintiff's rights therein.  As a direct result of the defendants' conversion, the plaintiff has suffered damages, including serious mental anguish, stress,

58

embarrassment, and humiliation.

269.     The plaintiff seeks economic and exemplary damages sustained by the unlawful conversion by the defendant.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

### COUNT XVII- STATUTORY LAW CONVERSION- SHEU AS TO DETROIT 90/90 AND AXIOS

270.     The plaintiffs incorporate paragraphs 1 through 269 above.

271.     The defendants came into possession of Sheu's personal documents by retrieving the laptop computer they had permitted her to use.

272.     The defendants intentionally and wrongfully exerted dominion over the Sheu's personal documents.

273.     The defendants' dominion over the plaintiff's personal documents was in denial of or inconsistent with the plaintiff's rights therein.  As a direct result of the defendants' conversion, the plaintiff has suffered damages, including serious mental anguish, stress, embarrassment, and humiliation.

274.     The plaintiff seeks economic and exemplary damages sustained by the unlawful conversion by the defendant.

275.     The defendant is liable for statutory conversion under MCL 600.2919a(1)(a).

276.     The plaintiff is entitled to and seeks a judgment against the defendants 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees.

PLAINTIFF REQUESTS that this court enter judgment against defendants in whatever sum to which she is deemed entitled, together with costs, interest, and attorney fees.

# RELIEF REQUESTED

For these reasons, the plaintiffs ask:

A.  That defendants be required to appear and answer the allegations of the Complaint;

B.  That this Court award to plaintiffs, for violation of their constitutional and common law actions for wrongful discharge: actual damages, including, but not limited to damages for loss of past and future salary and fringe benefits, emotional distress, exemplary damages, expenses associated with seeking other employment, plus punitive damages, interest and attorney's fees and costs;

C.  That this Court award to plaintiffs for violation their rights to privacy under state common law, federal statutes, and the Fourth Amendment: statutory and/or actual damages plus punitive damages, and a reasonable attorney's fee and other litigation costs reasonably incurred;

D.  That this Court award to plaintiff Justine Sheu 3 times the amount of actual damages sustained for the conversion of her personal documents, plus costs and reasonable attorney fees under MCL 600.2919a(1)(a);

E.  That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting the defendant from disclosing or disseminating the personal photographs of Justine Sheu and the personal email messages between Justine Sheu and Gabriela Gui and between Justine Shue and Grady Jones, Jr.;

F.  That this Court award to each plaintiff actual or compensatory damages, punitive damages in the amount of $500.00, and reasonable attorney fees and costs under the Michigan Freedom of Information Act;

G.  That this Court order the deletions, additions and corrections to the plaintiffs' personnel files and award to the plaintiffs statutory and actual damages, plus reasonable attorney fees and costs, under the Bullard-Plawecki Employee Right to Know Act;

H.  That this Court enter a declaratory judgment as to the accurate, fair, and complete contents of the plaintiffs' personnel files;

I.  That this Court enter a judgment and writ of possession for the return of Justine Sheu's personal documents, and;

J.  That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
6675 Edwood Ave.
West Bloomfield, MI 48324
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: May 18, 2015

## **JURY DEMAND**

The plaintiffs demand a jury to try this cause.


Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
6675 Edwood Ave.
West Bloomfield, MI 48324
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: May 18, 2015

# EXHIBIT 1

## *New Urban Learning*

### EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement") is entered into as of the 8th day of October 2009, by and between New Urban Learning/A.I. Central LLC, a Michigan Corporation, ("Employer"), and Gabriela Gui ("Employee").

Employer and Employee hereby agree as follows:

1.  <u>Employment</u>. Employer hereby employs Employee as a Principal at University Prep Science & Math High School, a Michigan public school academy managed by Employer (the "Academy"), and Employee hereby accepts such employment, on the terms and subject to the conditions set forth below.

2.  <u>Term of Employment</u>. The term of Employee's employment with Employer under this Agreement shall commence on July 1, 2010 and end on June 30, 2015.

3.  <u>Duties</u>. Employee shall perform all of the duties assigned to him or her by Employer and adhere to all of Employer's policies and procedures as may be in effect at any time or from time to time during Employee's employment. Employee further agrees to comply with all of the requirements of Michigan, federal and other applicable law with respect to Employer's operations and/or Employee's performance of his or her duties. Employee's duties under this Agreement shall include, but not be limited to, the following:

    (a)  Developing and implementing instructional programs in Employee's areas of expertise in accordance with any program established or approved by Employer for the Academy;

    (b)  Participating in cooperative efforts among teachers, staff and students with regard to curriculum, programmatic development and improvement, extra-curricular and other activities including:

    -   Engaging parents in each student's education
    -   Providing instruction to students and serving as a student advocate
    -   Maintaining appropriate student discipline and conduct
    -   Applying approved techniques for the ongoing assessment of student learning
    -   Attending staff and committee meetings, including two after-school meetings, and fully participating in faculty decision making
    -   Conducting and carrying out all other duties and obligations determined by Employer as necessary to facilitate the Academy's mission, goals and standards.

4.  <u>Qualifications</u>. Employee represents to Employer that he or she has the appropriate and valid certifications and state requirements for the school year of Agreement. If employee does not provide notarized certificate to Human Resources Department this Agreement shall be considered void and no payments shall be made to employee. Employee understands other required documentation for their file and understands they shall not be paid until file is one hundred percent complete.

5.  <u>Compensation</u>. Employer shall compensate Employee at an annual rate of **$115,000.00** for the school year 2010-11 with payments to be made biweekly. Three-percent raises will be given annually (July 1) through the life of the contract.

No compensation shall be paid to Employee for any period after the date on which Employee's employment with Employer under this Agreement has terminated.

    a.    **401K Plan**: Employee will be eligible to participate in 401K Plan and receive employer match up to $6,000 beginning July 1, 2010.

The following compensation will also be paid to Employee based on the representations below:

**Health Insurance Waiver:**
Employees who waive their health insurance benefits will receive an additional $2,000, which will also be made in biweekly payments as reflected on their paychecks, but will not be included as a part of their annual salary for the purpose of calculating annual percentage increases. If Employee chooses to receive health insurance benefits during the year, he or she forfeits the remaining portion of the $2,000 payments. *(Please check the appropriate line and initial.)*

Employee chooses to _____ receive or ___✓___ waive health insurance benefits.

**Compensation Summary:**

Base pay:                    **$ 115,000.00**

Waiver of Health Insurance:       $ 2,000.00

6.    <u>Benefits</u>. Employee will be provided with all of the benefits provided to other similarly situated employees of Employer including, without limitation, health insurance, vision and dental, (unless waived in Section 5, above), disability insurance, life insurance, vacation, sick and personal leave as specified in the Employee Handbook and the Axios/New Urban Learning Benefit Plan, and participation in Employer's retirement program, as permitted under applicable law and regulation, and as set forth in a separate document covering all specific benefits. Many of these benefits will be provided pursuant to formal written plans. The actual terms of any plan document for such benefit supersedes any contrary description and will govern in all instances. Employer necessarily reserves its right to modify or amend any of these benefits, at any time, in its sole discretion and in accordance with applicable law. Advance notice of such changes shall be given when possible.

7.    <u>Compliance with Law</u>. Employee understands and acknowledges that Michigan law requires employers to make accommodations to handicapped individuals where the accommodation does not impose an undue hardship on employers. Handicapped employees or applicants may request an accommodation by notifying Employer in writing of the need for accommodation within 182 days of the date the handicapper knows or should know that an accommodation is needed. Employee understands, agrees and acknowledges that failure to promptly notify Employer regarding the need for any such accommodation will preclude any claim that Employer failed to accommodate the handicapped.

8.    <u>Employment Relationship</u>. Employee's employment with Employer under this Agreement shall be "at will". Employer may terminate this Agreement and Employee's employment at any time, with or without cause. Either party seeking to terminate this Agreement and Employee's employment must provide the other party with 30 days notice of such intent to terminate. Employee understands and agrees that no person has authority to enter into any

-2-

oral agreement for employment for any specified period of time or to make any oral agreement contrary to this Section of this Agreement.

9. <u>Representations of Parties</u>. Employer and Employee each represents to the other that he, she or it (a) has carefully read and reviewed the terms of this Agreement, and (b) agrees to the terms of this Agreement freely and voluntarily and without coercion for the purposes of making a legal agreement. The parties further agree that no representations or promises inconsistent with or additional to this Agreement have been made.

10. <u>Memberships</u>. Employee's membership in outside organizations is permissible, provided that such memberships are in compliance with applicable Michigan law and do not constitute a conflict of interest

11. <u>Applicable Law and Form</u>. This Agreement shall be governed by and is subject to all applicable laws of the State of Michigan, and all rules and regulations of Employer and the Academy, all of which are made part of the terms and conditions of this Agreement.

12. <u>Addendum</u>. See attached Contract Addendum for agreements outside the scope of this document.

Employer and Employee have executed this Agreement as of the date first above written.

**EMPLOYER:**
New Urban Learning

By:_____

Date:_____

**EMPLOYEE:**

_____

Date:_____10/15/09_____

-3-

# EXHIBIT 2

To: Dr. Gabriela Gui
From: Margaret Trimer-Hartley
Re: Contract Addendum
Date: Oct. 15, 2009

May this Contract Addendum serve to:

1. Confirm and outline New Urban Learning's commitment to purchase five years of service credit for you in the Michigan Public School Employee Retirement System (MPSERS) as a signing bonus;
2. Outline the things for which you, as principal of UPSM High School, will be accountable;
3. Commit to provide you with a laptop computer and a cell phone to use for UPSM High School business beginning July 1, 2010;
4. Confirm New Urban Learning's/UPSM's commitment to site-based management.
5. Confirm your authority to make contractual commitments on behalf of UPSM HS to potential staff members for the 2010-2011 school year prior to your official hire date of July 1, 2010.

**Retirement**

As a signing bonus, New Urban Learning will purchase five years of service credit through MPSERS on your behalf at a cost of $78,590.31. We will pay the state of Michigan directly in one lump sum just prior to the date you give your current employer 60-day notice of resignation.

**Accountability**

As principal of UPSM High School, you will be accountable for the following:

- Meeting AYP beginning with year the second group of 11th graders to take the Michigan Merit Exam (MME) in 2013-14;
- Meeting performance goals outlined by Grand Valley State University— outperform host district; outperform peer districts; outperform weighted average performance of all districts represented in school;
- Graduating 90 percent of ninth graders after four years, and sending 90 percent on to college;
- Site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget; designing and implementing curriculum and instructional practices

**Laptop and Cell Phone**

You will be provided with a UPSM laptop computer and a UPSM cell phone to use for UPSM High School business beginning July 1, 2010 through the duration of your contract.

**Site-Based Management**

University Prep Science & Math District embraces the North Central Regional Educational Laboratory's definition of site-based management, and agrees to adhere to them for the term of your contract.

**Authority to Hire**

You will have authority to extend contract offers to staff members to work at UPSM HS for the 2010/2011 school year; all staff contracts will begin July 1, 2010.

Margaret Trimer-Hartley
Superintendent, UPSM

Dr. Gabriela Gui

# EXHIBIT 3

CONTRACT ADDENDUM

Dr. Gabriela Gui received a lump sum payment of $79,000 on Thursday, February 11.

The payment was given as a signing bonus for joining University Prep Science & Math as the founding high school principal in the 2010-2011 school year.  It is also intended to serve as compensation for work leading up to the opening of UPSM High School in the fall of 2010.

Further, UPSM agrees to set aside in an escrow account enough funds to cover the actual taxes incurred on her April 2011 tax return as a result of the $79,000 in income.

Dr. Gui has a five year contract with UPSM. She agrees to pay back in full the signing bonus and the taxes if she willfully breaches the employment contract in its current form at any time within the first 12 months.  The contract year begins July 1.


Dr. Gabriela Gui
Principal


Margaret Trimer-Hartley
Superintendent, UPSM

# EXHIBIT 4

## DETROIT 90/90

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement") is entered into as of the ____ day of _____ 2012, by and between Detroit 90/90/A.I. Central LLC, a Michigan Corporation, ("Employer"), and Gabriela Gui ("Employee").

Employer and Employee hereby agree as follows:

1.  <u>Employment</u>. Employer hereby employs Employee as a Principal at University Prep Science & Math High School, a Michigan public school academy managed by Employer (the "Academy"), and Employee hereby accepts such employment, on the terms and subject to the conditions set forth below.

2.  <u>Term of Employment</u>. The term of Employee's employment with Employer under this Agreement shall commence on July 1, 2012 and end on June 30, 2015.

3.  <u>Duties</u>. Employee shall perform all of the duties assigned to him or her by Employer and adhere to all of Employer's policies and procedures as may be in effect at any time or from time to time during Employee's employment. Employee further agrees to comply with all of the requirements of Michigan, federal and other applicable law with respect to Employer's operations and/or Employee's performance of his or her duties. Employee's duties under this Agreement shall include, but not be limited to, the following:

   (a)  As principal of UPSM High School, you will be accountable for the following:

    *  Meeting AYP beginning with year the second group of 11th graders to take the Michigan Merit Exam (MME) in 2013-14;
    *  Meeting performance goals outlined by Grand Valley State University - outperform host district; outperform peer districts; outperform weighted average performance of all districts represented in school;
    *  Graduating 90 percent of ninth graders after four years, and sending 90 percent on to college;
    *  Site-based management, including: hiring, evaluating and dismissing staff; managing the school's budget; designing and implementing curriculum and instructional practices.

   (b)  Developing and implementing instructional programs in Employee's areas of expertise in accordance with any program established or approved by Employer for the Academy;

   (c)  Participating in cooperative efforts among teachers, staff and students with regard to curriculum, programmatic development and improvement, extra-curricular and other activities including:

- Engaging parents in each student's education
- Providing instruction to students and serving as a student advocate
- Maintaining appropriate student discipline and conduct
- Applying approved techniques for the ongoing assessment of student learning
- Attending staff and committee meetings, including two after-school meetings, and fully participating in faculty decision making
- Conducting and carrying out all other duties and obligations determined by Employer as necessary to facilitate the Academy's mission, goals and standards.

4. <u>Qualifications</u>. Employee represents to Employer that he or she has the appropriate and valid certifications and state requirements for the school year of Agreement. If employee does not provide notarized certificate to Human Resources Department this Agreement shall be considered void and no payments shall be made to employee. Employee understands other required documentation for their file and understands they shall not be paid until file is one hundred percent complete.

5. <u>Compensation</u>. Employer shall compensate Employee at an annual rate of $122,450.00 for the school year 2012-13 with payments to be made twice a month. Three-percent raises will be given annually (July 1) through the life of the contract.

No compensation shall be paid to Employee for any period after the date on which Employee's employment with Employer under this Agreement has terminated.

a. **401K Plan:** Employee will be eligible to participate in 401K Plan and receive employer match up to $6,000 beginning July 1, 2012.

The following compensation will also be paid to Employee based on the representations below:

**Health Insurance Waiver:**

Employees who waive their health insurance benefits will receive an additional $2,000, which will also be made in twice monthly payments as reflected on their paychecks, but will not be included as a part of their annual salary for the purpose of calculating annual percentage increases. If Employee chooses to receive health insurance benefits during the year, he or she forfeits the remaining portion of the $2,000 payments. (Please check the appropriate line and initial.)

Employee chooses to _____ receive or _____X_____ waive health insurance benefits.

2

**Compensation Summary:**

Base pay:                                      **$ 122,450.00**

Waiver of Health Insurance:          $    2,000____

**Laptop and Cell Phone:**

You will be provided with a UPSM laptop computer and a UPSM cell phone to use for UPSM High School business for the duration of your contract.

6.     <u>Benefits</u>.  Employee will be provided with all of the benefits provided to other similarly situated employees of Employer including, without limitation, health insurance, vision and dental, (unless waived in Section 5, above), disability insurance, life insurance, vacation, sick and personal leave as specified in the Employee Handbook and the Axios/Detroit 90/90 Benefit Plan, and participation in Employer's retirement program, as permitted under applicable law and regulation, and as set forth in a separate document covering all specific benefits. Many of these benefits will be provided pursuant to formal written plans.  The actual terms of any plan document for such benefit supersedes any contrary description and will govern in all instances.  Employer necessarily reserves its right to modify or amend any of these benefits, at any time, in its sole discretion and in accordance with applicable law.  Advance notice of such changes shall be given when possible.

7.     <u>Site-Based Management.</u>  University Prep Science & Math District embraces the North Central Regional Educational Laboratory's definition of site-based management, and agrees to adhere to them for the term of your contract.

8.     <u>Authority to Hire.</u>  Employee will have authority to extend contract offers to staff members to work at UPSM HS for the 2012-2013 school year; all staff contracts will begin July 1, 2012.

9.     <u>Compliance with Law</u>.  Employee understands and acknowledges that Michigan law requires employers to make accommodations to handicapped individuals where the accommodation does not impose an undue hardship on employers. Handicapped employees or applicants may request an accommodation by notifying Employer in writing of the need for accommodation within 182 days of the date the handicapper knows or should know that an accommodation is needed. Employee understands, agrees and acknowledges that failure to promptly notify Employer regarding the need for any such accommodation will preclude any claim that Employer failed to accommodate the handicapped.

10.    <u>Employment Relationship</u>.  Employee's employment with Employer under this Agreement shall be "at will."  Employer may terminate this Agreement and Employee's employment at any time, with or without cause.  Either party seeking to terminate this Agreement and Employee's employment must provide the other

3

party with 30 days notice of such intent to terminate. Employee understands and agrees that no person has authority to enter into any oral agreement for employment for any specified period of time or to make any oral agreement contrary to this Section of this Agreement.

11. <u>Representations of Parties</u>. Employer and Employee each represents to the other that he, she or it (a) has carefully read and reviewed the terms of this Agreement, and (b) agrees to the terms of this Agreement freely and voluntarily and without coercion for the purposes of making a legal agreement. The parties further agree that no representations or promises inconsistent with or additional to this Agreement have been made.

12. <u>Memberships</u>. Employee's membership in outside organizations is permissible, provided that such memberships are in compliance with applicable Michigan law and do not constitute a conflict of interest.

13. <u>Applicable Law and Form</u>. This Agreement shall be governed by and is subject to all applicable laws of the State of Michigan, and all rules and regulations of Employer and the Academy, all of which are made part of the terms and conditions of this Agreement.

Employer and Employee have executed this Agreement as of the date first above written.

EMPLOYER:                                              EMPLOYEE:
Detroit 90/90/ A.I. Central LLC

By: _John B. Cleary_                                  GABRIELA GUI
        John Cleary                                    Name Printed

                                                       _Gabriela Gui_

Its: _Contract Administrator_                          Signature

Date: _3/30/2012_                                      Date: 03/28/2012

EMPLOYER:
Detroit 90/90/ A.I. Central LLC

By: _Geneva Williams_
        Geneva Williams

Its: _Interim CEO_

Date: _3/30/2012_

**EXHIBIT 5**



Detroit 90/90
Organizational Leadership Chart
Effective 9/30/2013

**EXHIBIT 6**

## ROBERT L. LEVI, P.C.

6675 Edwood Avenue
West Bloomfield, Michigan 48324

Telephone (248) 366-4412
Fax (877) 544-4082
www.robertlevilaw.com

*Robert Lawrence Levi*
*Attorney at Law*

July 7, 2014

The Public School Academies of Detroit          Via Certified Mail
c/o Ed Parks, Chairman of the Board              7013 0600 0000 5285 5075
610 Antoinette St.
Detroit, MI 48202

Re:   *Dr. Gabriela Gui*
      Request under Bullard-Plawecki Employee Right to Know Act and
      under Michigan Freedom of Information Act

Dear Mr. Parks:

I represent Dr. Gabriela Gui concerning matters related to her employment with Detroit 90/90 and The Public School Academies of Detroit. Please consider this letter a request under the Bullard-Plawecki Employee Right to Know Act (MCL 423.501 et, seq.) and under the Michigan Freedom of Information Act (MCL 15.231 et seq.).

Please provide me with access to Dr. Gui's entire "personnel record" under the Bullard-Plawecki Employee Right to Know Act. "Personnel record" means a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. A personnel record includes a record in the possession of a person, corporation, partnership, or other association who has a contractual agreement with the employer to keep or supply a personnel record. Please mail me a copy of her personnel file. I will pay the reasonable costs for copying and postage. Alternatively, I can first review the personnel file at your office and then I will pay for copies of the file.

Also, under the Michigan Freedom of Information Act, please provide me with all public records pertaining to Dr. Gui's employment at University Prep Science Math. "Public record" means a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created. Please provide me with all public

2

records, including minutes of Board meetings, pertinent to: Dr. Gui's qualifications for employment, transfer, additional compensation, or disciplinary action, the hiring of Dr. Gui, her job performance, her promotion or demotion, change in her job responsibilities or position, the discharge of Dr. Gui from employment, or, reports to Grand Valley State University or other entity concerning Dr. Gui's performance or the evaluation of University Prep Science Math.   I will pay the reasonable costs for copying and postage.

Finally, please provide me with all other employment records within your possession, custody, or control pertaining to Dr. Gui including, but not limited to, information concerning hours of employment, wages, salaries, plan document and current statement regarding her retirement benefits plan, current statement regarding her fringe benefits, any information regarding worker's compensation benefits, promotions, write-ups, disciplinary actions, performance evaluations, communications to Dr. Gui and others concerning her employment, and medical and other leaves of absence.  I will pay the reasonable costs for copying and postage.

I have enclosed an authorization signed by Dr. Gui that allows you to provide me with the records I have requested.

Thank you very much.

Sincerely,

Robert L. Levi

RLL:rll
Encl.
Cc:  Gabriela Gui w/encl.

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Public School Academies
of Detroit
c/o Ed Parks
610 Antoinette St.
Detroit, MI 48202

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
TOM TAPENTENNE                   7/9/14

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail®    ☐ Priority Mail Express™
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)   7013 0600 0000 5285 5075

PS Form 3811, July 2013        Domestic Return Receipt

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Robert L. Levi, P.C.
Attorney and Counsellor
6675 Edwood Avenue
West Bloomfield, MI 48324

24283175

# U.S. Postal Service™
## CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

### OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To  PSAD

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006                    See Reverse for Instructions

## Certified Mail Provides:

- A mailing receipt
- A unique identifier for your mailpiece
- A record of delivery kept by the Postal Service for two years

*Important Reminders:*

- Certified Mail may ONLY be combined with First-Class Mail® or Priority Mail®.
- Certified Mail is *not* available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**

PS Form 3800, August 2006 *(Reverse)* PSN 7530-02-000-9047

**EXHIBIT 7**

## ROBERT L. LEVI, P.C.

6675 Edwood Avenue
West Bloomfield, Michigan 48324

*Telephone (248) 366-4412*
*Fax (877) 544-4082*
*www.robertlevilaw.com*

*Robert Lawrence Levi*
*Attorney at Law*

July 24, 2014

The Public School Academies of Detroit     Via Certified Mail
c/o Ed Parks, Chairman of the Board     7013 0600 0000 5285 5112
610 Antoinette St.
Detroit, MI 48202

Re:    *Justine Sheu*
      Request under Bullard-Plawecki Employee Right to Know Act and
      under Michigan Freedom of Information Act

Dear Mr. Parks:

     I represent Dr. Justine Sheu concerning matters related to her employment with Detroit 90/90 and The Public School Academies of Detroit. Please consider this letter a request under the Bullard-Plawecki Employee Right to Know Act (MCL 423.501 et, seq.) and under the Michigan Freedom of Information Act (MCL 15.231 et seq.).

     Please provide me with access to Ms. Sheu's entire "personnel record" under the Bullard-Plawecki Employee Right to Know Act. "Personnel record" means a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. A personnel record includes a record in the possession of a person, corporation, partnership, or other association who has a contractual agreement with the employer to keep or supply a personnel record. Please mail me a copy of her personnel file. I will pay the reasonable costs for copying and postage. Alternatively, I can first review the personnel file at your office and then I will pay for copies of the file.

     Also, under the Michigan Freedom of Information Act, please provide me with all public records pertaining to Ms. Sheu's employment at University Prep Science Math. "Public record" means a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created. I will pay the reasonable costs for

2

copying and postage.

     Finally, please provide me with all other employment records within your possession, custody, or control pertaining to Ms. Sheu including, but not limited to, hiring and discharge, information concerning hours of employment, wages, salaries, plan document and current statement regarding her retirement benefits plan, current statement regarding her fringe benefits, any information regarding worker's compensation benefits, promotions, write-ups, disciplinary actions, performance evaluations, communications to Ms. Sheu and others concerning her employment, and medical and other leaves of absence.  I will pay the reasonable costs for copying and postage.

     I have enclosed an authorization signed by Ms. Sheu that allows you to provide me with the records I have requested.

     Thank you very much.

Sincerely,

Robert L. Levi

RLL:rll
Encl.
Cc:  Justine Sheu w/encl.

2

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Public School Academies of
Detroit
c/o Ed Parks
610 Antoinette St.
Detroit, MI 48202

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _(signature)_ ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Tom Stapertenne   7/30/14

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

_JUL 30 2014_ (stamp)

3. Service Type
☒ Certified Mail®   ☐ Priority Mail Express™
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7013 0600 0000 5285 5112

PS Form 3811, July 2013          Domestic Return Receipt

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Robert L. Levi, P.C.
Attorney and Counsellor
6675 Edwood Avenue
West Bloomfield, MI 48324

# U.S. Postal Service™
## CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

# OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

7112 5285 0000 0600 6013 7012

Sent To     PSAD

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006          See Reverse for Instructions

- A mailing re
- A unique ide... .....er for your mailpiece
- A record of delivery kept by the Postal Service for two years

*Important Reminders:*

- Certified Mail may ONLY be combined with First-Class Mail® or Priority Mail®.
- Certified Mail is *not* available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**

PS Form 3800, August 2006 *(Reverse)* PSN 7530-02-000-9047

# EXHIBIT 8



# University Prep Science & Math Middle School

**5100 John R., Detroit, Michigan 48202, T. 313.832.8400  F. 313.833.4816  www.uprepsm.com**

To:  Dr. Gabriela Gui
From:  Margaret Trimer-Hartley
Re:  First trimester performance review
Date:  December 1, 2010

May this memo serve as your official first trimester performance review.  It is a chance for both of us to reflect, rethink--if necessary--and recharge.

It has been a pleasure to put together my thoughts, impressions and analysis of your performance since you officially started as Principal of UPSM High School July 1, 2010.  My review touches several areas of performance, but I focus most on content (teaching AND learning), culture, communication and customer service—my top four priorities.

You deserve a hearty CONGRATULATIONS, Gabriela.  You have started a fabulous new general admissions science and math high school in the city of Detroit.  You have managed the myriad start-up challenges with determination, grace and a can-do, will-do, must-do attitude. Nothing you faced—from furniture and technology issues to enrollment and scheduling issues—proved insurmountable.  You and your mighty team tackled it all, and I am beaming with pride.

Perhaps your greatest accomplishment so far is the culture you have established in your professional learning community.  Your team asks the right questions, has the right debates and solves problems the way one would expect of master educators who are thoroughly committed to the kids AND to learning.   You chose well.  Your fidelity to our hiring protocol made a difference in the selection process. Now, the extremely high level of care, the support and the prodding you do gives them the courage and the desire to step outside their comfort zones and do the kinds of things necessary for student success.  You team appears willing and ready to do just about ANYTHING you ask of them. I believe you have the best team possible serving with you and Grady as the founders, the pioneers of UPSM HS.

The culture and camaraderie among the staff are beginning to trickle down to the students.  Developing meaningful, honest and productive relationships between teachers and students can be tricky—particularly at the high school level. Boundaries are critical, but so, too, are genuine, deep connections.  Our kids know the difference between superficial and super special!  The recent whole-school wrap session was one of a couple of turning points in the development of student-to-teacher and student-to-student relationships.  The warmth the students feel for you and the staff is palpable. I see it everyday in their interactions—the hugging, the

endearing and affectionate "hello, mom" comments, even the way they step it up when you and/or Grady tie their ties and make them pull up their pants.  And yet they are still terrified of you. ☺  They know that you expect, demand and reinforce excellence—nothing less.

I look forward to watching this dynamic continue to evolve in the next trimester.

Your attention to data and your fixation on results are precisely the traits you must have to move this group of kids forward fast.  Using data, you have made important course corrections and adjustments this first trimester.  Your move to mandatory study hall at a time when students were simply not completing and turning in work is just one example of how you used your site-based authority to make a smart policy decision in real time.  You're not over the homework hump with this group yet, but you clearly understand that getting students to do their work is absolutely critical, and your team must do "whatever it takes" to make it happen.  Further, the analysis of which students are truly at risk that you and your team just completed this week as final grades were logged in, again, emphasizes that you are using data in a powerful way to drive real-time interventions and intense individualization.  THAT is what we are all about.

I look forward to an even more intense focus on individual student progress as we dissect the new data from Renaissance Learning.

Your communication with me, with your staff and with parents has developed nicely.  Learning what information to relay to your various audiences when and how is no small task.  You have figured out how and what to share with me. I feel great about the development of our dialog—difficult conversations and all—and I hope that you are comfortable with it, too.  At the same time, I am working very hard to accept and appreciate that you solve problems at the local level so that they do not get to me.  That is a gift, but it is a new way of operating for me.  Thank you for your patience while I get used to not having my nose in every issue!

Your staff is always in the loop thanks to your emails, your morning meetings and your constant presence in the hallways and classrooms.  Information is power, and you understand that teachers need to feel looped in, engaged and in control.

Connecting with parents is the most difficult of our communication challenges. You have established multiple ways of reaching out and ensuring they are in the loop. I'm particularly delighted with the robo-calls and emails.  Using the technology of the day to reach parents where they are (usually on their cell phones) is smart and efficient.  Your weekly news briefs are also extremely helpful.  The teacher Web sites are developing nicely and have been a lifesaver for so many students—my own included.

Establishing a parent resource center is a huge step in the development of a stronger parent connection, and I'm excited to see that happening.  High school just

feels different for us parents—colder, more formal and distant.  For our highly emotional constituents who are accustomed to lots of hand-holding and bonding, it can be a difficult transition.  A parent center can serve as more than just a place to check PowerSchool and monitor student progress.  It can be a refuge where parents find each other, find their voice and find their way toward productive rather than reactive advocacy.  I encourage you to invite the Detroit Parent Network (DPN) in to offer training and support, and I urge you to continue working with Mrs. Robinson (Dana's mom) to develop our high school PTSA.  Our polling data and the mountain of anecdotal evidence we have from other charters and DPN show that the more we nurture the whole family, the more likely we will be able to recruit and retain them.

The team approach to working with some of your more challenging parents also appears to be a successful strategy for you.  You and Grady balance each other. Do not hesitate to bring me in when you need or want yet another style at the table.  I believe that worked well with Pace Cooper's family as well as Jamal Crews' parents.

Finally, we are looking forward to an extremely busy new year.  We will be recruiting students AND staff for next year, filing for our Title I funding, creating our district-wide salary schedule and many, many other things.  BUT all that, while important, is secondary to the job of moving every student forward as far and as fast as possible.

Stay as focused and relentless as you have been this first trimester.  And make sure you rest and restore yourself this winter break—or I will have to put you on an improvement plan in that area to ensure that you do not burn out!!

Thank you for choosing to lead UPSM High School.  You are a gift to our system, and I am a very fortunate superintendent.

# EXHIBIT 9

University Preparatory Academy
Teacher/Advisor Evaluation Rubric
Formal Evaluation 2010-11

## Domain I: Planning and Preparation

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| | | **LEVEL OF PERFORMANCE** | | |
| | | **Component Ia: Demonstrating Knowledge of Content and Pedagogy** | | |
| Knowledge of Content | Teacher makes content errors or does not correct content errors students make. | Teacher displays basic content knowledge but cannot articulate connections with other parts of the discipline or with other disciplines. | **Teacher displays solid content knowledge and makes connections between the content and other parts of the discipline and other disciplines.** | Teacher displays extensive content knowledge, with evidence of continuing pursuit of such knowledge. |
| Knowledge of Prerequisite Relationships | Teacher displays little understanding of prerequisite knowledge important for student learning of the content. | **Teacher indicates some awareness of prerequisite learning although such knowledge may be incomplete or inaccurate.** | Teacher's plans and practices reflect understanding of prerequisite relationships among topics and concepts. | Teacher actively builds on knowledge of prerequisite relationships when describing instruction or seeking causes for student misunderstanding. |
| Knowledge of Content-Related Pedagogy | Teacher displays little understanding of the pedagogical issues involved in student learning of the content. | Teacher displays basic pedagogical knowledge but does not anticipate student misconceptions. | **Pedagogical practices reflect current research on best pedagogical practices within the discipline but without anticipating student misconceptions.** | Teacher displays continuing search for best practice and anticipates student misconception. |
| | | **Component Ib: Selecting Instructional Goals** | | |
| Value | Goals are not valuable and represent either their low expectations or no conceptual understanding for students. Goals do not reflect important learning. | Goals are moderately valuable in either their expectations or conceptual understanding for students and in importance of learning. | **Goals are valuable in their level of expectations, conceptual understanding and importance of learning.** | Not only are the goals valuable, but teacher can also clearly articulate how goals establish high expectations and relate to curriculum frameworks and standards. |
| Clarity | Goals are either no clear or are stated as student activities. Some goals do not permit viable methods of assessment. | Goals are only moderately clear or include a combination of goals and activities. Some permit viable methods of assessment. | **Most of the goals are clear but may include a few activities. Most permit viable methods of assessment.** | All the goals are clear, written in the form of student learning, and permit viable methods of assessment. |
| Differentiation | Goals are not suitable for the class. | Most of the goals are suitable for most students in the class. | **All the goals are suitable for most students in the class.** | Goals take into account the varying learning needs of individual students or groups. |
| Balance | Goals reflect only one type of learning and one discipline or strand. | Goals reflect several types of learning but no effort at coordination or integration. | **Goals reflect several different types of learning and opportunities for integration.** | Goals reflect student initiative in establishing important learning. |

1

## Component Ic: Designing Coherent Instruction

| | | | | |
|---|---|---|---|---|
| **Learning Activities** | Learning activities are not suitable to students or instructional goals. They do not follow an organized progression and do not reflect recent professional research. | Only some of the learning activities are suitable to students or instructional goals. Progression of activities in the unit is uneven, and only some of the activities reflect recent professional research. | **Most of the learning activities are suitable to students and instructional goals. Progression of activities in the unit is fairly even, and most activities reflect recent professional research.** | Learning activities are highly relevant to students and instructional goals. They progress coherently, producing a unified whole and reflecting recent professional research. |
| **Instructional Materials and Resources** | Materials and resources do not support the instructional goals or engage students in meaningful learning. | Some of the materials and resources support the instructional goals, and some engage students in meaningful learning. | **All materials and resources support the instructional goals and most engage students in meaningful learning.** | All materials and resources support the instructional goals, and most engage students in meaningful learning. There is evidence of student participation in selecting or adapting materials. |
| **Instructional Groups** | Instructional groups do not support the instructional goals and offer no variety. | **Instructional groups are inconsistent in suitability to the instructional goals and offer minimal variety.** | Instructional groups are varied, as appropriate to the different instructional goals. | Instructional groups are varied, as appropriate to the different instructional goals, and most engage students in meaningful learning. There is evidence of student choice in selecting different patterns of instructional groups. |
| **Lesson and Unit Structure** | The lesson or unit has no clearly defined structure, or the structure is chaotic. Time allocations are unrealistic. | **The lesson or unit has a recognizable structure, although the structure is not uniformly maintained throughout. Most time allocations are reasonable.** | **The lesson or unit has a clearly defined structure that activities are organized around. Time allocations are reasonable.** | The lesson's or unit's structure is clear and allows for different pathways according to student needs. |

## Component Id: Assessing Student Learning

| | | | | |
|---|---|---|---|---|
| **Congruence with Instructional Goals** | Content and methods of assessment lack congruence with instructional goals. | Some of the instructional goals are assessed through the proposed approach, but many are not. | **.All the instructional goals are nominally assessed through the proposed plan, but the approach is more suitable to some goals than to others.** | The proposed approach to assessment is completely congruent with the instructional goals, both in content and process. |
| **Criteria and Standards** | The proposed approach contains no clear criteria or standards. | Assessment criteria and standards have been developed, but they are either not clear or have not been clearly communicated to students. | **Assessment criteria and standards are clear and have been clearly communicated to students** | Assessment criteria and standards are clear and have been clearly communicated to students. There is evidence that students contributed to the development of the criteria and standards. |
| **Use of Data in Planning** | The assessment results affect planning for students only minimally. | **Teachers uses assessment results to plan for the class as a whole.** | Teacher uses assessment results to plan for individuals and groups of students. | Students are aware of how they are meeting the established standards and participate in planning the next steps. |

2

Domain II: The Classroom Environment

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| | | | LEVEL OF PERFORMANCE | |
| **Component 2a: Establishing a Culture for Learning** | | | | |
| Importance of Content | Teacher or students convey a negative attitude toward the content, suggesting that the content is not important or is mandated by others. | Teacher communicates importance of the work but with little conviction and only minimal apparent buy-in by the students. | **Teacher conveys genuine enthusiasm for the subject, and students demonstrate consistent commitment to its value.** | Students demonstrate through their active participation, curiosity, and attention to detail that they value the content's importance. |
| Student Pride in Work | Students demonstrate little or no pride in their work. They seem to be motivated by the desire to complete a task rather than do high-quality work. | Students minimally accept the responsibility to "do good work" but invest little of their energy in the quality of the work. | **Students accept teacher insistence on work of high quality and demonstrate pride in that work.** | Students take obvious pride in their work and initiate improvements in it, for example, by revising drafts on their own initiative, helping peers, and ensuring that high-quality work is displayed. |
| Expectations for Learning and Achievement | Instructional goals and activities, interactions, and the classroom environment convey only modest expectations for student achievement. | Instructional goals and activities, interactions, and the classroom environment convey inconsistent expectations for student achievement. | **Instructional goals and activities, interactions, and the classroom environment convey high expectations for student achievement.** | Both students and teacher establish and maintain through planning of learning activities, interactions, and the classroom environment high expectations for the learning of all students. |
| **Component 2b: Managing Classroom Procedures** | | | | |
| Management of Instructional Groups | Students not working with the teacher are not productively engaged in learning. | Tasks for group work are partially organized, resulting in some off-task behavior when teacher is involved with one group. | **Tasks for group work are organized, and groups are managed so most students are engaged at all times.** | Groups working independently are productively engaged at all times, with students assuming responsibility for productivity. |
| Management of Transitions | Much time is lost during transitions. | Transitions are sporadically efficient, resulting in some loss of instructional time. | **Transitions occur smoothly, with little loss of instructional time.** | Transitions are seamless, with students assuming some responsibility for productivity. |
| Management of Materials and Supplies | Materials are handled inefficiently, resulting in loss of instructional time. | Routines for handling materials and supplies function moderately well. | **Routines for handling materials and supplies occur smoothly, with little loss of instructional time.** | Routines for handling materials and supplies are seamless, with students assuming some responsibility for efficient operation. |
| Performance of Non-Instructional Duties | Considerable instructional time is lost in performing non-instructional duties. | Systems for performing noninstructional duties are fairly efficient, resulting in little loss of instructional time. | **Efficient systems for performing noninstructional duties are in place, resulting in minimal loss of instructional time.** | Systems for performing noninstructional duties are well established, with students assuming considerable responsibility for efficient operation. |
| **Component 2c: The Classroom Environment** | | | | |
| Managing Student Behavior Expectations | No standards of conduct appear to have been established, or students are confused as to what the standards are. | Standards of conduct appear to have been established for most situations, and most students seem to understand them. | **Standards of conduct are clear to all students.** | Standards of conduct are clear to all students and appear to have been developed with student participation. |

| ELEMENT | LEVEL OF PERFORMANCE | | | |
|---|---|---|---|---|
| | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
| Monitoring of Student Behavior | Student behavior is not monitored, and teacher is unaware of what students are doing. | Teacher is generally aware of student behavior but may miss the activities of some students. | **Teacher is alert to student behavior at all times.** | Monitoring by teacher is subtle and preventative. Students monitor their own and peers' behavior, correcting one another respectfully. |
| Response to Student Misbehavior | Teacher does not respond to misbehavior, or the response is inconsistent, overly repressive, or does not respect the student's dignity. | Teacher attempts to respond to student misbehavior but with uneven results, or no serious disruptive behavior occurs. | **Teacher response to misbehavior is appropriate and successful and respects the student's dignity, or student behavior is generally appropriate.** | Teacher response to misbehavior is highly effective and sensitive to students' individual needs, or student behavior is entirely appropriate. |

Domain III: Instruction

Component 3a:
Engaging Students in Learning

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| Representation of Content | Representation of content is inappropriate and unclear or uses poor examples and analogies. | Representation of content is inconsistent in quality. Some is done skillfully, with good examples. Other portions are difficult to follow. | **Representation of content is appropriate and links well with students' knowledge and experience.** | Representation of content is appropriate and links well with students' knowledge and experience. Students contribute to representation of content. |
| Activities and Assignments | Activities and assignments are inappropriate for students in terms of their age or development. Students are not engaged mentally. | **Some activities and assignments are appropriate to students and engage them mentally, but others do not.** | Most activities and assignments are appropriate to students. Almost all students are cognitively engaged in them. | All students are cognitively engaged in the activities and assignments in their exploration of content. Students initiate or adapt activities and projects to enhance understanding. |
| Grouping of Students | Instructional groups are inappropriate to the students or to the instructional goals. | **Instructional groups are only partially appropriate to the students or only moderately successful in advancing the instructional goals of the lesson.** | Instructional groups are productive and fully appropriate to the students or to the instructional goals of the lesson. | Instructional groups are productive and fully appropriate to the instructional goals of a lesson. Students take the initiative to influence instructional groups to advance their understanding. |
| Instructional Materials and Resources | Instructional materials and resources are unsuitable to the instructional goals or do not engage students mentally. | Instructional materials and resources are partially suitable to the instructional goals, or students' level of mental engagement is moderate. | **Instructional materials and resources are suitable to the instructional goals and engage students mentally.** | Instructional materials and resources are suitable to the instructional goals and engage students mentally. Students initiate the choice, adaptation, or creation of materials to enhance their own purposes. |
| Structure and Pacing | The lesson has no clearly defined structure, or the pacing of the lesson is too slow or rushed, or both. | The lesson has a recognizable structure, although it is not uniformly maintained throughout the lesson. Pacing of the lesson is inconsistent. | **The lesson has a clearly defined structure around which the activities are organized. Pacing of the lesson is consistent.** | The lesson's structure is highly coherent, allowing for reflection and closure as appropriate. Pacing of the lesson is appropriate for the students. |

## Component 3b: Providing Feedback to Students

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| | | LEVEL OF PERFORMANCE | | |
| **Quality:** Accurate, Substantive, Constructive, Specific | Feedback is either not provided or is of uniformly poor quality. | Feedback is inconsistent in quality. Some elements of high quality are present. Others are not. | **Feedback is consistently high quality.** | Feedback is consistently high quality. Provision is made for students to use feedback in their learning. |
| **Timeliness** | Feedback is not provided in a timely manner. | Timeliness of feedback is inconsistent. | **Feedback is consistently provided in a timely manner.** | Feedback is consistently provided in a timely manner. Students make prompt use of the feedback in their learning. |

## Domain IV: Professional Responsibilities

### Component 4a: Reflecting on Teaching

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| **Accuracy** | Teacher does not know if a lesson was effective or achieved its goals, or profoundly misjudges the success of a lesson. | **Teacher has a generally accurate impression of a lesson's effectiveness and the extent to which instructional goals were met.** | Teacher makes an accurate assessment of a lesson's effectiveness and the extent to which it achieved its goals and can cite general references to support the judgment. | Teacher makes a thorough and accurate assessment of a lesson's effectiveness and the extent to which it achieved its goals, citing many specific examples from the lesson and weighing the relative strength of each. |
| **Use in Future Teaching** | Teacher has no suggestions for how a lesson may be improved another time. | Teacher makes general suggestions about how a lesson may be improved. | **Teacher makes a few specific suggestions of what he may try another time.** | Drawing on an extensive repertoire of skills, the teacher offers specific alternative actions, complete with probable successes of different approaches. |

### Component 4b: Maintaining Accurate Records/Reports

| ELEMENT | UNSATISFACTORY | BASIC | PROFICIENT | DISTINGUISHED |
|---|---|---|---|---|
| **Student Completion of Assignments** | Teacher's system for maintaining information on student completion of assignments is in disarray or does not meet time requirements | **Teacher's system for maintaining information on student completion of assignments is rudimentary and only partially effective.** | Teacher's system for maintaining information on student completion of assignments is fully effective. | Teacher's system for maintaining information on student completion of assignments is fully effective. Students participate in the maintenance of the records. |
| **Student Progress in Learning** | Teacher has no system for maintaining information on student progress in learning, or the system is in disarray. | **Teacher's system for maintaining information on student progress in learning is rudimentary and partially effective.** | Teacher's system for maintaining information on student progress in learning is effective. | Teacher's system for maintaining information on student progress in learning is fully effective. Students contribute information and interpretation of the records. |
| **Non-instructional records** | Teacher's records for non-instructional activities are in disarray, resulting in errors and confusion. | Teacher's records for non-instructional activities are adequate, but they require frequent monitoring to avoid error. | **Teacher's system for maintaining information on non-instructional activities is fully effective.** | Teacher's system for maintaining information on non-instructional activities is highly effective, and students contribute to its maintenance. |

### Component 4c:

## Communicating with Families

| | | | |
|---|---|---|---|
| **Information About the Instructional Program** | Teacher provides little information about the instructional program to families. | Teacher participates in the school's activities for parent communication but offers little additional information. | **Teacher provides frequent information to parents, as appropriate, about the instructional program. Students participate in preparing materials for their families.** | Teacher provides frequent information to parents, as appropriate, about the instructional program. Students participate in preparing materials for their families. |
| **Information about Individual Students** | Teacher provides minimal information to parents and does not respond or responds insensitively to parent concerns about students. | Teacher adheres to the school's required procedures for communicating with parents. Responses to parent concerns are minimal. | **Teacher communicates with parents about students' progress on a regular basis and is available as needed to respond to parent concerns.** | Teacher provides information to parents frequently on both positive and negative aspects of student progress. Response to parent concerns is handled with great sensitivity. |
| **Engagement of Families in the Instructional Program** | Teacher makes no attempt to engage families in the instructional program, or such attempts are inappropriate. | Teacher makes modest and inconsistently successful attempts to engage families in the instructional program. | **Teacher's efforts to engage families in the instructional program are frequent and successful.** | Teacher's efforts to engage families in the instructional program are frequent and successful. Students contribute ideas for projects that will be enhanced by family participation. |

## Component 4d: Contributing to the School and District

| | | | |
|---|---|---|---|
| **Relationships with Colleagues** | Teacher's relationships with colleagues are negative or self-serving. | Teachers maintains cordial relationships with colleagues to fulfill the duties that the school or district requires. | **Support and cooperation characterize relationships with colleagues.** | Support and cooperation characterize relationships with colleagues. Teacher takes initiative in assuming leadership among the faculty. |
| **Service to the School** | Teacher avoids becoming involved in school events. | Teacher participates in school events when specifically asked. | **Teacher volunteers to participate in school events, making a substantial contribution.** | Teacher volunteers to participate in school events, making a substantial contribution, and assumes a leadership role in at least some aspects of school life. |
| **Participation in School and District Projects** | Teacher avoids becoming involved in school and district projects. | **Teacher participates in school and district projects when specifically asked.** | Teacher volunteers to participate in school and district projects, making a substantial contribution. | Teacher volunteers to participate in school and district projects, making a substantial contribution, and assumes a leadership role in a major school or district project. |
| **Timeliness** | Teacher is consistently late to school, meetings, and/or classes. Causing problems for colleagues, parents, and/or students. | Teacher maintains an inconsistent pattern of timeliness with regard to arriving at school, meetings and/or classes on time, causing problems for colleagues, parents, and/or students. | **Teacher is consistently on time for school, meetings, and/or classes.** | Teacher arrives early to school, meetings, and/or classes and uses these opportunities to provide extra support for colleagues, parents, and/or students. |

6

## Component 4c: Showing Professionalism

| | | | | |
|---|---|---|---|---|
| Service to Students | Teacher is not alert to student needs. | Teacher's attempts to serve students are inconsistent. | **Teacher is moderately active in serving students.** | Teacher is highly proactive in serving students, seeking out resources when necessary. |
| Advocacy | Teacher contributes to school practices that result in some students being ill served by the school. | Teacher does not knowingly contribute to some students being ill served by the school. | **Teacher works within the context of a particular team or department to ensure that all students receive a fair opportunity to succeed.** | Teacher makes a particular effort to challenge negative attitudes and helps ensure that all students, particularly those traditionally underserved, are honored in the school. |
| Decision Making | Teacher makes decisions based on self-serving interests. | Teacher's decisions are based on limited though genuinely professional considerations. | **Teacher maintains an open mind and participates in team or building decision-making.** | Teacher takes a leadership role in team or building decision-making and helps ensure that such decisions are based on the highest professional standards. |

Teacher:

Building Lead:

Principal:

7

## JURY DEMAND

The plaintiff demands a jury to try this cause.


Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
6675 Edwood Ave.
West Bloomfield, MI 48324
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598


Date: February 26, 2015

**EXHIBIT 10**

From: **Gabriela Gui** <gabi_gui@hotmail.com>
Date: Tue, May 20, 2014 at 7:27 PM
Subject: RE: My Email
To: Justine Sheu <jsheu@umich.edu>

I talked with Ramona today about you and enlisted her help. I hope you don't mind.
She cares a lot about you, like I do, and has some resources.

Hope to see you tomorrow at the end of PT Conferences at a drink in the
neighborhood. Coordinate with Hachigian.

Take care.

Date: Tue, 20 May 2014 15:05:18 -0400
Subject: My Email
From: jsheu@umich.edu
To: gabi_gui@hotmail.com

From: gabi_gui@hotmail.com
To: jsheu@umich.edu
Subject:
Date: Tue, 20 May 2014 21:24:36 -0400

Aaron Cooper 313-332-1631, 3134575105, 3136736214, cooperlinda8088@yahoo.com

Kathryn Davis 3135315779, 3135315779, 2486196380, mommyd320@hotmail.com

Lexus Giddings 313 405 2449, mercedeshoo@yahoo.com

Darian Hogue 248-773-1512, 248-420-1389, kroberts0511@gmail.com

Charnelle McIntosh 3133008062, 3132354427, stinkabul@sbcglobal.net

Dana Robinson 3136001353, Drobinson950@yahoo.com

Endya Sharpe 3134750714, 313-442-1224, lpatterson@walbridge.com

Ralph Smith 3134455312, 313-353-4335, candeeLsmith@gmail.com

Allyn Verbal 313 850-8242 taverbal@yahoo.com, taverbal@gmail.com

1

From: **Gabriela Gui** <gabi_gui@hotmail.com>
Date: Tue, May 20, 2014 at 8:26 PM
Subject: RE: Suspension and Investigation Process
To: Justine Sheu <jsheu@umich.edu>


Great job!!!




Date: Tue, 20 May 2014 15:46:53 -0400
Subject: Suspension and Investigation Process
From: jsheu@umich.edu
To: ebitzarakis@detroit9090.org; jsanford@axiosincorporated.com

Hello Emily and John,

I write to you from my personal email because I have been locked out of my work email account. On Monday, May 19, I was suspended from work and asked to relinquish my keys, computer, and phone. The reasons cited were student statements about remarks I made in a presentation given to seniors on Friday, May 16, and Margaret Trimer-Hartley's personal feelings about my style of interaction with students. At the meeting, I expressed sincere regret about my remarks, how they were received by students, and the judgment I showed in making them. I also expressed my feeling that that my remarks had been taken out of context and tried to clarify the context in which they had been made and their original intent.

I wasn't given the opportunity to offer much testimony before I was told that I will be suspended with pay pending an investigation. I have been told nothing about what the investigation will consist in. I hope that whatever investigation occurs is fair and transparent, but seeing as neither administrators, staff, nor students (other than those who made statements) have been consulted, and Mrs. Trimer-Hartley has never directly observed me interacting with students with the exception of the UPSM senior luncheon, I have my concerns.

I write to request the following:

1. Copies of the statements or complaints made about my remarks
2. Citation of the policies or rules in the employee handbook that I have violated to incur suspension
3. Clarification on the policies regarding progressive reprimand, since this is the first incident of its nature
4. Clarification on the nature of the "investigation" process.

Specifically, since allegations were made by Mrs. Trimer-Hartley regarding my professionalism,

demeanor, and style of interaction with students, I would like to know the following:

1. Who will be consulted in the investigation process - that is, will the perspectives of students, staff, and administrators I have worked with be considered?
2. Whether my perspective and testimony will be considered
3. Whether I will receive a hearing or can appeal the result of the process

Please clarify and advise.

Thank you for your time and consideration,
Justine

From: **Justine Sheu** <jeun666@gmail.com>
Date: Wed, May 21, 2014 at 3:36 AM
Subject: Please Proofread Email and Attachment
To: "hachigi2 ." <hachigi2@gmail.com>, Gabriela Gui <gabi_gui@hotmail.com>


Dear Friend,

I write to you from my personal email account because I have been locked out of my work email account. On Monday, May 19, I was suspended from work, asked to immediately relinquish my keys, computer, and phone, and am facing a likely termination pending an "investigation" into my professional character. The reasons cited were remarks I made in a presentation given to seniors at UPA Friday, May 16, and Margaret Trimer-Hartley's personal feelings about my style of interaction with students.

I wasn't given an adequate opportunity to respond or offer written testimony before I was told that would be suspended. I have been told nothing about what the investigation will consist in. I hope that whatever investigation occurs is fair, transparent, and reflects the perspectives of all relevant parties, but I have grave concerns that this will not be the case and that I will be wrongfully terminated and defamed.

I am shocked and devastated. In the past year I have given my all to serving my students to the very best of my ability as a college advisor and ACT prep teacher. I have enjoyed the most effort-laden yet rewarding year of my career thanks to the incredibly community of students, parents, and staff with whom and for whom I work. And now I fear that I will lose my reputation, my career, and my most valued asset - my students - under unjust circumstances.


Before a final decision is made regarding my employment, I am hopeful that the voices of students, parents, and staff members with whom I have worked with and who have most closely observed my professional character and instructional methods will be heard, as I believe they have the best perspective on my professionalism, my interactions with students, my teaching, and my impact on and service to the school.


Please, if you have the time and heart, take a moment to read the attached statement summarizing the circumstances of my suspension, my responses, and my request for your support. If you would be willing to write an honest statement on my behalf attesting to my professional character, I would be deeply grateful. See the attachment for details.


Sincerely Yours,
Justine

--

**Justine J. Sheu**
College Success Advisor
University Prep Science and Math High School
University Preparatory Academy High School

## My Suspension

On Monday, May 19, following at 12:30 – 1:00 PM meeting with Venus Crosby, Margaret Trimer-Hartley, and HR Consultant John Stanford, I was suspended from work and asked to immediately relinquish my keys, computer, and phone.  I have been locked out of my email account and banned from both UPA and UPSM High Schools. The reasons cited were remarks I made in a presentation given to seniors at University Prep Academy High School on Friday, May 16, from 11:30 AM – 12:15 PM, and Margaret Trimer-Hartley's personal feelings about my style of interaction with students. The following remarks were cited:

1.  Jokes I made about my Asian heritage.
2.  My comment to seniors that they should never consume substances they have not prepared or watched being prepared.
3.  My use of the word "ass"

I was then told the following:

1.  My jokes about my Asian heritage were racially offensive and inappropriate. Specifically, I was read a complaint written by a student in which he stated he was offended by my remark.
2.  My message to seniors was that it was permissible to smoke marijuana as long as they rolled it – that is, I was actively encouraging students to smoke marijuana.
3.  My use of "ass" constituted profanity and was unprofessional.

At the meeting, I expressed sincere regret about my remarks, how they were received, and the judgment I showed in making them. I asked for but was denied the opportunity to personally apologize to the students whom I had offended with my Asian jokes on the grounds that "their identities cannot be revealed." However, I also expressed my regrets that that my remarks had been taken out of context and tried to clarify the context in which they had been made and their original intent. Specifically, I responded that

1.  The jokes I made about my Asian heritage were intended to be self-deprecating and mocking of racial stereotypes. Specifically, they were made in the context of a story I told about the first time I received a D on a midterm in college due to my own lack or preparedness and over-confidence, and I was warning students against repeating my mistakes.
2.  When discussing illegal substances, the title of the PowerPoint slide was **"Pressure to Engage in Unsafe Behavior."** In the course of enumerating all the risks associated with drinking and smoking, I acknowledged the reality that some students would feel pressured to drink and smoke and would drink or smoke but warned that you never know what others could put in your drinks. Thus, I stated that you should never consume a substance you have not prepared or personally witnessed being prepared. My remarks were made specifically to warn against the dangers of binge drinking and smoking and were immediately followed by a story about a talented athlete who smoked a laced blunt, ended in a coma for a year, and awoke with severe brain damage. I also warned them about women whose drinks were laced or who were pressured to binge drink but were sexually assaulted. The overriding message was clearly to *avoid engaging in unsafe behavior.*
3.  My use of the word "ass" was made in the process of advising students that they should not join a fraternity or sorority their freshman year because, in addition to an enormous commitment or time and energy, they would likely "be getting their asses beat" every night.

In response to my remarks, Mrs. Trimer-Hartley proceeded to state that she had had "had concerns for a while" about me because she had repeatedly observed me behaving unprofessionally and inappropriately in my interactions with students. When I asked for specific examples, she cited three additional offenses:

1.  A reference to "my pretty Asian face" in an email I sent to seniors about scholarships
2.  My remarks at the UPSM senior luncheon

Specifically, I was told that by Mrs. Trimer-Hartley that my scholarship presentation at the senior luncheon was inappropriate, unprofessional, and cavalier because I greeted students by saying "what it do, seniors," and they responded with "what it do, Sheu."

I responded that my use of the phrase "What it do, students" was a call-and-response technique (Teach Like a Champion, Technique 23) that I use in my ACT classes and presentations to greet students and get their attention.

However, I wasn't given much of an opportunity to offer testimony or provide my prospective before I was informed that I would be suspended from work pending an investigation. I have been told nothing about what the investigation will consist in – only that it will likely conclude by this Friday, May 23. I hope that whatever investigation occurs is fair and transparent, but given (a) the manner in which my suspension was handled and the fact that (b) Mrs. Trimer-Hartley has never directly observed me interacting with students with the exception of the UPSM senior luncheon, I have my concerns.

### My Response

I sincerely regret that my remarks caused offense, and I acknowledge and regret that I showed poor judgment in my choice of words. My intent was never to be racially insensitive, endorse substance abuse, or otherwise act unprofessionally. I am more than willing to admit my mistakes and apologize to whomever I offended.

However, I fear that I may be wrongfully terminated and defamed under unfair circumstances. I feel that the manner in which the management responded is (a) egregiously disproportionate to the alleged indiscretions and offenses, (b) devoid of transparency or fairness, (c) based solely on subjective feelings and partial testimony, and (d) lacks any regard for procedural integrity (e.g., progressive reprimand).

Specifically, I contest the following points:

1.  **I was not given an adequate opportunity to offer official testimony or express my perspective before being told I would be suspended pending an investigation.** Clearly, the decision to suspend me had already been made. If written statements were collected from students as part of the investigation process, then written statements should have also been collected from me regarding the remarks in question. I have not been asked to submit a copy of my notes from the presentation nor my actual PowerPoint presentation slides.

2.  **I have been told nothing about what the investigation will consist in, the process that will be followed, or who will be consulted in the process. If an actual investigation is to occur, I only ask that it be fair, transparent, and reflective of the perspectives of all relevant parties.** If the issue of my professionalism or interaction with students is at stake, then it is only right that the voices of students, staff, parents, and administration I have worked with extensively should be consulted in the process. However, the investigation, if there is any, seems that it will not be either fair or transparent. Both principals of UPA and UPSM have been informed that this is a "closed investigation," meaning that their input will not be considered in the process.

3. **The perspectives and testimony of *all* students who attended my presentation should be considered and represented.** Immediately after the meeting on Friday, May 19, I asked several students about what they learned from the presentation, and they cited advice about scheduling, finishing strong, and staying focused on academics. I was also told by a parent who drove several students home on Friday that their response to the presentation was positive and the overall message they gathered was "it's not how you start, but how you finish" and "just because you did well in high school doesn't mean you're set for college." Given that my presentation was delivered on Friday, May 16, from 11:30 AM – 12:30 PM but my initial meeting with management was scheduled for Monday, May 19, at 9:15 AM, there clearly was not adequate time for management to gather testimony reflecting a variety of student perspectives on my presentation.

4. **The case has been managed with patent disregard for procedural integrity (e.g., progressive reprimands)**
   a. If, as Mrs. Trimer-Hartley stated, she has "had concerns for a while" about my interactions and relationships with students, then I question why she did not address me sooner and or warn or reprimand me.
   b. I have delivered 10 presentations and taught over 80 hours of ACT Prep since the beginning of the academic year. Of all the presentations and classes I have taught, I have never received a single complaint of impropriety, vulgarity, or lack of professionalism. Seeing as this was the first instance in which I have ever received a complaint, why was the immediate response a suspension and not a verbal or written reprimand?

5. **Margaret Trimer-Hartley's personal feelings about my instructional methods, demeanor, or style of interaction with my students do not form an adequate or objective basis for forming judgments about my professionalism,** especially considering that

   a. Of the 10 presentations I have delivered and over 80 hours I have spent teaching ACT Prep, **Mrs. Trimer-Hartley has never observed me interacting with students in any setting other than the UPSM senior luncheon.**
   b. Of the various staff members, students, and various Detroit 90-90 management employees who attended the UPSM senior luncheon on Wednesday, May 14, not a single concern or complain was raised about my scholarship presentation. If my remarks were indeed so aparently inappropriate and unprofessional, as alleged, then I question why (a) she did not make remarks to me following the luncheon (b) no other school or Detroit 90-90 staff member remarked on the contents of my speech.

### Your Support

I am shocked and devastated. In the past year I have given my all to serving my students to the very best of my ability as a college advisor and ACT prep teacher. I have enjoyed the most effort-laden yet rewarding year of my career thanks to the community of incredible students, parents, and staff with whom and for whom I work. And I fear that due to this incident, I will lose my reputation, my career, and my most valued asset – my students – under unjust circumstances.

Before a final decision is made regarding my employment, I am hopeful that the voices of students, parents, and staff members whom I have worked with and whom have most closely observed my professional character and instructional methods will be heard, as I believe they have the best perspective on:

- My professionalism
- My interactions and relationships with students

- My methods of presentation and instruction
- My impact on students and service to the school

As these are the issues at stake, I would be sincerely grateful if you would take a moment to write a statement of support or testimonial on my behalf *only if* you feel that you have honest remarks to offer on any of the above.

If you decide to write a statement, please include the following:

- How long you have known me and in what capacity
- Your statements on any of the following...
  - My professionalism
  - My demeanor, interactions with, and relationships with students
  - My methods of presentation and instruction
  - My impact on students and service to the school

If you decide to submit a statement of support, please email the following individuals (and, if you decide, bcc me at jsheu@umich.edu so I can retain a copy for my personal records) with your statement as soon as possible. The situation is highly time-sensitive (final decision expected by Friday, May 23).

Mark Ornstein
Chief Executive Officer
mornstein@detroit9090.org
(313) 549-8081

Margaret Trimer-Hartley
Chief External Relations Officer
(313) 806-8817
mtrimerhartley@detroit9090.org

Venus Crosby
(313) 920-5722
vcrosby@detroit9090.org

Emily Bitzkarakis
Director of Human Resources
(313) 269-5624
ebitzarakis@detroit9090.org

John Sanford
Director of Consulting Services
(616) 451-6216
jsanford@axiosincorporated.com

From: gabi_gui@hotmail.com
To: hachigi2@gmail.com
Subject: RE: In Regards to the Investigation of Justine Sheu
Date: Wed, 21 May 2014 19:09:58 -0400

Well done, my dear!

---

Date: Wed, 21 May 2014 16:42:17 -0400
Subject: In Regards to the Investigation of Justine Sheu
From: hachigi2@gmail.com
To: gradyjones007@sbcglobal.net; gabi_gui@hotmail.com; jeun666@gmail.com

Good morning,

I am writing to you because I have heard that Ms. Justine Sheu has been suspended and come under investigation for actions unbecoming an employee of U Prep Schools; I wish to give my input into that investigation as a character witness and a loyal employee of the U Prep School District.

I have worked extensively with Ms. Sheu this past year, and I can say without reservation that she is an incredibly dedicated worker. Her compassion for the students at both high schools is unquestionable, both in how she tenaciously prepared them for their record-setting ACT scores and amazing ability to find more and more money for each student's future college endeavors. She did so through well-prepared lessons and strategic, experienced knowledge in both aspects of her job.

She has an amazing relationship with both the students and parents here at UPSMHS, and her contributions to both the juniors and the seniors here is unparalleled. I've taught my students for three years now, and I can undoubtedly say that they will be crushed if Ms. Sheu is terminated. Many of them hold Ms. Sheu personally responsible for their large jump in ACT scores, which has directly contributed to their lifelong goals becoming a reality. I fear their spirit might truly be broken by seeing someone who's meant so much to them let go so abruptly.

I am not writing this to you to imply Ms. Sheu didn't err in her professionalism in regards to something she said during her presentation; none of us are incapable of making a mistake. But she is a highly regarded colleague and an asset to every

1

student, parent, teacher, and school in this district, to that point where, if prompted, I believe many others would tell you the same.

In Mr. Ornstein's recent presentation where he explained the core values the he is standing behind for the future of our district, his first was "We Care About People".  In an explanation thereof, he said that we, both as a district and as individuals, must be brave enough to help each other, not in the hopes of getting them in trouble, but to help our colleagues for the betterment of both the students and the district.  If Ms. Sheu has made a mistake, I would hope that we live up to our new values and aim to help her, both for the good that she has done thus far, and the future good she can do for the U Prep image.

Writing this message is not something I take lightly.  Normally, I prefer to keep my head down, do my job, and produce results.  For three years, I have done just that.  I have seen many people come and go here at UPSMHS, but this is the first time I have felt compelled to say something on someone's behalf.  Whether it's her dedication to the students, her truly amazing impact on the ACT scores for both schools, or how much the students and parents here at UPSMHS truly love her, I hope you will truly consider her reinstatement at U Prep Schools. Thank you very much for your time.

Stephen Hachigian
English Teacher and Junior Advisor
University Prep Science and Math High School



From: **Grady Jones** <gradyjones007@sbcglobal.net>
Date: Wed, May 21, 2014 at 7:39 PM
Subject: Re: In Regards to the Investigation of Justine Sheu
To: Steve Hachigian <hachigi2@gmail.com>, "gabi_gui@hotmail.com"
<gabi_gui@hotmail.com>, Justine Sheu <jeun666@gmail.com>


Well stated.

Peace,


Grady Jones
On Wednesday, May 21, 2014 4:42 PM, Steve Hachigian <hachigi2@gmail.com> wrote:


Good morning,

I am writing to you because I have heard that Ms. Justine Sheu has been suspended and come under
investigation for actions unbecoming an employee of U Prep Schools; I wish to give my input into that
investigation as a character witness and a loyal employee of the U Prep School District.

I have worked extensively with Ms. Sheu this past year, and I can say without reservation that she is an
incredibly dedicated worker.  Her compassion for the students at both high schools is unquestionable,
both in how she tenaciously prepared them for their record-setting ACT scores and amazing ability to find
more and more money for each student's future college endeavors.  She did so through well-prepared
lessons and strategic, experienced knowledge in both aspects of her job.

She has an amazing relationship with both the students and parents here at UPSMHS, and her
contributions to both the juniors and the seniors here is unparalleled.  I've taught my students for three
years now, and I can undoubtedly say that they will be crushed if Ms. Sheu is terminated.  Many of them
hold Ms. Sheu personally responsible for their large jump in ACT scores, which has directly contributed to
their lifelong goals becoming a reality.  I fear their spirit might truly be broken by seeing someone who's
meant so much to them let go so abruptly.

I am not writing this to you to imply Ms. Sheu didn't err in her professionalism in regards to something she
said during her presentation; none of us are incapable of making a mistake.  But she is a highly regarded
colleague and an asset to every student, parent, teacher, and school in this district, to that point where, if
prompted, I believe many others would tell you the same.

In Mr. Ornstein's recent presentation where he explained the core values the he is standing behind for the
future of our district, his first was "We Care About People".  In an explanation thereof, he said that we,
both as a district and as individuals, must be brave enough to help each other, not in the hopes of getting
them in trouble, but to help our colleagues for the betterment of both the students and the district.  If Ms.
Sheu has made a mistake, I would hope that we live up to our new values and aim to help her, both for
the good that she has done thus far, and the future good she can do for the U Prep image.

Writing this message is not something I take lightly.  Normally, I prefer to keep my head down, do my job,
and produce results.  For three years, I have done just that.  I have seen many people come and go here
at UPSMHS, but this is the first time I have felt compelled to say something on someone's
behalf.  Whether it's her dedication to the students, her truly amazing impact on the ACT scores for both
schools, or how much the students and parents here at UPSMHS truly love her, I hope you will
truly consider her reinstatement at U Prep Schools. Thank you very much for your time.

Stephen Hachigian
English Teacher and Junior Advisor
University Prep Science and Math High School



From: **Steve Hachigian** <hachigi2@gmail.com>
Date: Wed, May 21, 2014 at 8:21 AM
Subject: Re: Please Proofread Email and Attachment
To: Justine Sheu <jeun666@gmail.com>

On Wed, May 21, 2014 at 8:05 AM, Steve Hachigian <hachigi2@gmail.com> wrote:

Dear Friend,

I write to you from my personal email account because I have been locked out of my work email account. On Monday, May 19, I was suspended from work, asked to immediately relinquish my keys, computer, and phone, and am facing a likely termination pending an "investigation" into my professional character. The reasons cited were remarks I made in a presentation given to seniors at UPA Friday, May 16, and Margaret Trimer-Hartley's personal feelings about my style of interaction with students.

I wasn't given an adequate opportunity to respond or offer written testimony before I was told that I would be suspended. I have been told nothing about what the investigation will consist in. I hope that whatever investigation occurs is fair, transparent, and reflects the perspectives of all relevant parties, but I have grave concerns that this will not be the case and that I will be wrongfully terminated and defamed.

I am shocked and devastated. In the past year, I have given my all to serving my students to the very best of my ability as a college advisor and ACT prep teacher. I have enjoyed the most effort-laden yet rewarding year of my career thanks to the incredibly community of students, parents, and staff with whom and for whom I work. And now I fear that I will lose my reputation, my career, and my most valued asset - my students - under unjust circumstances.

Before a final decision is made regarding my employment, I am hopeful that the voices of students, parents, and staff members with whom I have worked with and who have most closely observed my professional character and instructional methods will be heard, as I believe they have the best perspective on my professionalism, my interactions with students, my teaching, and my impact on and service to the school.

Please, if you have the time and heart, take a moment to read the attached statement summarizing the circumstances of my suspension, my responses, and my request for your support. If you

would be willing to write an honest statement on my behalf attesting to my professional character, I would be deeply grateful. See the attachment for details.


Sincerely Yours,
Justine


--
**Justine J. Sheu**
College Success Advisor
University Prep Science and Math High School
University Preparatory Academy High School

# EXHIBIT 11

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "Agreement") is made effective as of July 1, 2012 by and between **DETROIT 90/90, LLC**, a Michigan nonprofit corporation ("Detroit 90/90") and **THE PUBLIC SCHOOL ACADEMIES OF DETROIT,** a Michigan public school academy (the "PSAD") formed under Part 6c of the Revised School Code, Public Act 451 of 1976 (the "Code"), as amended.

PSAD is an urban high school academy organized under the Code. PSAD has been issued a contract (the "Contract") by **GRAND VALLEY STATE UNIVERSITY BOARD OF TRUSTEES** (the "Authorizer") to organize and operate one or more urban high school academies.

PSAD and Detroit 90/90 desire to enter into an agreement, as defined in MCL 380.523c(2)(c), whereby PSAD and Detroit 90/90 will work together to deliver systems of educational excellence and services to PSAD and its University Preparatory Science and Math urban high school academy ("UPSM") based on the vision for the PSAD's urban high school academies as described in the Contract and Detroit 90/90's vision of school design, management principles, and the "Educational Program" (defined below).

THEREFORE, the parties agree as follows:

## ARTICLE I
## Relationship of the Parties and Other Matters

Section 1.     Authority. PSAD represents that (a) it is authorized by law to contract with an educational management organization for the provision of management and operational services to PSAD, and (b) PSAD has been issued the Contract from the Authorizer to organize and operate one or more urban high school academies. To the extent permitted by law, PSAD authorizes and grants to Detroit 90/90, the necessary authority and power to perform under this Agreement.

Section 2.     Services; Educational Program. The parties agree that Detroit 90/90, to the extent permitted by, and in conformity with, applicable laws, shall provide all labor, materials, and supervision necessary for the provision of comprehensive educational, administrative, management, and instructional services contemplated by this Agreement to PSAD (the "Services") as set forth below and as further set forth in Exhibit A hereto.

Detroit 90/90 shall provide Services to PSAD so PSAD can meet its obligations under the Contract and all other applicable law and to carry out the educational goals, curriculum, method of pupil assessment, admissions, policy and criteria, school calendar and school day schedule, and age and grade range of pupils to be enrolled, educational goals and methods to be used to monitor compliance with performance of targeted educational outcomes, as previously adopted by the PSAD Board of Directors ("Board") and as included in the Contract (collectively, the "Educational Program").

Section 3.   Compliance with the Contract.  Detroit 90/90 agrees to perform its duties and responsibilities under this Agreement in a manner that is consistent with PSAD's obligations under the Contract issued by the Authorizer. The provisions of the PSAD's Contract shall supersede any competing or conflicting provisions in this Agreement.

Section 4.   Relationship of the Parties.  Detroit 90/90 is not a division or any part of PSAD. PSAD is not a division or any part of Detroit 90/90 and is a separate corporate and governmental entity authorized under the Code.  The relationship between the parties was developed and entered into through arms-length negotiation and is based solely on the terms of this Agreement.

Section 5.   Detroit 90/90 as Independent Contractor; Agency.  In the performance of Services under this Agreement, Detroit 90/90 (its officers, directors, employees, and designated agents) shall be regarded at all times as performing services as independent contractors of PSAD. No agent or employee of Detroit 90/90 shall be determined to be an agent or employee of PSAD, except as expressly acknowledged, if at all, in writing, by PSAD.  Notwithstanding the foregoing, Detroit 90/90 and its staff are designated as agents of PSAD for the limited purpose of allowing them access to educational records under the Family Educational Rights and Privacy Act, 20 U.S.C. §1232(g), during the Term of this Agreement (defined below).

During the Term of this Agreement, PSAD may disclose confidential data and information to Detroit 90/90, and its respective officers, directors, employees and designated agents to the extent permitted by applicable law, including without limitation, the Individual with Disabilities Education Act ("IDEA"), 20 USC §1401 et seq., 34 CFR 300.610 -300.626; Section 504 of the Rehabilitation Act of 1973, 29 USC §794a, 34 CFR 104.36; the Michigan Mandatory Special Education Act, MCL 380.1701 et seq.; the American with Disabilities Act, 42 USC §12101 et seq.; the Health Insurance Portability and Accountability Act ("HIPAA"), 42 USC 1320d – 13200d-8; 45 CFR 160, 162 and 164; and social security numbers, as protected by the federal Privacy Act of 1974, 5 USC §552a; and the Michigan Social Security Number Privacy Act, MCL 445.84.

Detroit 90/90 will be solely responsible for its acts, the acts of its agents, employees, and those subcontractors who are contracted through Detroit 90/90.

Section 6.   No Related Parties or Common Control.  The parties agree that none of the voting power of the governing body of PSAD or the Board will be vested in Detroit 90/90 or its directors, members, managers, officers, shareholders, or employees.  Further, PSAD and Detroit 90/90 are not, and shall not become:  (a) members of the same controlled group, as that term is defined in the Internal Revenue Code of 1986, as amended (the "IRS Code"); or (b) related persons, as that term is defined in the IRS Code.

Section 7.   Teachers.  Teachers or staff employed or retained by Detroit 90/90 shall not be considered employees of PSAD or teachers for purposes of continuing tenure under MCL 38.71 et seq.

Section 8.   Chief Executive Officer.  Detroit 90/90 shall identify and retain a Chief Executive Officer ("CEO") for UPSM.  PSAD and Detroit 90/90 understand that they will also

2

enter into a similar educational management agreement respecting the operation of the PSAD University Preparatory Academy ("UPA") urban high school academy. The CEO for UPSM shall serve as the CEO for UPA. Detroit 90/90 shall provide periodic written updates about a CEO search to the Contract Administrator and PSAD. Detroit 90/90 shall not retain a CEO to which the Contract Administrator or PSAD objects. The CEO shall hold all required certifications as required by the Code. The CEO may be disciplined or terminated by Detroit 90/90 in its sole discretion. Detroit 90/90 shall notify the Board before the termination of the CEO. Detroit 90/90 will have the authority, consistent with applicable laws, to select and supervise the CEO and to hold the CEO accountable for the success of UPSM. Detroit 90/90 will empower the CEO with the authority to select and hold accountable the teachers and staff at UPSM.

Section 9.  <u>Criminal Background Checks.</u>  Detroit 90/90 agrees that it shall not assign any of its employees, agents or other individuals to perform any services under this Agreement except as permitted under Sections 1230, 1230a, 1230b and related provisions of the Code pertaining to criminal background and criminal conduct checks. Detroit 90/90 shall require that the results of the criminal background check are received, reviewed, and used (subject to a verification process) by the CEO acting on behalf of PSAD and/or the Board, only as permitted by law to confirm that the individual does not have a criminal history and to evaluate the qualifications of the individual for his/her assignment.

Section 10.  <u>Unprofessional Conduct Checks.</u>  Detroit 90/90 agrees that it will conduct unprofessional conduct checks, in accordance with MCL 380.1230b, before hiring an employee assigned to work at the UPSM worksite.

Section 11.  <u>Compliance with Section 523c.</u>  On an annual basis, Detroit 90/90 agrees to provide the UPSM Board with the same information that a school district is required to disclose under section 18(2) of the State School Aid Act of 1979, MCL 388.1618, for the most recent school fiscal year for which the information is available. Within thirty (30) days of receipt of this information, the UPSM Board shall make the information available on UPSM's website home page, in a form and manner prescribed by the Michigan Department of Education. The defined terms in section 523c of the Code, MCL 380.523c shall have the same meaning in this Agreement.

Section 12.  <u>The Board.</u>  The Board is the governing body with oversight responsibilities over PSAD. The parties acknowledge that throughout this Agreement the term "Board" and the term "PSAD" are sometimes used interchangeably in some sections for the sole purpose of readability based on the nature and subject-matter of the article/section.

Section 13.  <u>Availability of Funds.</u>  Detroit 90/90 shall be liable to PSAD for any cost it commits PSAD to without the Board's approval in the event such cost is beyond the amount in PSAD's budget or any amendment thereto. Detroit 90/90 shall only be required to perform its responsibilities under this Agreement to the extent PSAD has appropriated funds in its budget, as amended.

Section 14.  <u>Non-Compete Agreement.</u>  Detroit 90/90 agrees that it shall not impose any contractual requirement or contractual obligation on any of its teachers, support staff,

3

principals, agents or others under its employ, who are currently working to enter into a non-compete provision or agreement.

## ARTICLE II
### Term

This Agreement shall be effective for a three (3) year period beginning July 1, 2012 and ending June 30, 2015 (the "Term"), subject to earlier termination under Article VI.

## ARTICLE III
### Obligations of the Academy

Section 1.     Good Faith Obligation.  PSAD shall exercise good faith in considering recommendations by Detroit 90/90 relative to the Educational Program.

Section 2.     PSAD Funds.  The Board shall determine the depository of all funds received by PSAD including, but not limited to, the State School Aid and any Additional Revenue.  All funds received by PSAD shall be deposited in PSAD's depository account. Signatories on the depository account shall be members of the Board or properly designated Board agents, which may include employees or agents of Detroit 90/90.  All interest or investment earnings on PSAD deposits shall accrue to PSAD.

Section 3.     Building Facilities.  PSAD shall provide reasonable access, at no cost, to the Building Facilities as described in the Contract to Detroit 90/90 for the provision of Services and the Educational Program.

## ARTICLE IV
### Compensation and Reimbursement of Costs

Section 1.     Compensation for Services.  During the first year of the Term of this Agreement, the Board shall pay Detroit 90/90 an annual fee equal to twelve and four tenths percent (12.4%) of the total aid received by PSAD attributed to UPSM from the state of Michigan, pursuant to the State School Aid Act of 1979, as amended, for the particular number of students enrolled in PSAD after deduction of the fee payable to Grand Valley State University pursuant to PSAD's Charter Contract (the "Fee").  Detroit 90/90 shall receive the Fee in twelve (12) installments of approximately equal monthly amounts beginning in July of each academic year and ending in the following June.

The parties agree that the Fee amount is reasonable compensation for the provision of the Services and Detroit 90/90's incurring of non-reimbursable expenses of the types and classifications, and in the amounts, set forth in **Schedule A** (the "Fee Budget"), as adjusted for each year of the Term.  PSAD and Detroit 90/90 agree to make adjustments to the Fee as necessary because of factors such as differences in actual and projected enrollments, differences between actual and projected operating expenses and funding changes mandated by federal, state or municipal sources.  At no time shall the Fee be less than $450,000.00 annually or greater than $900,000.00 annually.   The Fee shall be Detroit 90/90's sole compensation under this Agreement.  For each subsequent year of the Term of this Agreement, the Fee shall change based

4

on the applicable Fee Budget for such year of the Term, as agreed between Detroit 90/90 and PSAD.

In the event Detroit 90/90 incurs expenses in amounts less than those set forth in the applicable Fee Budget in any type or classification, resulting in a surplus (a "Budget Surplus") for any year of the Term, Detroit 90/90 shall make a proposal to PSAD for disposition of the Budget Surplus for such year of the Term for PSAD's review and approval. PSAD and Detroit 90/90 must mutually agree to the disposition of the Budget Surplus for such year of the Term. If the parties do not mutually agree to the disposition of the Budget Surplus for such year of the Term after informal discussion, the parties shall participate in mediation and, arbitration, if the matter is not resolved, as set forth in Article X of this Agreement. In the event Detroit 90/90 incurs expenses in amounts more than those set forth in the applicable Fee Budget in any type or classification, resulting in a deficit (a "Budget Deficit") for any year of the Term, Detroit 90/90 shall make a proposal to PSAD for an adjustment for the applicable Fee for such year of the Term for PSAD's review and approval. PSAD and Detroit 90/90 must mutually agree to the proposal for an adjustment for the applicable Fee in the event of a Budget Deficit for any year of the Term. If the parties to not mutually agree to the adjustment for the applicable Fee in the event of a Budget Deficit for any year of the Term after informal discussion, the parties shall participate in mediation and, arbitration, if the matter is not resolved, as set forth in Article X of this Agreement. Notwithstanding the foregoing, Detroit 90/90 shall give PSAD written notice not less than fifteen (15) days after becoming aware of a potential Budget Deficit.

Upon receipt of PSAD State Aid funds, PSAD shall immediately deposit those funds in an account mutually agreed upon by the parties and administered by the CEO of Detroit 90/90.

Section 2.    Reimbursement of Costs. In addition to the Fee, PSAD shall reimburse Detroit 90/90 for all costs reasonably incurred and paid by Detroit 90/90 in providing the Services specifically related to PSAD except for those costs which are included in the applicable Fee Budget. Such reimbursable costs include, but are not limited to, certain employment or retention costs of Detroit 90/90 employees or staff assigned to UPSM, other expenses for building facilities, equipment, software, supplies, food service, transportation, special education, psychological services, and medical services. Detroit 90/90 will invoice PSAD for reimbursement of certain employment or staff costs of Detroit 90/90 employees or staff assigned to UPSM. Detroit 90/90 will invoice PSAD for reimbursement of all other costs not included in the applicable Fee Budget with a detailed receipt of material or services provided. PSAD shall only reimburse for costs included in an annual operating budget approved by the Board or as amended during the academic year. In paying such costs on behalf of PSAD, Detroit 90/90 shall not charge an added fee (or mark-up). Marketing and development costs paid by or charged to PSAD shall be limited to those costs specific to UPSM. Detroit 90/90 shall not include any costs for the marketing and development of Detroit 90/90 nor any other corporate costs of Detroit 90/90, including but not limited to insurance, audit, legal other corporate compliance expenses, or miscellaneous costs that are too detailed and burdensome to attribute to UPSM. All such non-reimbursable costs are the responsibility of Detroit 90/90 and shall be paid out of the Fee or such other revenue of Detroit 90/90. A complete description of costs that are not to be allocated to PSAD and UPSM are included in the Fee Budget.

If desired, PSAD may advance funds to Detroit 90/90 for such costs before such costs are incurred (rather than reimburse Detroit 90/90 after the expense is incurred). Detroit 90/90 shall provide to PSAD or the Board proper documentation and accounting of any advanced funds or reimbursement, and such accounting shall be periodically ratified by PSAD.

All items acquired with PSAD funds including, but not limited to, instructional materials, equipment, supplies, furniture, computers, and all other technology, shall be owned by and remain the property of PSAD.

Detroit 90/90 shall not obligate PSAD to any loan, financing arrangement, or lease whether or not in Detroit 90/90's name for the benefit of PSAD without the prior written approval of PSAD and in accordance with the Contract.

Section 3.    Review of Budget.  Detroit 90/90 shall timely prepare and propose an annual budget and all appropriate amendments in accordance with applicable law for UPSM and the Board's review and consideration.

Section 4.    Procurement Policies.  The Board retains the obligation, as provided in Section 1274 of the Code, to adopt written policies governing the procurement of supplies, materials, and equipment to PSAD.  Unless otherwise prohibited by law, Detroit 90/90 shall directly procure all supplies, materials, and equipment provided that Detroit 90/90 complies with Section 1274 of the Code, and the Board's written policies promulgated thereunder related to such items.

## ARTICLE V
## Proprietary Information

Section 1.    PSAD's Rights to Curriculum and Educational Materials.  PSAD shall own, without restriction, all proprietary rights to curriculum and educational materials used at UPSM, including but not limited to such materials developed during the Term or paid for with PSAD funds.

Section 2.    Detroit 90/90's Rights to Curriculum and Educational Materials.  Detroit 90/90 shall own, without restriction, all curriculum and educational materials, and all other proprietary information owned by, developed by or otherwise in the possession of Detroit 90/90, except as set forth in this Article.

Section 3.    Non-Disclosure of Proprietary Information; Remedy for Breach.  Except as specifically required by the Code or the Michigan Freedom of Information Act, the proprietary information and materials of either party shall be held in strict confidence by the other party to this Agreement.

## ARTICLE VI
## Termination

Section 1.    Termination by Detroit 90/90.  Detroit 90/90 may terminate this Agreement before the end of the Term in the event PSAD fails to remedy a material breach within the required time frames below.  A material breach includes, but is not limited to, (a)

6

PSAD's failure to timely remit the Fee, all payroll costs, or any reimbursement due to Detroit 90/90. PSAD has thirty (30) days after notice from Detroit 90/90 to remedy a breach that involves the advancement of funds for all compensation required for payroll or to reach an agreement with Detroit 90/90 on the payment of those funds.

Termination before the end of the Term shall not relieve PSAD of any financial or other obligations to Detroit 90/90 outstanding as of the date of termination. Failure by Detroit 90/90 to (a) declare a breach, (b) place PSAD on notice thereof, or (c) fail to exercise or exert any remedy available to Detroit 90/90 under this Agreement or applicable laws, shall not be deemed a waiver of Detroit 90/90's right and remedies whatsoever.

Section 2.    Termination by PSAD.  PSAD may terminate this Agreement before the end of the Term in the event that Detroit 90/90 fails to remedy a material breach within the required time frames below.  A material breach includes, but is not limited to:

a.    Failure by Detroit 90/90 to reasonably account for its expenditures;

b.    Failure by Detroit 90/90 to pay PSAD operating expenses as required under this Agreement (provided funds are available);

c.    Failure by Detroit 90/90 to substantially follow policies, procedures, rules, regulations, or curriculum duly adopted by the Board which are not in violation of applicable laws or this Agreement;

d.    Failure by Detroit 90/90 to provide the Services as required by this Agreement; and/or

e.    Any action or inaction by Detroit 90/90 that places the Contract in jeopardy of revocation, suspension or termination, as evidenced by written notification from the Authorizer.

f.    Failure to meet the educational performance requirements in the Contract, any lease agreement entered into by PSAD for the operation of UPSM, or in **Schedule B** to this Agreement.

Detroit 90/90 has ten (10) days after notice from PSAD to remedy a breach that involves the non-payment of funds for all "compensation" required for payroll (provided that Detroit 90/90 has received such funds from PSAD to do so) or to reach an agreement with PSAD on the payment of those funds.  Detroit 90/90 has thirty (30) days after written notice from PSAD to remedy all other material breaches.

Either party may also terminate this Agreement without cause before the end of the Term by giving written notice of termination to the other party by December 1 of a particular year, and unless otherwise agreed to by the parties, the termination shall be effective as of June 30 of the following year.  Notice of termination provided after December 1 shall not be effective until one year after June 30 of the following year.

7

Section 3. <u>Revocation or Termination of Contract</u>. If the Contract, as it relates to UPSM only, issued by the Authorizer is revoked or terminated or a new charter contract is not issued or obtained, this Agreement shall automatically terminate on the same date as the Contract is revoked or terminated without further action of the parties, provided, however, that this Agreement will continue to remain in effect until the termination date set forth in Article II if (i) PSAD has entered into a subsequent contract with an authorizing body, and (ii) this Agreement has not been terminated pursuant to Article VI.

Section 4. <u>Change in Law</u>. If any federal, state or local law or regulation, or court or administrative decision, or attorney general's opinion (collectively referred to in this Agreement as the "applicable laws") has a substantial and material adverse impact (as reasonably determined by the party suffering the impact) on the ability of the impacted party to carry out its obligations under this Agreement, then the impacted party, upon written notice, may request a renegotiation of this Agreement. If the parties are unable or unwilling to successfully renegotiate the terms of this Agreement within ninety (90) days after the notice, and after making good faith efforts which shall include, but not be limited to, the use of a third party arbitrator and/or alternative dispute resolution process, the impacted party may terminate this Agreement as of the end of the then-current academic year.

Section 5. <u>Transition</u>. In the event of any termination or expiration of this Agreement, Detroit 90/90 shall provide PSAD reasonable assistance for up to ninety (90) days to assist in the orderly transition away from Detroit 90/90 as the educational management company, or to another educational management company, in whole or in part. Such reasonable assistance shall include but is not limited to the following: Detroit 90/90 shall make staff reasonably available to provide PSAD or Detroit 90/90's successor as educational management company with all information and access to such records and information necessary for the ongoing operation of UPSM. Until the expiration of the transition period, Detroit 90/90 shall ensure that PSAD will have timely, reasonable access to all information, systems, electronic databases (including passcodes and electronic keys) necessary to ensure orderly transition including but not limited to the following, to the extent reasonably accessible by Detroit 90/90: all student records; school database and information systems; all free and reduced lunch records/reports; financial and facilities information, vendor subcontracts and other administrative records necessary for school management and operations.

Moreover, after any notice of termination is provided by either party, Detroit 90/90 shall not initiate contact with (i) the parents and legal guardians or students of PSAD directly or indirectly to promote or recruit enrollment for other schools other than PSAD; or (ii) any employee or independent contractor who currently works at or for the educational or administrative operation or management of UPSM to hire or retain any employee or independent contractor of a person who currently works at or for the educational or administrative operation or management of UPSM.

Moreover, after any notice of termination is provided by either party and until the effective date of termination of this Agreement, Detroit 90/90 shall undertake the following:

1. carry out its obligations under this Agreement in the ordinary course of business;

8

2. use its best efforts to maintain its relations and good will with suppliers, customers, landlords, creditors, employees, agents and others having business relationships with it.

3. make no material changes in administrative, operational, or management personnel, including the chief administrative officer, superintendent for UPSM, principals for each of the UPSM schools, or teaching staff without prior written approval of PSAD.

4. use its best efforts not to disturb UPSM's relations and good will with parents, students and the educational community relating to the operation and management of UPSM and otherwise comply with this Agreement;

5. comply with all legal requirements and contractual obligations assigned to it applicable to the operations of UPSM;

6. continue in full force and effect all required insurance coverages;

7. cooperate with PSAD in identifying the governmental authorizations or other approvals including but not limited to those regarding UPSM facilities, required by PSAD to operate UPSM; and

8. prepare and provide to PSAD within thirty (30) days of the provision of notice of termination, at Detroit 90/90's own expense, a draft transition agreement which shall specifically detail and plan for each and every transition issue and provide a timeline for addressing each issue.

Section 6.    Personal Property upon Termination or Expiration.  Upon any termination or the expiration of this Agreement, PSAD may elect (a) to purchase any personal property which has been purchased or leased from a third party solely with Detroit 90/90 funds, provided such purchase or lease is permitted under the purchase or lease documents relating thereto, at the fair market, depreciated value of such personal property or (b) to return same to Detroit 90/90. All personal property purchased or leased by Detroit 90/90 using PSAD funds shall remain the personal property of PSAD.  PSAD shall own, without restriction, all property, tangible and intangible, purchased, licensed, or acquired in any fashion by or for PSAD, or by or with PSAD funds.

Section 7.    Obligations Upon Termination or Expiration.    Upon any termination or the expiration of this Agreement, the parties shall remain obligated for all financial or other obligations due at the time of the termination or expiration.   After any termination or the expiration of this Agreement, and once all such obligations referenced above are satisfied, the parties shall have no further obligations to each other under this Agreement whatsoever except for the continuing obligations under (a) Article V (confidentiality and non-use/non-disclosure of proprietary information) and (b) Article VII (indemnification).

# ARTICLE VII
## Indemnification & Cooperation

Section 1.    Indemnification of Detroit 90/90.  To the extent permitted by law and without waiving any privilege or immunity, PSAD shall indemnify and save and hold Detroit

9

90/90 and all of its employees, officers, directors, subcontractors and agents, harmless against any and all claims, demands, suits or other forms of liability that may be caused by any negligent or intentional misconduct by PSAD, its officers, directors, employees, subcontractors and agents, or by any failure to act or any omission that causes harm to Detroit 90/90 arising out of this Agreement. In addition, to the extent permitted by law, PSAD shall reimburse Detroit 90/90 for all legal costs and reasonable attorney fees associated with the defense of any such claim, demand or suit. If desired, all or part of the indemnification obligations set forth in this Section 1, may be met by the purchase of insurance by PSAD.

Section 2. <u>Immunities and Limitations</u>. PSAD may assert all privileges; immunities and statutory limitations of liability in connection with any claims arising under this Agreement.

Section 3. <u>Indemnification of PSAD</u>. Detroit 90/90 shall indemnify and save and hold PSAD and all of its employees, officers, directors, subcontractors and agents harmless against any and all claims, demands, suits or other forms of liability that may be caused by any negligent or intentional misconduct by Detroit 90/90, its officers, directors, employees, subcontractors and agents, or by any failure to act or omission by Detroit 90/90 that causes harm to PSAD arising out of this Agreement. In addition, Detroit 90/90 shall reimburse PSAD for all legal costs and reasonable attorney fees associated with the defense of any such claim, demand or suit. If desired, all or part of the indemnification obligations set forth in this section may be met by the purchase of insurance by Detroit 90/90.

Section 4. <u>Mutual Duty to Cooperate.</u> The parties acknowledge that each party has a duty and obligation to cooperate with the other party, and further that such duty to cooperate is a material part of this Agreement.

Section 5. <u>Indemnification of the Authorizer</u>. The parties acknowledge and agree that the Grand Valley State University Board of Trustees, Grand Valley State University and its members, offices, employees, agents or representatives are deemed to be third party beneficiaries for purposes of this Agreement. As third party beneficiaries, the parties hereby promise to indemnify and hold harmless Grand Valley State University Board of Trustees, Grand Valley State University and its members, offices, employees, agents or representatives from all claims, demands, or liability, including attorney fees, and related expenses, on account of injury, loss or damage, including, without limitation, claims arising from bodily injury, personal injury, sickness, disease, death, property loss or damage or any other losses of any kind whatsoever and not caused by the sole negligence of Grand Valley State University, which arise out of or are in any manner connected with Grand Valley State University Board of Trustees' approval of PSAD's public school academy application, the University Board's consideration of or issuance of a Contract, PSAD's preparation for and operation of a public school, or which are incurred as a result of the reliance by Grand Valley State University and its Board of Trustees members, officers, employees, agents or representatives upon information supplied by PSAD or Detroit 90/90, or which arises out of the failure of PSAD to perform its obligations under the Contract. The parties expressly acknowledge and agree that Grand Valley State University and its Board of Trustee members, officers, employees, agents or representatives may commence legal action against either party to enforce its rights as set forth in this Agreement.

10

## ARTICLE VIII
### Insurance

Section 1.    <u>Academy Insurance</u>.  PSAD shall maintain such policies of insurance coverage in the amounts as required by the Contract.  PSAD agrees to add Detroit 90/90 as an additional insured on all policies.

Section 2.    <u>Detroit 90/90 Insurance</u>.  Detroit 90/90 shall maintain separate general liability and umbrella insurance coverage, with PSAD listed as an additional insured on all policies.  Detroit 90/90 shall maintain such policies of insurance in the amounts as required by the Contract and any lease agreement entered into by PSAD for the operation of UPSM.

Section 3.    <u>Evidence and Notices</u>.  Each party shall, upon written request, present evidence to the other that it maintains the requisite insurance.

Section 4.    <u>Workers' Compensation Coverage</u>.    Additionally, each party shall maintain workers' compensation insurance, as required by state law, covering their respective employees, if any.

## ARTICLE IX
### Warranties and Representations

Section 1.    <u>Warranties and Representations of PSAD</u>.  PSAD represents to Detroit 90/90 that it has the authority under law to execute, deliver and perform this Agreement and to incur the obligations provided for under this Agreement, and its actions have been duly and validly authorized.

Section 2.    <u>Good Standing</u>.  Detroit 90/90 represents and warrants to PSAD that (a) it is a Michigan limited liability company in good standing duly authorized to conduct business in the state of Michigan, (b) it has the authority under applicable laws to execute, deliver and perform this Agreement and to incur the obligations provided for under this Agreement, (c) its actions have been duly and validly authorized, and (d) it will adopt any and all resolutions required for execution of this Agreement.

Section 3.    <u>Contract Administrator</u>.    Detroit 90/90 represents and warrants that it has a thorough understanding of the Contract Administration Agreement entered into by PSAD and the Contract Administrator dated August 28, 2008 as provided by the Contract and the Code and that Detroit 90/90 shall cooperate in such a manner so as to allow PSAD and the Contract Administrator to comply with their respective obligations and exercise their respective rights under the Contract Administration Agreement.

Section 4.    <u>Facilities</u>.    Detroit 90/90 represents and warrants that it has a thorough understanding of the facilities that are provided by PSAD, and all applicable documentation including lease agreements, certificate of occupancy, and all other permits, to operate UPSM and that such facilities allow Detroit 90/90 to undertake and meet its obligations herein.

Section 5.    <u>Other Schools</u>.    Detroit 90/90 represents and warrants that, other than entering into an educational management agreement with PSAD for the operation of UPSM

11

or UPSM, it shall not operate any other school or third party programs, including but not limited to a pre-K school, a public school, a private school, a public school academy, an urban high school academy, a trade school, or an institution of high learning, without the express written consent of PSAD and the Contract Administrator.

Section 6.  Change in Control.  Detroit 90/90 represents and warrants that it will not amend its articles of incorporation or bylaws without thirty (30) days written notice to PSAD of the proposed Detroit 90/90 amendment(s) to the articles of incorporation or bylaws.  PSAD has ten (30) days to respond to the proposed amendment(s) before the proposed amendment(s) become effective.  Detroit 90/90 understands and agrees that any amendments to its articles of incorporation or bylaws will not materially impact Detroit 90/90's ability to fulfill its obligations under this Agreement.  Detroit 90/90 will provide PSAD and the Contact Administrator with a listing of its current directors, their board titles and their terms of office as of July 1, 2012. Detroit 90/90 will provide PSAD and the Contract Administrator with timely notice of any director resignations.  Prior to the election of any new or replacement directors or appointment changes in board positions, Detroit 90/90 will provide PSAD and the Contract Administrator with timely notice of such pending appointments.

Section 7.  Naming Rights and Intellectual Property.  Detroit 90/90 represents and warrants that it shall not use, or apply for federal trademark status, any UPA or UPSM names or marks or substantially similar names or marks in its operation or management of any other school. This includes but is not limited to "UPA," "University Prep." "University Preparatory," "University Preparatory Academy," "UPA," "UPREP," "Uprep," "University Prep Science & Math," and "UPSM," and Detroit 90/90 shall be prohibited from using any of the following: (i) any name containing "University Preparatory" followed by the word "Academy,"  the words "Science and "Math" or any name the acronym of which would be "UPA" or "UPSM"; and  (ii) any name containing "University Prep" followed by the word "Academy,"  the words "Science and "Math" or any name the acronym of which would be "UPA" or "UPSM"; and (iii) "UPA", "UPSM" or "UPREP" or "Uprep" in any e-mail domains or web addresses; provided, however, that the term "Uprep" may be used as a shorthand or informal reference in marketing communications.  Detroit 90/90

## ARTICLE X
## Alternative Dispute Resolution

Section 1.  Mediation.  Any and all disputes between the parties concerning any alleged breach of this Agreement or arising out of or relating to the interpretation of this Agreement or the parties' performance of their respective obligations under this Agreement shall first be discussed informally between the parties.  In the event that the parties cannot resolve their dispute, the matter shall be submitted to mediation for resolution in Wayne or Oakland County. Both parties must mutually agree upon the mediator selected and shall participate in all meetings in good faith.  The mediation shall be conducted in accordance with the rules of the American Arbitration Association seated in Wayne or Oakland County, Michigan, with such variations as the parties and arbitrators unanimously accept.  The parties will share equally in the costs of the mediation including forum fees, expenses and charges of the mediator.

12

Section 2.    Arbitration.  If the mediation does not result in a mutually satisfactory compromise, then the matter shall be resolved by arbitration, and such procedure shall be the sole and exclusive remedy for such matters, except for the pursuit of injunctive or equitable relief.  Any dispute, difference, or disagreement arising under or related to this Agreement shall be referred to a single arbitrator, mutually agreed upon by the parties, or if no single arbitrator can be agreed upon, an arbitrator shall be selected in accordance with the rules of the American Arbitration Association and such dispute, difference, or disagreement shall be settled by arbitration in accordance with the then prevailing Commercial Rules of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.  All arbitration proceedings shall take place exclusively in the State of Michigan in Wayne or Oakland County, Michigan.  If the parties are unable to agree on a mutual location for the arbitration, the arbitration shall take place at the Southfield Office of the American Arbitration Association.  The arbitrator's award shall be final and binding.  Each party shall be responsible for their own costs and attorneys' fees.

## ARTICLE XI
## Miscellaneous

Section 1.    Entire Agreement.  This Agreement supersedes and replaces any and all prior written or oral agreements and understandings between PSAD and Detroit 90/90 regarding the subject matter hereof.  This Agreement, including all Exhibits and Schedules, constitutes the entire agreement of the parties.

Section 2.    Force Majeure.  Notwithstanding any other sections of this Agreement, neither party shall be liable for any delay in performance or inability to perform due to acts of God or due to war, riot, embargo, fire, explosion, sabotage, accident, labor strike, flood, terrorism, or other acts beyond its reasonable control.

Section 3.    Governing Law.  This Agreement and the rights of the parties shall be interpreted according to the laws of the state of Michigan.

Section 4.    Official Notices.  All notices or other communications required by the terms of this Agreement shall be in writing and sent to the parties at the addresses set forth below.  Notice may be given by certified or registered mail, postage prepaid, return receipt requested, traceable carrier or personal delivery.  Notices shall be deemed to have been given on the date of personal delivery, or, if given by mail, the postmark date.  Unless amended or updated in writing, the addresses of the parties hereto for the purposes of this Agreement shall be:

PSAD:                         The Public School Academies of Detroit
                              c/o Board President
                              610 Antoinette
                              Detroit, MI 48202

                              and

13

                                    Contract Administrator
                                    P.O. Box 2349
                                    Plymouth, MI 48170

        with a copy to:            Peter H. Webster, Esq.
                                    Dickinson Wright PLLC
                                    2600 W. Big Beaver Road, Suite 300
                                    Troy, MI 48084-3312

        Detroit 90/90:             Detroit 90/90
                                    c/o President
                                    610 Antoinette Street
                                    Detroit, MI 48202

        With a copy to:            Reginald M. Turner
                                    Clark Hill PLC
                                    500 Woodward Avenue, Suite 3500
                                    Detroit, MI 48226-3435

        Section 5.    Assignment.  This Agreement shall not be assigned (a) by Detroit 90/90, without prior consent of the Board, in writing, which consent shall not be unreasonably withheld; or (b) by PSAD, without the prior consent of Detroit 90/90, in writing, which consent shall not be unreasonably withheld and in a manner consistent with the Authorizer's educational management company policies.

        Section 6.    Amendment; Effect of Headings.  This Agreement may only be amended in writing, signed by a duly authorized representative of each party and in a manner consistent with the Authorizer's educational management company policies.  The underlined headings are included for convenience of the reader, and if the underlined headings are inconsistent with the other text the underlined text shall be disregarded.

        Section 7.    Tax Exempt Financing.  If at any time PSAD determines that it is in the best interests of PSAD to obtain financing that is tax-exempt pursuant to the IRS Code, then the parties agree that this Agreement shall be automatically amended for the sole and limited purpose of compliance with Revenue Procedure 97-13.  Any such automatic amendment shall be as limited as practicable, and the parties shall promptly execute a written agreement reflecting such amendment, but the failure of the parties to do so shall not affect the effectiveness of the automatic amendment referenced above.

        Section 8.    Waiver.  No waiver of any portion of this Agreement shall be deemed or shall constitute a waiver of any other provision, nor shall such waiver constitute a continuing waiver unless otherwise expressly stated in writing.

        Section 9.    Severability.  The invalidity of any portion or term of this Agreement shall not affect the remaining portions or terms of this Agreement.  In the event a portion or a term of this Agreement is deemed invalid, the parties shall cooperatively work together to modify the

                                            14

invalid portion or term as minimally as possible to cure the invalidity, while at all times preserving the spirit and purpose of the applicable portion or term.

Section 10.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

Section 11.    No Third Party Rights.  This Agreement is made for the sole benefit of PSAD and Detroit 90/90.  Except as otherwise expressly provided herein, nothing in this Agreement shall create or be deemed to create a relationship between the parties, or either of them individually with any third person, third party beneficiary, fiduciary, or the Authorizer.

Section 12.    Survival of Termination.  All representations, warranties, indemnities, and non-disclosures/confidentiality obligations made in this Agreement shall survive any termination or expiration of this Agreement without limitation.

Section 13.    Delegation of Authority; Compliance with Laws.    Nothing in this Agreement shall be construed as delegating to Detroit 90/90 any of the powers or authority of the Board which are not subject to delegation by the Board in accordance with all applicable laws. The parties agree to comply with all applicable laws.

Section 14.    Execution in Counterparts.  The parties may execute this Agreement by facsimile or in counterparts.  A facsimile or photographic copy of this Agreement may be relied upon by either party, or any third party, as if it were an original signature copy.  If this Agreement is executed in counterparts, the separate counterpart signature pages shall be combined and treated by the parties, or any third party, as if the separate counterpart signature pages were part of one original signature copy.

Section 15.    Review by Independent Counsel.    The parties agree that each has reviewed, or had the opportunity to review, this Agreement with its own independent legal counsel prior to the execution of this Agreement.

[Signature Page Follows]

15

The undersigned execute this Agreement as of the date set forth above.

**PUBLIC SCHOOL ACADEMIES OF DETROIT**, a Michigan nonprofit corporation

By _____
   Edward Parks, President

**DETROIT 90/90**, a Michigan nonprofit corporation

By _____
   Dr. Glenda Price, President

16

**EXHIBIT A**
**TO**
**INDEPENDENT CONTRACTOR AGREEMENT**

The purpose of this Exhibit A is to set forth and define the Services to be provided by Detroit 90/90 pursuant to the Agreement.

**EDUCATIONAL MANAGEMENT SERVICES**
**TO BE PROVIDED BY DETROIT 90/90, LLC**

A.      Detroit 90/90 shall implement the Educational Program (defined in Article I, Section 2 of the Agreement). Substantial modification of the Educational Program may only occur with the prior written consent of the Board and, if required, an amendment to the Contract which requires Authorizer approval.

B.      Detroit 90/90 may perform functions other than instruction, including but not limited to purchasing, professional development and administrative functions off-site (i.e., not on PSAD property), unless prohibited by applicable laws. Student records are the property of PSAD shall be maintained by Detroit 90/90 at the corresponding PSAD UPSM's sites.

C.      Although the Board shall be responsible for establishing and implementing recruitment admission policies in accordance with the Educational Program and the Contract, Detroit 90/90 shall enroll students for PSAD in accordance with such policies provided that the policies are in compliance with the contract and applicable laws.

D.      Detroit 90/90 shall provide student due process hearings in compliance with all applicable laws, to an extent consistent with PSAD's own obligations as to students only (and not as to faculty).

E.      Detroit 90/90 shall administer and provide the Educational Program in a manner which shall meet federal, state and local requirements, the requirements imposed under the Code and the Contract, and all lease provisions entered into by PSAD for the operation of UPSM.

F.      In order to supplement and enhance the school aid payments received from the state of Michigan, and improve the quality of education at UPSM, Detroit 90/90 shall assist PSAD's endeavors to obtain revenue from other sources (the "Funding Sources"), and in this regard:

  1. PSAD and/or Detroit 90/90 may solicit grants and donations in the name of PSAD from various Funding Sources consistent with the mission of PSAD in furtherance of the Educational Program;
  2. PSAD and/or Detroit 90/90 only after written notice to PSAD may apply for and receive grant money in the name of PSAD from various Funding Sources in furtherance of the Educational Program;
  3. PSAD and/or Detroit 90/90 only with prior Board approval may apply for and receive grant money in the name of PSAD from various Funding Sources for activities outside of the Educational Program.

4. To the extent permitted under the Code and Contract, and with the approval of the Board, PSAD may charge fees to students for extra services, such as summer and after-school programs, athletics, etc., and charge non-PSAD students who participate in such programs;

5. All funds, other consideration, or property purchased with such funds, received by PSAD, or Detroit 90/90 on behalf of PSAD, from such other revenue sources (generally the "Additional Revenue") shall inure to, and be the deemed property of, PSAD.

6. Detroit 90/90 shall provide bimonthly reports to PSAD regarding any grant requests for applications, grant application or grant administration status relating to grants or grant applications relating to UPSM.

G.    Detroit 90/90 may subcontract, with the prior written approval of PSAD, which approval shall not unreasonably be withheld, any and all aspects of the Services, including, but not limited to, food service. However, Detroit 90/90 shall not mark up any costs related to providing the Services.

H.    Detroit 90/90 agrees to perform its duties and responsibilities under this Agreement in a manner that is consistent with PSAD's obligations under its Contract issued by Grand Valley State University Board of Trustees. The provisions of PSAD's Contract shall supersede any competing or conflicting provisions contained in this Agreement.

I.    Detroit 90/90 shall timely provide reasonably requested or expected information to the Board on a monthly basis, or upon the Board's reasonable request, to enable the Board to monitor Detroit 90/90's performance under this Agreement.

J.    Detroit 90/90 shall implement pupil performance evaluations consistent with the Educational Program, which permit evaluation of the educational progress of each PSAD student. Detroit 90/90 shall be responsible for and accountable to the Board for the performance of students who attend PSAD and shall meet the educational performance requirements of the Contract and any lease provision entered into by PSAD for the UPSM facilities. At a minimum, Detroit 90/90 shall utilize assessment strategies required by the Educational Program and the Authorizer. PSAD and Detroit 90/90 will cooperate in good faith to identify other measures of and goals for students and school performance. Such other measures of and goals for students and school performance shall be initially identified in a signed writing by the parties and the Contract Administrator by September 10, 2012 and shall be included as **Schedule B** to this Agreement.

K.    Detroit 90/90 shall plan and supervise special education services to students who attend UPSM. Detroit 90/90 may subcontract these services if it determines that it is necessary and appropriate for the provision of services to students with special needs, or if instruction cannot be met within UPSM's program. Such services shall be provided in a manner that complies with applicable laws.

## BUSINESS/FINANCE SERVICES
## TO BE PROVIDED BY DETROIT 90/90, LLC

L.     Detroit 90/90 shall be directly accountable to the Board for the administration, operation and performance of UPSM in accordance with the Contract. Detroit 90/90 shall not expend UPSM funds in excess of the amount set forth in the PSAD Budget, as amended.

M.     Detroit 90/90 shall be responsible for all of the management, operation, administration and education at UPSM which includes, but is not limited to:

1. implementation and administration of the Educational Program, including administration of any and all extra-curricular and co-curricular activities and programs, and the selection and acquisition of instructional materials, equipment and supplies;
2. management of all personnel functions, including professional development for all instructional personnel and the personnel functions outlined in this Agreement;
3. aspects of the business administration (as determined as generally understood in the industry) of UPSM as agreed between Detroit 90/90 and the Board;
4. any function necessary or expedient for the administration of UPSM consistent with the Educational Program, or otherwise approved by the Board.

N.     Except as otherwise provided in this Agreement, Detroit 90/90 shall keep all student and financial records relating to UPSM at the respective UPSM site, and the same shall be available for public inspection upon reasonable request consistent with applicable laws. All student and financial records will remain the property of PSAD.

O.     Detroit 90/90 shall provide the Board with:
1. a projected annual budget that complies with applicable law before June 1st of each school year, related to the Services in accordance with the Contract and the Educational Program;
2. detailed monthly statements (in a form and as requested by the Board) of all revenues received, from whatever source, with respect to PSAD, and detailed budgets with statements of all direct expenditures (with details) for the Services rendered to or on behalf of PSAD, whether incurred on-site or off-site;
3. facilitate the annual audit in compliance with applicable laws showing the manner in which funds are spent at PSAD, however, it is acknowledged that only PSAD shall select and retain auditors and PSAD shall contract directly with any auditor of its choice, and Detroit 90/90 will cooperate with the production of any and all documents necessary for the audit. Any such audit and audit materials shall be the property of PSAD; and
4. other information as reasonably requested by the Board to enable the Board to monitor Detroit 90/90's performance under the Agreement.

P.     Reporting Requirements. Detroit 90/90 shall provide to the Board at least annually the following information to ensure that PSAD can comply with the following statutory reporting requirements, including, but not limited to, MCL 380.523c and MCL 380.1618 and the following:

3

1. Each health care benefits plan, including, but not limited to, medical, dental, vision, disability, long-term care, or any other type of benefits that would constitute health care services, offered to any employee at the Academy.

2. The PSAD audit report conducted for the most recent fiscal year for which it is available.

3. The bids required under section 5 of the public employee health benefits act, 2007 PA 106, MCL 124.75.

4. The total salary and a description and cost of each fringe benefit included in the compensation package for the superintendent of the district and for each employee of the district whose salary exceeds $100,000.00.

5. The annual amount spent on dues paid to associations.

6. The annual amount spent on lobbying or lobbying services. As used in this subdivision, "lobbying" means that term as defined in section 5 of 1978 PA 472, MCL 4.415.

7. All of the same information that a school district is required to disclose under section 18(2) of the state school aid act of 1979, MCL 388.1618, for the most recent school fiscal year for which that information is available, and make all of such information available through a link on the UPSM website homepage, in a form and manner prescribed by the Michigan Department of Education.

## HUMAN RESOURCES SERVICES
## TO BE PROVIDED BY
## DETROIT 90/90, LLC

Q.    Detroit 90/90 shall recommend staffing levels, and select, evaluate, assign, discipline and transfer personnel, consistent with applicable laws, and consistent with the parameters adopted and included within the Educational Program.

R.    Detroit 90/90 shall provide PSAD with such teachers, qualified in the applicable grade levels and subjects approved by the Board and consistent with the Contract. Detroit 90/90 shall ensure that the curriculum taught by PSAD's teachers is the curriculum set forth in the Contract. Such teachers may also provide instruction at PSAD on a full or part time basis. If assigned to PSAD on a part-time basis, such teachers may also provide instruction at another institution, or other locations approved by Detroit 90/90. Each teacher assigned or retained to PSAD shall hold a valid teaching certificate issued by the State Board of Education under the Code, to the extent required under the Code and all other requirements as established by the Michigan Department of Education, the Authorizer, and state and federal law.

S.    Detroit 90/90 shall work to provide PSAD with support staff, qualified in the areas required. The parties anticipate that such support staff may include clerical staff, administrative assistants and director, bookkeeping staff, maintenance personnel, and the like.

T.    Detroit 90/90 shall pay its portion of social security, unemployment, and any other taxes required by law to be paid on behalf of its employees assigned to PSAD and hold PSAD harmless from same. Unless required by applicable laws, Detroit 90/90 shall not make payments

4

to the Michigan Public School Employees' Retirement System or any other public retirement system on behalf of its employees.

U.     Detroit 90/90 will be responsible for all necessary 401K regulatory and plan documents as required by law.

V.     Detroit 90/90 shall conduct criminal background checks and unprofessional conduct checks on its employees that are assigned to PSAD and all subcontractors assigned to regularly and continuously work under contract in PSAD as required by law, as if it were a public school academy under the Code.

## **SCHEDULE A**

See attached.



|  | UPSM |
|---|---|
| Budgeted Student Count | 828 |
|  | 32% |
| Salaries and benefits | $ 630,021 |
| Insurance | 27,500 |
| Professional development | 1,762 |
| Professional fees | 10,570 |
| Equipment | 3,844 |
| Internet/Phones/Email/Copier | 9,225 |
| Meetings & Conferenes | 2,082 |
| Office expense | 3,844 |
| Travel & Transportation | 1,602 |
| Contingency | 3,203 |
| Non-Recurring Expenses: |  |
| Consultants | 3,203 |
| Recruiter Fees | 18,578 |
| Total expenses | $ 715,433 |

## SCHEDULE B

[insert educational performance goals ]

BLOOMFIELD 38030-2 1202643v7

Rev. Dated October 31, 2012

# Detroit 90/90

## Our Program. Our Performance. Our Promise.

Detroit 90/90 believes that its schools—University Preparatory Academy (UPA) and University Prep Science & Math (UPSM)—offer a powerful and unique model for teaching and engaging urban children. Our schools are dedicated to educating the whole child in ways that prepare students for success in college, other post-secondary training, and life, as well as ensure high performance on required standardized tests and college entrance exams.

University Prep Schools understand that true college readiness does not depend solely on students' academic success and mastery of standards. Readiness also hinges on developing students as confident, motivated self-managers and problem solvers, with a variety of talents and experiences. These are the characteristics and traits we build in our students, and the reasons our schools are able to graduate students who persist in college and fulfill their dreams.

Key elements of the University Prep Schools model that ensure college readiness for graduates, and are supported by research-based practices, include:

- Rigorous curriculum designed to meet state and federal standards at every level. The University Prep Schools curricula is designed to achieve the benchmarks set out in Michigan's Curriculum Framework and the ACT College Readiness standards—and will evolve to meet the new Common Core standards. Our schools ensure student success on challenging work by providing support in different ways—starting with small classes, personalized learning plans for every student and differentiated instruction that enables advanced learners as well as struggling students to connect to academic content and reach their potential.

- Intentional strategies to build and maintain strong relationships between and among students, parents, and teachers, including small schools, small class sizes, working with a primary teacher/advisor for multiple years, and individual Learning Team meetings. The Advisory program engages students in their learning and gives them the anchor of a caring adult who knows them well. A small and supportive classroom community helps students find their passion, discover dreams, plot their plans and hone the habits of mind and work essential to success in college and in life.

- Curiosity, focus, and effort are critical to student learning. University Prep Schools use personal relationships, a culture of success, integration of technology, and fun, interest-based projects to ensure strong student engagement. When learning is fun, learners invest much more energy and imagination in getting through the hard work. In addition, we employ a wide range of practical, authentic, real-world experiences, from meaningful internships and community service to international travel and college campus tours, to complement academic instruction so that students can navigate the global marketplace with confidence and competence.

- Being able to think, talk, write, and speak about what's being learned is crucial to becoming the self-directed learner demanded for success in college and the world of work. From kindergarten through the 12th grade, University Prep Schools students present public exhibitions of their work several times each year.

- An emphasis on staff development that focuses on effective teaching and learning strategies and continuous improvement. Opportunities for reflection, team critique and data analysis are built into our model. Staff development also is an opportunity for student monitoring and real-time intervention. University Prep Schools use multiple measures that include state achievement tests, the Measures of Academic Progress, ACT practice tests, and a wide variety of classroom-based and building-based assessments to monitor student achievement. The results of these measures are reviewed continuously throughout each school year, and used to identify students needing supplementary instruction. All University Prep Schools have designed robust supplementary instructional programs that offer additional learning opportunities within the school day, after school, and throughout the summer.

Rev. Dated October 31, 2012

## Detroit 90/90 College Ready Goals

- All graduates will have the drive and motivation to achieve their college, career and life goals.

- All graduates will have the focus and self-discipline necessary to follow their life plan and avoid unnecessary distraction.

- All graduates will have the resilience to rebound from difficulties and persist through challenges.

- All graduates will have the confidence to navigate college, know their learning needs and advocate for them.

- All graduates will have the Habits of Work—Collaboration and Citizenship, Organization, Grit and Tenacity,

- Time Management, Self-Management—essential to success and in demand in the workplace.

- All graduates will have significant strong and enduring relationships with caring adults so that they have an anchor and a resource to call upon when they need support.
  - Detroit 90/90 will develop and maintain tracking procedures to assist in measuring college readiness including tracking graduates 2 years in post-secondary education. Such measures will be reported to PSAD on no less than an annual basis.

## Detroit 90/90 Performance Metrics

### *For the high schools:*

- 90% of the freshman high school class entering the high schools each year shall graduate within four years as measured by the Michigan Department of Education graduation rate formula. In applying the four year measurement test, a very limited exception will be made for certain students not entering the high school in the ninth grade.

- 90% of the students who graduate each year shall attend college, other post-secondary studies or enlist in the military.

- Average daily attendance rate for students shall be at least 90% for each school year.

- University Prep Schools agree to set a goal of a 21 composite ACT score by the 11th grade administration of the MME. Progress toward that goal will be measured student—by-student using an agreed upon measure of "reasonable growth," such as the ACT's analysis of such.

- At least 90% of the parents of students enrolled in the high schools shall attend the scheduled learning conferences each school year.

- The enrollment of the incoming freshman class for every year for each of UPA and UPSM shall be 100 or more students.

2

Rev. Dated October 31, 2012

*For the middle schools:*

- Average daily attendance rate for students shall be at least 90% for each school year.

- Eighth graders will score within 10 percent of the state average in reading and math on the state exam, currently the MEAP, and outperform selected districts serving students from comparable demographic backgrounds.

- The middle schools in the University Prep Schools system will administer the Explore—or the actual ACT—to prepare students for success on the high stakes exam.

- Re-enrollment rates shall result in at least 75% of eligible eighth grade students entering the high schools upon graduation from the middle schools each year (students who migrate from middle schools, students who move to other high performing schools as defined by MDE, and students who move out of the area are included in the percentage).

- University Prep Schools will meet whatever metric the state determines will replace Adequate Yearly Progress (AYP).

*For the elementary schools:*

- Each year, at least 90% of the eligible fifth graders will enter the middle schools the following fall.

- 75% of the sixth graders entering the middle schools who attended the elementary schools since kindergarten will read at or above grade level.

- Average daily attendance rate for students shall be at least 90% for each school year.

- University Prep Schools will meet whatever metric the state determines will replace Adequate Yearly Progress (AYP).

## Detroit 90/90 Mandatory Reporting Requirements

*For all schools:*

- Annually, the PSAD Board will be provided certain mandatory reporting data as outlined and in the format as depicted in attached **Exhibit**. This data and the reports are to be provided by October 31st of each school year.

Agreed

Glenda D. Price                                    Public School Academies of Detroit
Detroit 90/90

BLOOMFIELD 38030-32 1231915v2

3

## EXHIBIT B.1

1 of 3

### PSAD - UPA Required Reporting - ENROLLMENT SUMMARY

Date of Report: _____

### UNIVERSITY PREPATORY ACADEMY DISTRICT

| SUMMARY ENROLLMENT DATA | K-5 - Ellen Thompson | K-5 - Mark Murray | Middle School | High School | Total |
|---|---|---|---|---|---|
| LAST YEAR at 5/3/12 | | | | | |
| ORIGINAL BUDGET | | | | | |
| DASHBOARD REPORT - PSAD BOARD MTG. - 9/25/12 | | | | | |
| ENROLLMENT - COUNT DAY - 10/3/12 | | | | | |

### ENROLLMENT BY GRADE - COUNT DAY 10/3/12

| K | | | | | |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| TOTAL | | | | | |

### Individual Classroom Student Size - COUNT DAY 10/3/12

| GRADE | K-5 - Ellen Thompson | K-5 - Ellen Thompson | K-5 - Ellen Thompson | K-5 - Ellen Thompson | Total for K-5 - Ellen Thompson | K-5 - Mark Murray | K-5 - Mark Murray | K-5 - Mark Murray | K-5 - Mark Murray | Total for K-5 - Mark Murray | Total for Both K-5's |
|---|---|---|---|---|---|---|---|---|---|---|---|
| K | | | | | | | | | | | |
| 1 | | | | | | | | | | | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | |

NOTE: FOR Middle School and High School - Submit report named "Count of Studentid" generated through PowerSchool, by Detroit 90/90 Central Office Staff.

Case 2:14-cv-14177-GCS-RSW ECF No. 46, PageID.1541 Filed 05/18/15 Page 152 of 160
Case 2:14-cv-14177-GCS-RSW Doc # 142, PageID 12385 Filed 01/12/15 Pg 152 of 160
2 of 3

# PSAD - UPA Required Reporting - GRADE TO GRADE STUDENT ATTRITION
## UNIVERSITY PREPATORY ACADEMY DISTRICT

| GRADE | K-5 - Ellen Thompson | | | K-5 - Mark Murray | | | Middle School | | | High School | | | ALL SCHOOL BUILDINGS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # of Students @ end of school year 6/30/12 | # of new students enrolled | # of Students on Count day 10/3/12 next grade up | # of Students @ end of school year 6/30/12 | # of new students enrolled | # of Students on Count day 10/3/12 next grade up | # of Students @ end of school year 6/30/12 | # of new students enrolled | # of Students on Count day 10/3/12 next grade up | # of Students @ end of school year 6/30/12 | # of new students enrolled | # of Students on Count day 10/3/12 next grade up | # of Students @ end of school year 6/30/12 | # of new students enrolled | # of Students on Count day 10/3/12 next grade up |
| (left UPA) | that left UPA | | | that left UPA | | | that left UPA | | | that left UPA | | | that left UPA | | |
| K | | | | | | | | | | | | | | | |
| 1 | | | | | | | | | | | | | 0 | 0 | 0 |
| 2 | | | | | | | | | | | | | 0 | 0 | 0 |
| 3 | | | | | | | | | | | | | 0 | 0 | 0 |
| 4 | | | | | | | | | | | | | 0 | 0 | 0 |
| 5 | | | | | | | FOR SIXTH GRADE BELOW, USE TOTAL OF BOTH K-5'S | | | | | | 0 | 0 | 0 |
| 6 | | | | | | | | | | | | | 0 | 0 | 0 |
| 7 | | | | | | | | | | | | | 0 | 0 | 0 |
| 8 | | | | | | | FOR EIGHTH GRADE BELOW, USE UPA Middle School | | | | | | 0 | 0 | 0 |
| 9 | | | | | | | | | | | | | 0 | 0 | 0 |
| 10 | | | | | | | | | | | | | 0 | 0 | 0 |
| 11 | | | | | | | | | | | | | 0 | 0 | 0 |
| 12 | | | | | | | | | | | | | 0 | 0 | 0 |
| TOTAL | | | | | | | | | | | | | 0 | 0 | 0 |

From 5th grade
From 8th grade
From other grades

NOTE: NUMBER OF STUDENTS THAT MATRICULATED TO UPSM AND/OR HFA-SCS

Check figures horizontally

| PSAD - UPA Required Reporting - GRADE TO GRADE TEACHER ATTRITION |
|---|

| UNIVERSITY PREPATORY ACADEMY DISTRICT |
|---|

| Building | # of Teachers @ end of 2011-12 school year | # of Teachers that left UPA | # of new Teachers hired | # of Teachers at start of school - Fall 2012 |
|---|---|---|---|---|
| K-5 -Ellen Thompson | | | | |
| K-5 - Mark Murray | | | | - |
| Middle School | | | | - |
| High School | | | | - |
| TOTAL | - | - | - | - |

| Type of Employee | Number @ end of 2011-12 school year | Number that left UPA | # of new hires | Number at start of school - Fall 2012 |
|---|---|---|---|---|
| Principal | | | | - |
| Team Leaders | | | | - |
| Special Education | | | | - |
| Specialists | | | | - |
| Counselors | | | | - |
| Other Teaching | | | | - |
| Other | | | | - |
| TOTAL | - | - | - | - |

# EXHIBIT B.1

1 of 3

## PSAD - UPSM Required Reporting - ENROLLMENT SUMMARY

Date of Report: _____

| UNIVERSITY PREP SCIENCE AND MATH DISTRICT | | | | |
|---|---|---|---|---|
| SUMMARY ENROLLMENT DATA | K-5 - FALL 2013 | Middle School | High School | Total |
| LAST YEAR at 5/3/12 | | | | |
| ORIGINAL BUDGET | | | | |
| DASHBOARD REPORT - PSAD BOARD MTG. - 9/25/12 | | | | |
| ENROLLMENT - COUNT DAY - 10/3/12 | | | | |

| ENROLLMENT BY GRADE - COUNT DAY 10/3/12 | K-5 - FALL 2013 | Middle School | High School | Total |
|---|---|---|---|---|
| K | | | | |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| TOTAL | | | | |

| Individual Classroom Student Size - COUNT DAY Fall 2013 | | | | |
|---|---|---|---|---|
| GRADE | K-5 - Fall 2013 | K-5 - Fall 2013 | K-5 - Fall 2013 | K-5 - Fall 2013 | Total for K-5 - Fall 2013 |
| K | | | | |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| TOTAL | | | | |

NOTE: FOR Middle School and High School - Submit report named "Count of Studentid" generated through PowerSchool, by Detroit 90/90 Central Office Staff.

Case 2:14-cv-14177-GCS-RSW ECF No. 46, PageID.1544 Filed 05/18/15 Page 155 of 160
Case 2:14-cv-14177-GCS-RSW Doc # 1-42 Filed 01/12/15 Pg 92 of 885 Page 257

2 of 3

## PSAD - UPSM Required Reporting - GRADE TO GRADE STUDENT ATTRITION
### UNIVERSITY PREP SCIENCE AND MATH DISTRICT

| GRADE | K-5 - Fall 2013 | | | | Middle School | | | | High School | | | | ALL SCHOOL BUILDINGS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # of Students @ end of school year 6/30/13 | # of Students that left UPA | # of new students enrolled | # of Students on Count day 10/1/13 | # of Students @ end of school year 6/30/12 | # of Students that left UPA | # of new students enrolled | # of Students on Count day 10/1/12 next grade up | # of Students @ end of school year 6/30/12 | # of Students that left UPA | # of new students enrolled | # of Students on Count day 10/1/12 next grade up | # of Students @ end of school year 6/30/12 | # of Students that left UPA | # of new students enrolled | # of Students on Count day 10/1/12 next grade up |
| K | | | | | | | | | | | | | | | | |
| 1 | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | |
| 5 | | | | | FOR SIXTH GRADE BELOW, USE UPSM K-5 | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | FOR EIGHTH GRADE BELOW, USE UPSM Middle School | | | | | | | |
| 9 | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | | | | |

From 5th grade | From 8th grade | From other grades

NOTE: NUMBER OF STUDENTS THAT MATRICULATED TO UPA AND/OR HFA-SCS

Check figures horizontally

| PSAD - UPSM Required Reporting - GRADE TO GRADE TEACHER ATTRITION |||||
|---|---|---|---|---|
| **UNIVERSITY PREP SCIENCE AND MATH DISTRICT** |||||
| Building | # of Teachers @ end of 2011-12 school year | # of Teachers that left UPA | # of new Teachers hired | # of Teachers at start of school - Fall 2012 |
| K-5 -Fall 2013 | | | | |
| Middle School | | | | |
| High School | | | | - |
| **TOTAL** | - | - | - | - |

| Type of Employee | Number @ end of 2011-12 school year | Number that left UPA | # of new hires | Number at start of school - Fall 2012 |
|---|---|---|---|---|
| Principal | | | | - |
| Team Leaders | | | | - |
| Special Education | | | | - |
| Specialists | | | | - |
| Counselors | | | | - |
| Other Teaching | | | | - |
| Other | | | | - |
| **TOTAL** | - | - | - | - |

## INDEPENDENT CONTRACTOR AGREEMENT AMENDMENT

This Independent Contractor Agreement Amendment (the "Amendment") is made effective as of September 10, 2012 by and between **DETROIT 90/90, LLC**, a Michigan nonprofit corporation ("Detroit 90/90") and **THE PUBLIC SCHOOL ACADEMIES OF DETROIT,** a Michigan public school academy (the "PSAD") formed under Part 6c of the Revised School Code, Public Act 451 of 1976 (the "Code"), as amended.

THEREFORE, the parties agree as follows:

PSAD is an urban high school academy organized under the Code.  PSAD has been issued a contract (the "Contract") by **GRAND VALLEY STATE UNIVERSITY BOARD OF TRUSTEES** (the "Authorizer") to organize and operate one or more urban high school academies.

PSAD and Detroit 90/90 entered into an Independent Contractor Agreement dated July 1, 2012 (the "UPSM-ICA") to deliver systems of educational excellence and services to PSAD and its University Preparatory Science and Math urban high school academy ("UPSM").

PSAD and Detroit 90/90 desire to amend the UPSM-ICA.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein set forth, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Agreement, as follows:

1.      Paragraph J of Exhibit A shall be amended by restating the paragraph in its entirety as follows:

Detroit 90/90 shall implement pupil performance evaluations consistent with the Educational Program, which permit evaluation of the educational progress of each PSAD student.  Detroit 90/90 shall be responsible for and accountable to the Board for the performance of students who attend PSAD and shall meet the educational performance requirements of the Contract and any lease provision entered into by PSAD for the UPSM facilities.  At a minimum, Detroit 90/90 shall utilize assessment strategies required by the Educational Program and the Authorizer.  PSAD and Detroit 90/90 will cooperate in good faith to identify other measures of and goals for students and school performance.  Such other measures of and goals for students and school performance shall be initially identified in a signed writing by the parties and the Contract Administrator by **November 1, 2012** and shall be included as **Schedule B** to the Independent Contractor Agreement.

[Signature Page Follows]

The undersigned execute this Agreement as of the date set forth above.

**PUBLIC SCHOOL ACADEMIES OF DETROIT**, a Michigan nonprofit corporation

By: _____
            Edward Parks, President

**DETROIT 90/90**, a Michigan nonprofit corporation

By: _____
            Dr. Glenda Price, President

BLOOMFIELD 38030-2 1222807v1

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTINE SHEU and
GABRIELA GUI,

      Plaintiffs,                        Case No. 2:14-cv-14177

v                                   Hon. George Caram Steeh

DETROIT 90/90, et al.

      Defendants.

| | |
|---|---|
| Robert L. Levi (P42598)<br>ROBERT L. LEVI, P.C.<br>6675 Edwood Avenue<br>West Bloomfield, MI  48324<br>(248) 366-4412<br>robert@robertlevilaw.com<br>*Attorneys for Plaintiffs* | Peter H. Webster (P48783)<br>Aimee R. Gibbs (P70522)<br>DICKINSON WRIGHT PLLC<br>2600 W. Big Beaver Road, Suite 300<br>Troy, MI  48084<br>(248) 433-7513<br>pwebster@dickinsonwright.com<br>agibbs@dickinsonwright.com<br>*Attorneys for Defendants Public School*<br>*Academies of Detroit and its Board* |
| | Maria F. Dwyer (P34335)<br>Brian D. Shekell (P75327)<br>CLARK HILL PLC<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>(313) 965-8300<br>mdwyer@clarkhill.com<br>bshekell@clarkhill.com<br>*Attorneys for Defendants Detroit 90/90, Board Of*<br>*Directors of Detroit 90/90, Axios International,*<br>*Inc., A.I. Central, LLC, Board Of Directors of*<br>*Axios Incorporated, and Axios, Incorporated.* |

## CERTIFICATE OF SERVICE

On the date below I served a copy of the Plaintiffs' First Amended Complaint and Jury Demand, and this Certificate of Service on

**Brian Shekell pbright@clarkhill.com, bshekell@clarkhill.com**

**Ryan M. Shannon pburnett@dickinsonwright.com, rshannon@dickinsonwright.com**

**Peter H. Webster mluyckx@dickinsonwright.com, pwebster@dickinsonwright.com**

**Maria Fracassa Dwyer mdwyer@clarkhill.com, pproffitt@clarkhill.com**

**Aimee R. Gibbs agibbs@dickinsonwright.com, jtinney@dickinsonwright.com**

through the Court's ECF system.

I declare that the statements above are true to the best of information, knowledge, and belief.

Dated:  May 18, 2015

> /s/    Robert L. Levi
> Robert L. Levi
> 6675 Edwood Ave.
> West Bloomfield, MI 48324
> (248)366-4412
> robert@robertlevilaw.com
> (P42598)

2